## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK D. CHAPMAN, LEROY GWINN JR., WILLIAM MCDUFFIE, GARY GODWIN, CLAY KINCHELOE, BRYAN JOYCE, TIM TAYLOR, MICHAEL GREGORY, MICHAEL JON MCCORMICK, ARNOLD RECCHIA, BRUCE DAWSON, JOHN TAMBURINI, WILLIAM FORTMEYER, RYAN BEGNEAUD, JOHN CAPPIELLO, NATHAN HOWTON, TRISHA ALLISS, RICHARD EGLEBERRY, CALVIN SMITH, STACY WADE SIZELOVE, NICHOLAS ALLEN MILLER, KEVIN ALLEN LAWSON, HOLLY REASOR, and MELODY ANNE DEARBORN, individually and on behalf of themselves and all others similarly situated, | Cause No. 19-cv-12333 |
| | **CONSOLIDATED AND SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS LLC, a Delaware corporation, | |
| Defendant. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................1

II.   PARTIES...........................................................................6

    A.   The Plaintiffs. ...........................................................6

        1.   Plaintiff Mark D. Chapman ........................7

        2.   Plaintiff Leroy Gwinn Jr. .........................11

        3.   Plaintiff William McDuffie .......................13

        4.   Plaintiff Gary Godwin................................16

        5.   Plaintiff Clay Kincheloe............................18

        6.   Plaintiff Bryan Joyce ................................21

        7.   Plaintiff Tim Taylor ..................................24

        8.   Plaintiff Michael Gregory .........................27

        9.   Plaintiff Michael Jon McCormick ............29

        10.  Plaintiff Arnold Recchia ...........................32

        11.  Plaintiff Bruce Dawson .............................35

        12.  Plaintiff John Tamburini ...........................40

        13.  Plaintiff William Fortmayer ......................44

        14.  Plaintiff Ryan Begneaud ...........................46

        15.  Plaintiff John Cappiello ............................49

        16.  Plaintiff Nathan Howton ...........................52

        17.  Plaintiff Trisha Alliss................................56

        18.  Plaintiff Richard Egleberry .......................58

        19.  Plaintiff Calvin Smith ...............................62

        20.  Plaintiff Stacy Wade Sizelove ...................64

        21.  Plaintiff Nicholas Allen Miller..................68

        22.  Plaintiff Kevin Allen Lawson ...................71

        23.  Plaintiff Holly Reasor ...............................73

        24.  Plaintiff Melody Anne Dearborn...............77

|       | B.    | The Defendant. ....................................................... | 79  |
|       |       | 1.   General Motors LLC ................................. | 79  |
| III.  | JURISDICTION AND VENUE ..................................... | | 80  |
| IV.   | FACTUAL ALLEGATIONS ........................................ | | 81  |
|       | A.    | The Class Vehicles............................................... | 81  |
|       | B.    | GM Profits from the Rise of Diesel Vehicles in the United States. ................................................... | 82  |
|       | C.    | The Fragile CP4 Fuel Pump Design. ................. | 89  |
|       | D.    | Characteristics of U.S. Diesel Fuel................... | 102 |
|       | E.    | The Unreliability of U.S. Diesel Fuel. ............. | 109 |
|       | F.    | Water in U.S. Diesel Fuel. ................................ | 111 |
|       | G.    | Dirt/Corrosion Particles and Gasoline Contamination in U.S. Diesel Fuel................... | 112 |
|       | H.    | Pre-Class Period Failures and Industry Knowledge........................ | 112 |
|       | I.    | The CP4 Defect Poses an Inherent Risk to Vehicle Occupant Safety and Renders the Class Vehicles *Per Se* Defective. .............. | 127 |
|       | J.    | The Cost and Damage from "Progressive" CP4 Failures Are Significant. ..................... | 147 |
|       | K.    | GM Knew Durability and Superiority Were Material to Consumers and Falsely Promised its Trucks Were Durable and Superior................... | 153 |
|       | L.    | GM's "Certified Pre-Owned" Vehicle Sales Allow GM to Further Profit Off of its Fraudulent Conduct. .................. | 160 |
|       | M.    | Allegations Establishing Agency Relationship Between Manufacturer GM and GM Dealerships. ........................ | 162 |
| V.    | TOLLING OF THE STATUTE OF LIMITATIONS ................. | | 167 |
| VI.   | CLASS ACTION ALLEGATIONS ................................... | | 171 |
| VII.  | CAUSES OF ACTION ............................................... | | 181 |
|       | A.    | Multi-State Claims.............................................. | 181 |

- ii -

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT 15 U.S.C. § 2301, *ET. SEQ.* ............................................................ 181

    B.    Texas Allegations .......................................................... 186

COUNT II FRAUDULENT CONCEALMENT (COMMON LAW) ................ 187

COUNT III BREACH OF CONTRACT (COMMON LAW) ........................... 195

    C.    Claims Brought on Behalf of the Alabama Class. ......................... 197

COUNT I VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE
PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ.*) .............................. 197

COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (ALA. CODE § 7-2-314) .................................... 202

COUNT III UNJUST ENRICHMENT .............................................................. 203

    D.    Claims Brought on Behalf of the Alaska Class ............................... 204

COUNT I VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (ALASKA
STAT. ANN. § 45.50.471, *ET SEQ.*) ......................................................... 204

COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (ALASKA STAT. § 45.02.314) .......................... 206

    E.    Claims Brought on Behalf of the Arizona Class. ............................. 207

COUNT I VIOLATIONS OF THE ARIZONA CONSUMER FRAUD
ACT (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*) ....................................... 207

COUNT I VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE
ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) ..................................... 212

COUNT II BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (ARK. CODE ANN. § 4-2-314) ........................ 218

    F.    Claims Brought on Behalf of the California Class ........................... 219

COUNT I VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET
SEQ.*) ....................................................................................................... 219

COUNT II  VIOLATIONS OF THE CONSUMER LEGAL REMEDIES
ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*)............................225

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (CAL. COM. CODE §§ 2314 AND
10212)..........................................................................................................231

COUNT IV  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (CAL. CIV. CODE § 1791, *ET SEQ.*) ...............235

    G.    Claims Brought on Behalf of the Colorado Class. ...........................236

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER
PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*) .............236

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (COLO. REV. STAT. § 4-2-314) .......................242

COUNT III  UNJUST ENRICHMENT ............................................................244

    H.    Claims Brought on Behalf of the Connecticut Class.......................245

COUNT I  VIOLATIONS OF THE CONNECTICUT UNFAIR  TRADE
PRACTICES ACT (CONN. GEN. STAT. ANN. § 42-110A
*ET SEQ.*)....................................................................................................245

COUNT II  UNJUST ENRICHMENT..............................................................250

    I.    Claims Brought on Behalf of the District of Columbia (D.C.)
Class. ...........................................................................................251

COUNT I  VIOLATIONS OF THE CONSUMER PROTECTION
PROCEDURES ACT (D.C. CODE § 28-3901, *ET SEQ.*).........................251

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (D.C. CODE § 28:2-314)...................................257

    J.    Claims Brought on Behalf of the Delaware Class. ..........................258

COUNT I  VIOLATIONS OF THE DELAWARE CONSUMER
FRAUD ACT (DEL. CODE §§ 2513, *ET SEQ.*).......................................258

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (6. DEL. CODE § 2-314)...................................264

    K.    Claims Brought on Behalf of the Florida Class. ..............................265

COUNT I  VIOLATIONS OF THE FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT ("FDUTPA"), (FLA. STAT.
ANN. § 501.201, *ET SEQ.*)........................................................................265

COUNT II  UNJUST ENRICHMENT................................................................267

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY, (FLA. STAT. ANN. §§ 672.314 AND
680.212)................................................................................................269

    L.    Claims Brought on Behalf of the Georgia Class............................272

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS
PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*)..................272

COUNT II  VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE
TRADE PRACTICES ACT (GA. CODE ANN. § 10-1-370
*ET SEQ.*)...............................................................................................277

COUNT III  UNJUST ENRICHMENT..............................................................278

    M.    Claims Brought on Behalf of the Hawaii Class............................279

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF
HAWAII LAW (HAW. REV. STAT. ANN. §§ 480, *ET SEQ.*)...............279

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY (HAW. REV. STAT. ANN. § 490:2-314)...........284

    N.    Claims Brought on Behalf of the Idaho Class...............................285

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER
PROTECTION ACT (IDAHO CIV. CODE § 48-601 *ET SEQ.*)..............285

COUNT II  UNJUST ENRICHMENT................................................................290

    O.    Claims Brought on Behalf of the Illinois Class............................292

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND  DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS
505/1 *ET SEQ.* AND 720 ILCS 295/1A)....................................................292

COUNT II  BREACH OF THE IMPLIED WARRANTY FOR
MERCHANTABILITY (810 ILCS 5/2-314) ............................................297

COUNT III  UNJUST ENRICHMENT ............................................................298

    P.    Claims Brought on Behalf of the Indiana Class................................299

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)..........................299

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (IND. CODE § 26-1-2-314)................................305

COUNT III  UNJUST ENRICHMENT ............................................................306

    Q.    Claims Brought on Behalf of the Iowa Class...................................307

COUNT I  CONSUMER FRAUDS ACTS IN VIOLATION OF IOWA
LAW (IOWA CODE § 714H.1 *ET SEQ.*)..................................................307

    R.    Claims Brought on Behalf of the Kansas Class. ..............................312

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER
PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*) ...............312

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (KAN. STAT. ANN. § 84-2-314) .......................319

    S.    Claims Brought on Behalf of the Kentucky Class. ..........................320

COUNT I  VIOLATIONS OF THE KENTUCKY CONSUMER
PROTECTION ACT (KY. REV. STAT. ANN. § 367.110
*ET SEQ.*)...................................................................................................320

    T.    Claims Brought on Behalf of the Louisiana Class. ..........................325

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (LA.
STAT. ANN. § 51:1401 *ET SEQ.*)............................................................325

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY/ WARRANTY AGAINST
REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524) ...........331

    U.    Claims Brought on Behalf of the Maine Class. ...............................332

COUNT I  VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A
*ET SEQ.*)...................................................................................................332

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
　　　MERCHANTABILITY (ME. REV. STAT. ANN. TIT. § 2-314) ............337

　　　V.　Claims Brought on Behalf of the Maryland Class. .........................339

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER
　　　PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101
　　　*ET SEQ.*).................................................................................................339

COUNT II  BREACH OF IMPLIED WARRANTY OF
　　　MERCHANTABILITY (MD. CODE COM. LAW § 2-314) ...................345

　　　W.　Claims Brought on Behalf of the Massachusetts Class. ..................346

COUNT I  VIOLATIONS OF THE MASSACHUSETTS CONSUMER
　　　PROTECTION ACT (MASS. GEN. LAWS CH. 93A)............................346

COUNT II  BREACH OF IMPLIED WARRANTY OF
　　　MERCHANTABILITY (MASS. GEN. LAWS CH. 106, § 2-314) ...........351

　　　X.　Claims Brought on Behalf of the Michigan Class. .........................352

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER
　　　PROTECTION ACT  (MICH. COMP. LAWS § 445.903 *ET SEQ.*).........352

COUNT II  BREACH OF IMPLIED WARRANTY OF
　　　MERCHANTABILITY (MICH. COMP. LAWS § 440.2314) ..................358

COUNT III  UNJUST ENRICHMENT ..............................................................360

　　　Y.　Claims Brought on Behalf of the Minnesota Class. ........................361

COUNT I  VIOLATION OF THE MINNESOTA PREVENTION OF
　　　CONSUMER FRAUD ACT  (MINN. STAT. § 325F.68 *ET SEQ.*) ..........361

COUNT II  BREACH OF IMPLIED WARRANTY OF
　　　MERCHANTABILITY (MINN. STAT. § 336.2-314)..............................366

　　　Z.　Claims Brought on Behalf of the Mississippi Class.........................368

COUNT I  BREACH OF IMPLIED WARRANTY OF
　　　MERCHANTABILITY (MISS. CODE ANN. § 75-2-314).......................368

　　　AA.　Claims Brought on Behalf of the Missouri Class. ...........................369

COUNT I  VIOLATIONS OF THE MISSOURI MERCHANDISING
     PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*)....................369

COUNT II  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (MO. REV. STAT. § 400.2-314) .......................374

COUNT III  UNJUST ENRICHMENT .............................................................376

    BB.   Claims Brought on Behalf of the Montana Class............................377

COUNT I  VIOLATION OF MONTANA UNFAIR TRADE
     PRACTICES AND CONSUMER PROTECTION ACT OF 1973
     (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)..........................................377

COUNT II  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (MONT. CODE ANN. § 30-2-314) ...................382

    CC.   Claims Brought on Behalf of the Nebraska Class...........................383

COUNT I  VIOLATION OF THE NEBRASKA CONSUMER
     PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*) ..............383

COUNT II  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (NEB. REV. STAT. § 30-2-314) .......................389

    DD.   Claims Brought on Behalf of the Nevada Class. ............................390

COUNT I  VIOLATIONS OF THE NEVADA DECEPTIVE TRADE
     PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)................390

COUNT II  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (NEV. REV. STAT. § 104.2314).......................395

    EE.   Claims Brought on Behalf of the New Hampshire Class.................397

COUNT I  VIOLATION OF NEW HAMPSHIRE CONSUMER
     PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1
     *ET SEQ.*)..................................................................................................397

COUNT II  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY (N.H. REV. STAT. ANN. § 382-A:2-314) .........403

COUNT III  UNJUST ENRICHMENT .............................................................405

    FF.   Claims Brought on Behalf of the New Jersey Class. ......................406

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER
FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ...............................406

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.J. STAT. ANN. § 12A:2-314)......................412

    GG.   Claims Brought on Behalf of the New Mexico Class. ....................413

COUNT I  VIOLATIONS OF THE NEW MEXICO UNFAIR  TRADE
PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*) ..................413

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.M. STAT. ANN. § 55-2-314) .......................419

    HH.   Claims Brought on Behalf of the New York Class. ........................421

COUNT I  VIOLATIONS OF NEW YORK GENERAL BUSINESS
LAW § 349 (N.Y. GEN. BUS. LAW § 349)..............................................421

COUNT II  VIOLATIONS OF NEW YORK GENERAL BUSINESS
LAW § 350 (N.Y. GEN. BUS. LAW § 350)..............................................426

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. § 2-314) ........................................431

COUNT IV  UNJUST ENRICHMENT ..............................................................432

    II.     Claims Brought on Behalf of the North Carolina Class. ..................433

COUNT I  VIOLATIONS OF THE NORTH CAROLINA UNFAIR
AND  DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN.
STAT. § 75-1.1 *ET SEQ.*) .........................................................................433

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.C. GEN. STAT. § 25-2-314)..........................438

    JJ.    Claims Brought on Behalf of the North Dakota Class. ....................440

COUNT I  VIOLATIONS OF THE NORTH DAKOTA CONSUMER
FRAUD ACT (N.D. CENT. CODE § 51-15-02)......................................440

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.D. CENT. CODE § 41-02-31) .......................446

    KK.   Claims Brought on Behalf of the Ohio Class....................................448

COUNT I  VIOLATIONS OF THE OHIO CONSUMER SALES
PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*) .................448

COUNT II  BREACH OF IMPLIED WARRANTY IN TORT..........................454

    LL.   Claims Brought on Behalf of the Oklahoma Class. .........................455

COUNT I  VIOLATION OF OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*) ...............455

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (OKLA. STAT. ANN. § 12A-2-314)..................462

    MM.  Claims Brought on Behalf of the Oregon Class..............................464

COUNT I  VIOLATIONS OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT  (OR. REV. STAT. § 646.605, *ET SEQ.*) ..................464

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (OR. REV. STAT. § 72-3140) ..........................470

    NN.   Claims Brought on Behalf of the Pennsylvania Class.....................471

COUNT I  VIOLATIONS OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 P.S. § 201-1 *ET SEQ.*) ........................................................471

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (13 PA. CONS. STAT. ANN. § 2314)...............477

COUNT III  UNJUST ENRICHMENT ...........................................................478

    OO.   Claims Brought on Behalf of the Rhode Island Class.....................480

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN.
LAWS § 6-13.1 *ET SEQ.*).........................................................480

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (R.I. GEN. LAWS § 6A-2-314).........................482

COUNT III  UNJUST ENRICHMENT ...........................................................484

    PP.   Claims Brought on Behalf of the South Carolina Class. .................485

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10
*ET SEQ.*)....................................................................................................485

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA
REGULATION OF MANUFACTURERS, DISTRIBUTORS,
AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET SEQ.*)............491

COUNT III  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (S.C. CODE ANN. § 36-2-314)..........................493

QQ.    Claims Brought on Behalf of the South Dakota Class. ...................494

COUNT I  VIOLATIONS OF SOUTH DAKOTA DECEPTIVE TRADE
PRACTICES AND CONSUMER PROTECTION LAW (S.D.
CODIFIED LAWS § 37-24-1 *ET SEQ.*) ...................................................494

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (S.D. CODIFIED LAWS § 57A-2-314)..............500

RR.    Claims Brought on Behalf of the Tennessee Class. .........................501

COUNT I  VIOLATIONS OF THE TENNESSEE CONSUMER
PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET SEQ.*) .........501

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (TENN. CODE ANN. § 47-2-314) ....................507

SS.    Claims Brought on Behalf of the Utah Class..................................509

COUNT I  VIOLATIONS OF THE UTAH CONSUMER SALES
PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)................509

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (UTAH CODE ANN. § 70A-2-314)...................516

TT.    Claims Brought on Behalf of the Vermont Class............................517

COUNT I  VIOLATIONS OF THE VERMONT CONSUMER FRAUD
ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)....................................517

COUNT II  BREACH OF IMPLIED WARRANTY OF
MERCHANTIBILITY (VT. STAT. ANN. TIT. 9A, § 2-314) .................518

UU.    Claims Brought on Behalf of the Virginia Class. ...........................520

COUNT I  VIOLATIONS OF THE VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*) ...............520

COUNT II  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (VA. CODE ANN. § 8.2-314) ...........................526

    VV.   Claims Brought on Behalf of the Washington Class.......................528

COUNT I  VIOLATIONS OF THE WASHINGTON CONSUMER
    PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010
    *ET SEQ.*)................................................................................528

COUNT II  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (WASH. REV. CODE ANN. § 62A.2-
    314) ..........................................................................................534

    WW. Claims Brought on Behalf of the West Virginia Class. ..................537

COUNT I  VIOLATIONS OF THE WEST VIRGINIA CONSUMER
    CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101
    *ET SEQ.*)................................................................................537

COUNT II  BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (W. VA. CODE § 46-2-314)...............................543

    XX.   Claims Brought on Behalf of the Wisconsin Class. ........................545

COUNT I  VIOLATIONS OF THE WISCONSIN  DECEPTIVE
    TRADE PRACTICES ACT (WIS. STAT. § 110.18)...............................545

    YY.   Claims Brought on Behalf of the Wyoming Class..........................550

COUNT I  VIOLATIONS OF THE WYOMING CONSUMER
    PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*)..................550

COUNT II  BREACH OF THE IMPLIED WARRANTY OF
    MERCHANTABILITY (WYO. STAT. §§ 34.1-2-314)...........................556

PRAYER FOR RELIEF.................................................................558

DEMAND FOR JURY TRIAL.........................................................559

Plaintiffs Mark D. Chapman, Leroy Gwinn Jr., William McDuffie, Gary Godwin, Clay Kincheloe, Bryan Joyce, Tim Taylor, Michael Gregory, Michael Jon McCormick, Arnold Recchia, Bruce Dawson, John Tamburini, William Fortmeyer, Ryan Begneaud, John Cappiello, Nathan Howton, Trisha Alliss, Richard Egleberry, Calvin Smith, Stacy Wade Sizelove, Nicholas Allen Miller, Kevin Allen Lawson, Holly Reasor, and Melody Anne Dearborn, and individually and on behalf of all others similarly situated ("the Class"), file this suit against Defendant General Motors LLC ("GM"). This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I.    INTRODUCTION

1.    General Motors LLC ("GM") designed, manufactured, distributed, and sold hundreds of thousands of 2011-2016 GMC and Chevrolet diesel trucks equipped with 6.6L Duramax engines (the "Class Vehicles") which contain defective high-pressure fuel injection pumps (the "CP4 pump") designed by Robert Bosch GmbH ("Bosch"). GM has concealed from consumers the crucial fact that the CP4 pump has a fragile and unstable design, which causes metal parts to rub against each other on the first day of operation and through the life of the vehicle. This friction generates metal shavings that contaminate the fuel system, which inevitably

will cause component wear, and can lead to catastrophic engine failure. GM never disclosed this critical defect to consumers at the point of sale or in any other communication.

2.     The design of the CP4 pump is fundamentally flawed in several respects. While cheap and simple, the pump is—as others have described it—a ticking "time bomb." As GM knew, the CP4 pump's fragile design—which generates metal shavings in the fuel system regardless of fuel quality—is particularly incompatible with U.S. diesel fuel, which is "dry" and not lubricious. The CP4 pump uses the fuel itself for lubrication, and the design of the pump requires a cam and two pumping cylinders with individual rollers to seamlessly roll together without skipping, sliding, sticking, or wearing to operate effectively. Since standard U.S. diesel fuel is not lubricious, the wear on the cam and rollers is accelerated, producing an even greater number of tiny metal shavings that disperse throughout the high-pressure fuel injection system.

3.     The release of these metal shavings into the fuel system can be catastrophic, as it eventually causes the fuel injectors to become blocked and leads to an entire shutdown of the engine. Repair costs for a catastrophic failure are at least $10,000 and are time-intensive; however, any such repair is futile because it will not actually fix the issue so long as the vehicle is being filled with U.S. diesel fuel.

4.     Catastrophic failure can occur as early as mile one, as the fuel injection disintegration process begins at the very first fill of the tank and start of the engine, with pump components beginning to deteriorate and dispersing metal shavings throughout the internal engine components and fuel supply system. And catastrophic failure often causes the vehicle to shut off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system and engine component parts have been completely contaminated with metal shards. This presents an inherent and substantial risk to consumer safety—one which GM itself has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles.

5.     Even short of catastrophic failure, the fragile pump design will inevitably lead to pump component wear that damages the fuel injectors, or causes them to inject fuel at times and rates which causes significant harm to the component parts of the vehicle's engine. There are numerous ways in which the defective pump can harm the engine and related components, including: (1) over-fueling, which decreases fuel economy; (2) broken injector tips; (3) fuel spray hitting the cylinder wall, causing dilution of the lube oil, which damages the engine; (4) over-heating of cylinders causing wear damage to the cylinders; (5) melted or twisted pistons; (6) damaged exhaust valves; (7) damaged turbochargers; (8) hydraulic lock; (9) damaged cylinder heads; (10) damaged exhaust manifolds; and (11) damage

and/or loss of emission control (including increases in NOx, particulates, and carbon dioxide).

6.     GM's frequent company line is to blame catastrophic failures on "contaminated fuel," which is not covered under warranty because it is "not caused by" GM. But poor fuel quality is not the primary cause of pump failure, because the defect is inherent in the pump design itself. Other diesel trucks without the CP4 pump do not have these problems. It is also unfair to blame customers for "bad" fuel because it is effectively impossible for customers to determine the quality of their fuel when they fill up at the pump—and one "bad" fueling can lead to catastrophic failure.

7.     Some victims of GM's scheme are businesses who own several vehicles and have suffered multiple failures. Others have spent hundreds or thousands of dollars on repairs and mitigation efforts. The Class Vehicles themselves come with a hefty price tag, ranging from approximately $42,000 to $67,000. Diesel owners pay a premium of approximately $5,000 to $8,000 for their vehicles because diesel engines are traditionally expected to last for a range of 500,000–800,000 miles. [1]

---

[1] *See* WorkTruckOnline.com, *Pros & Cons: Diesel vs. Gas in Class 3-4 Trucks* (Nov. 3, 2011), available at https://www.worktruckonline.com/147984/pros-and-cons-of-gas-vs-diesel-in-class-3-4-trucks; PickupTrucks.com, *Considering a Diesel Pickup? Here Are Costs to Ponder* (Sept. 8, 2018), available at https://news.pickuptrucks.com/2018/09/considering-a-diesel-pickup-here-are-costs-to-ponder.html.

8.     Well before GM ever chose to use the CP4 pump, the issue of U.S. diesel fuel lubrication was well-known throughout the auto manufacturing industry, but was completely disregarded in the design, manufacture, marketing, and sales or leases of the Class Vehicles. GM, as well as fellow domestic automotive manufacturers Ford and FCA, had industry-wide experience with catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which GM is a member company[2]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in high-pressure fuel injection system components.

9.     GM and its affiliates knowingly and intentionally deceived American consumers through its consistent representations to consumers in order to sell the Class Vehicles. Through representations by GM dealers, and through GM's advertisements online, in print, on TV, and on the radio, GM promised consumers the continued reliability of their diesel engines, but with increased fuel efficiency and power at greater fuel efficiency. These representations were false, and GM failed to disclose the defect, passing along the substantial cost of the defect to consumers.

---

[2] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Feb. 25, 2020).

10.     No Plaintiff—indeed, no reasonable consumer—would have purchased or leased these vehicles if GM's disclosures had been materially truthful. And certainly no consumer would have paid a premium for these defective trucks or paid the price they were charged.

11.     When consumers have complained, in order to deny warranty claims GM has blamed vehicle owners for the presence of metal wear particles in the fuel, even though these fragments were produced by the pump's faulty design. GM has further sought to delay vehicle owners' discovery of the damage through re-defining "failure" and delaying repairs, in the hopes that the final and catastrophic failure occurs out of warranty.

12.     Plaintiffs accordingly bring this class action complaint to recover on behalf of the class all relief to which they are entitled, including but not limited to recovery of the purchase price of their vehicles, compensation for overpayment and diminution in value of their vehicles, out-of-pocket and incidental expenses, disgorgement of GM's unjustly derived profits, and an injunction compelling GM to replace or recall and fix the Class Vehicles.

## II.     PARTIES

A.     **The Plaintiffs.**

13.     For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Year | State |
|---|---|---|---|---|
| Mark D. Chapman | Chevrolet | Silverado 2500 HD | 2016 | NY |
| Leroy Gwinn Jr. | Chevrolet | Silverado 3500 HD | 2014 | IL |
| William McDuffie | GMC | Sierra 2500 HD | 2014 | IA |
| Gary Godwin | Chevrolet | Silverado 2500 HD | 2016 | MD |
| Clay Kincheloe | Chevrolet | Silverado 3500 HD | 2015 | MT |
| Bryan Joyce | GMC | Sierra 2500 | 2015 | PA |
| Tim Taylor | Chevrolet | Silverado 3500 | 2013 | VA |
| Michael Gregory | GMC | Sierra 2500 HD | 2016 | NC |
| Michael Jon McCormick | Chevrolet | Silverado 3500 HD | 2015 | AL |
| Arnold Recchia | Chevrolet | Silverado 2500 HD | 2014 | MI |
| Bruce Dawson | GMC (2) | Sierra 3500 (2) | 2011 & 2016 | NJ |
| John Tamburini | GMC | Sierra 2500 | 2015 | NJ |
| William Fortmayer | Chevrolet | Silverado 3500 | 2015 | LA |
| Ryan Begneaud | GMC | Sierra 2500 | 2014 | LA |
| John Cappiello | GMC | Sierra 3500 | 2016 | PA |
| Nathan Howton | GMC | Sierra 2500 | 2015 | IL |
| Trisha Alliss | Chevrolet | Sierra 2500 HD | 2012 | IL |
| Richard Egleberry | Chevrolet (4) | Silverado 3500 HD (4) | 2011 (2) 2015 2016 | OK |
| Calvin Smith | Chevrolet | Silverado 2500 | 2012 | CA |
| Stacy Wade Sizelove | GMC | Sierra HD Denali | 2016 | CA |
| Nicholas Allen Miller | Chevrolet | Silverado 3500 HD | 2015 | FL |
| Kevin Allen Lawson | Chevrolet | Silverado 2500 HD | 2013 | CA |
| Holly Reasor | Chevrolet | Silverado 2500 HD | 2015 | FL |
| Melody Anne Dearborn | Chevrolet | Silverado 3500 HD | 2015 | CA |

### 1.    Plaintiff Mark D. Chapman

14.    Plaintiff Mark D. Chapman (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of New York, and domiciled in Tully, New York. On or about May 10, 2016, Plaintiff purchased a new 2016

Chevrolet Silverado 2500 HD Duramax diesel (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $53,000 from Jack McNerney Chevrolet, an authorized GM dealership in Tully, New York. Plaintiff still owns the vehicle and it presently has approximately 80,000 miles on the odometer. Plaintiff purchased his Silverado as his daily driving vehicle to get to and from work, and for daily activities. On August 5, 2018, with just 52,000 miles on the Class Vehicle's odometer, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump. Plaintiff was driving the Class Vehicle on a highway when the truck suddenly lost power and shut down. The vehicle was towed to the GM dealership where he purchased the Vehicle. After a day of diagnostics, the GM dealership informed him that the CP4 fuel pump had "detonated" and damaged his entire fuel system. The repair estimate quoted by the GM dealership was approximately $15,000, which GM then refused to cover under warranty despite the fact the truck only had approximately 52,000 miles on the odometer. At the time of the catastrophic failure Plaintiff's Class Vehicle was still under a GM-backed 5-year/100,000 mile manufacturing warranty. Plaintiff took the vehicle to Double Down diesel repair shop for the repair. Plaintiff had to replace the entire fuel system at his own expense, which included approximately $9,000 in out-of-pocket repair costs. In an effort to mitigate future CP4 pump failures, Plaintiff (like many other

- 8 -

Class members) had no choice but to modify the vehicle with a CP3 fuel pump and lift pump for another (approximately) $1,000 in out-of-pocket expenses.

15.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel

engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

16.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 2.    Plaintiff Leroy Gwinn Jr.

17.    Plaintiff Leroy Gwinn Jr. (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Illinois, and domiciled in Chatham, Illinois. In or around April 2015, Plaintiff purchased a new 2014 Chevrolet Silverado 3500 HD Duramax diesel (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $58,000 from Smokey Jennings Chevrolet, an authorized GM dealership in Palmyra, Illinois. Plaintiff still owns the vehicle and it currently has approximately 49,000 miles on the odometer. Plaintiff purchased the Class Vehicle to use as his daily driver to get to and from work, and for daily activities.

18.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent

these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

Moreover, Plaintiff (like so many other Class members) has had to purchase fuel lubricant additives to help ameliorate the consequences of the defect.

19.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 3.     Plaintiff William McDuffie

20.     Plaintiff William McDuffie (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Iowa, and domiciled in Glenwood, Iowa. In or around November 2013, Plaintiff purchased a new 2014 GMC Sierra 2500 HD Duramax diesel (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $51,000 from H&H Buick GMC, an authorized GM dealership in Council Bluffs, Iowa. Plaintiff still owns the vehicle and it currently has approximately 35,000 miles on the odometer. Plaintiff purchased his GMC Sierra to use as his daily driving vehicle to get to and from work, and for daily activities.

21.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to

purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would not have purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

22.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 4.   Plaintiff Gary Godwin

23.    Plaintiff Gary Godwin (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Maryland, and domiciled in Baltimore County, Maryland. On or about September 2016, Plaintiff purchased a new 2016 Chevrolet Silverado 2500 HD Duramax diesel (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $71,000 from Bob Bell Chevrolet, an authorized GM dealership in Bel Air, Maryland. Plaintiff still owns the vehicle and it currently has approximately 18,000 miles on the odometer. Plaintiff purchased his Chevrolet Silverado as his leisure driving vehicle and to get to and from work.

24.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicles were compatible with U.S. diesel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—*but they are not*. Absent these

representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

25.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 5.     Plaintiff Clay Kincheloe

26.     Plaintiff Clay Kincheloe (for purposes of this paragraph and the three paragraphs that follow, "Plaintiff") is a citizen of the State of Montana, and is domiciled in Sam Leo, Montana. In or around November 2014, Plaintiff purchased a new 2015 Chevrolet Silverado 3500 HD Duramax diesel (for the purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") for approximately $58,000 from Notbohm Motors, an authorized GM dealership in Miles City, Montana. Plaintiff still owns the vehicle and it presently has approximately 128,000 miles on its odometer. Plaintiff purchased his Silverado as his daily driving vehicle to get to and from work, to pull trailers, and for daily activities.

27.     In February 2019, with approximately 119,000 miles on the odometer, Plaintiff's vehicle experienced a catastrophic CP4 fuel pump failure. Specifically,

while towing a stock trailer with eight cows on Kinsey Highway in the Miles City, MT vicinity, Plaintiff's vehicle suddenly went into reduced power mode, and then seemed to completely die shortly thereafter. Plaintiff was able to coast the vehicle to the side of the road, and then had the vehicle towed to the GM dealership of his original purchase (Notbohm Motors). Despite diagnosing this catastrophic failure as being caused by the implosion of the CP4 high-pressure fuel injection pump—a now-well-known, inherent defect in GM-manufactured Class Vehicles—GM refused to cover the price of the repair, and Plaintiff was forced to pay approximately $10,000 out of his own pocket to have the entire fuel injection system flushed and replaced.

28.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and heard (and recalled) GM's television commercials, internet advertisements, and radio advertisements wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would

not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchase the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

29.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 6.     Plaintiff Bryan Joyce

30.     Plaintiff Bryan Joyce (for purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Pennsylvania, and is domiciled in Pittsburgh, Pennsylvania. In or around March 2015, Plaintiff purchased a new 2015 GMC Sierra 2500 Duramax diesel (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $57,000 from Budd Baer Auto, an authorized GM dealership in Washington, Pennsylvania. Plaintiff still owns the vehicle and it presently has approximately 108,000 miles on the odometer. Plaintiff purchased his Silverado as his daily driving vehicle, and relied on the GM dealership's statements about the Class Vehicle's durability and performance in making the underlying purchase. In December 2018, with approximately 97,000 miles on the odometer, Plaintiff's Vehicle experienced a catastrophic failure of its CP4 high-pressure fuel injection pump. While driving on

a highway in the Robinson, Pennsylvania area, Plaintiff's Vehicle completely shut off and would not restart. Plaintiff had the Vehicle towed to #1 Cochran Buick GMC of Robinson in Pittsburgh, Pennsylvania, where the GM dealership service center informed him that the CP4 fuel pump in his Class Vehicle had imploded and metal shards had dispersed throughout his Vehicle's fuel injection system. After a back-and-forth with GM about warranty coverage of the repairs, GM declined to cover the cost, and Plaintiff was forced to pay approximately $11,000 out-of-pocket for repairs.

31.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and heard (and recalled) GM's television commercials, internet advertisements, and radio advertisements wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class

Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff— through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished value of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

32.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing

- 23 -

capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 7.     Plaintiff Tim Taylor

33.    Plaintiff Tim Taylor (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of Virginia, and is domiciled in Lebanon, Virginia. In or around November 2012, Plaintiff purchased a new 2013 Chevrolet Silverado 3500 Duramax diesel (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") for approximately $60,000 from Ramey Chevrolet, an authorized GM dealership in Tazewell County, Virginia. Plaintiff purchased the vehicle to be able to use it as his daily driver, and to tow trailers recreationally. Plaintiff still owns the vehicle, and it presently has approximately 86,000 miles on its odometer.

34.    In February 2019, with approximately 80,000 miles on the odometer, Plaintiff's vehicle experienced a catastrophic CP4 fuel pump failure. Specifically, while Plaintiff was driving down Interstate 40 in the middle of Arizona, the vehicle suddenly and without warning shut down, almost as if it was out of fuel, and would not restart. Plaintiff's fuel tank needle indicated that he did have sufficient fuel, but regardless, he thought that perhaps the needle was off and had someone bring him some diesel fuel to put in the tank. Thereafter, the vehicle still would not crank. He

ultimately had someone tow his vehicle to the closest GM dealership, which was in Kingman, Arizona. The GM dealership service center diagnosed the problem as a CP4 fuel pump failure and showed him pictures of the metal that was dispersed throughout the fuel injector lines and entire fuel system. Despite recognizing this as yet another CP4 fuel pump failure (which should have been covered by warranty), GM refused to cover the cost of the repairs, and Plaintiff was forced to pay approximately $11,000 out-of-pocket for repairs.

35.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More important, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection

system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

36.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is

approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 8.    Plaintiff Michael Gregory

37.    Plaintiff Michael Gregory (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of North Carolina, and is domiciled in Goldsboro, North Carolina. In or around June 2018, Plaintiff purchased, for his personal use, a certified pre-owned 2016 Chevrolet Silverado 2500 HD Duramax diesel (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") with approximately 16,000 miles on the odometer from John Hiester Chevrolet, a GM-authorized dealership in Lilington, North Carolina. The purchase price was approximately $62,000, and the Truck currently has approximately 53,000 miles on its odometer.

38.    In or around November 2019, with approximately 43,000 miles on the odometer, Plaintiff's Truck experienced catastrophic CP4 fuel pump failure. Plaintiff was driving on the highway on his was to work when the Truck suddenly died without warning. He was able to coast to the side of the road and call a tow truck to haul him to John Hiester Chevrolet, where the GM-authorized service technicians diagnosed CP4 fuel pump failure as the problem. Although he received a partial discount on the repair, possibly due to the extended warranty he had

purchased, he was still forced to pay at least $3,000 out of pocket and go several days without his Truck.

39.   In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel Truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel

engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

40.    Plaintiff also paid a premium for his diesel-powered Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**9.    Plaintiff Michael Jon McCormick**

41.    Plaintiff Michael Jon McCormick (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of Alabama, and is

domiciled in Auburn, Alabama. In or around September 2015, Plaintiff purchased, largely for personal use, a new 2015 Chevrolet Silverado 3500 HD Duramax diesel (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") from Fikes Chevrolet, a GM-authorized dealership in Hamilton, Alabama, though he ultimately registered the Truck in state of Tennessee. The Truck's purchase price was approximately $60,700, and it currently has approximately 230,000 miles on its odometer.

42.     In or around October 2017, Plaintiff's Truck experienced catastrophic CP4 fuel pump failure while Plaintiff was driving on city roads in Auburn, Alabama. Specifically, the Class Vehicle suddenly and without warning died and Plaintiff was forced to coast to a rolling stop; the Truck would not restart. Plaintiff had the Truck towed by Lamb Towing to Fikes Chevrolet in Hamilton, Alabama, where the GM-authorized service technicians diagnosed the problem as catastrophic CP4 fuel pump failure, though GM refused to cover the cost of repairs. The mileage on the odometer at the time of the catastrophic failure was approximately 110,000 miles. In total, Mr. McCormick was forced to pay approximately $9,362.43 for the CP4-fuel-pump-related repair work that was performed plus the vehicle towing, and was forced to be without his vehicle for at least six days.

43.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television

commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed

appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

44.     Plaintiff also paid a premium for his Truck. Based on his pre-purchase research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 10.     Plaintiff Arnold Recchia

45.     Plaintiff Arnold Recchia (for purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the state of Michigan, and is domiciled in Shelby Charter Township, Michigan. In or around November 2013, Plaintiff purchased, primarily for personal use, a new 2014 Chevrolet Silverado 2500 HD Duramax diesel (for purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") from Buff Whelan Chevrolet, a GM-authorized

- 32 -

dealership in Sterling Heights, Michigan. The Truck's purchase price was approximately $63,500, and it currently has approximately 147,000 miles on its odometer.

46.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the

- 33 -

existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles. and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

47. Plaintiff also paid a premium for his Truck. Based on his pre-purchase research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**11.    Plaintiff Bruce Dawson**

48.      Plaintiff Bruce Dawson (for purposes of this paragraph and the next six paragraphs, "Plaintiff") is a citizen of the state of New Jersey, and is domiciled in Ship Bottom, New Jersey. In or around October 2010, Plaintiff purchased a new 2011 GMC Sierra 3500 Duramax diesel pickup truck (for purposes of this paragraph and the next six paragraphs, the "Class Vehicle" or "Truck") for approximately $51,521 from an authorized GM dealership in Manahawkin, New Jersey. Plaintiff purchased the vehicle for personal use and for his business, Dawson's Boat Hauling. Dawson sold his vehicle in 2018, with approximately 180,000 miles on the odometer.

49.      In the fall of 2013, with approximately 165,000 miles on the odometer, Plaintiff's vehicle experienced a catastrophic CP4 fuel pump failure while hauling a boat on a trailer in Charlottesville, Virginia. As a result of this breakdown, Plaintiff was forced to pay a third party $800 to complete the boat transport job, and lost the use of his truck for about 40 days to repair the Class Vehicle. He also incurred approximately $10,000 in out-of-pocket costs for repairs.

50.      In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one

Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by

overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

51. In April 2016, after repeated assurances from his GM dealership that the Bosch CP4 fuel pump in the Class Vehicles was not defective and catastrophic CP4 failure would not happen again, Plaintiff purchased a new 2016 Duramax diesel GMC Sierra 3500 pickup truck from Asplundh GMC (now Barlow Buick GMC), an authorized GM dealership located in Manahawkin, New Jersey, for approximately $63,071. Plaintiff used this as both his personal vehicle and for his business, Dawson's Boat Hauling. In or around October 2016, with approximately 44,658 miles on his Class Vehicle's odometer, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump. As Plaintiff was driving his vehicle while towing his client's boat on an attached trailer, the "check engine" appeared on his dashboard, and his vehicle suddenly lost power and stalled. He took the vehicle to an authorized GM dealership, Jim Browne Chevrolet Buick GMC in Dade City, Florida. After consulting a service bulletin, "Document ID 4474673," the service technician "found injection pump came apart and spread metal throughout fuel system[.]" The technician replaced the fuel pump, along with several other parts. Approximately six weeks later, in November 2016, with approximately 45,960 miles on his vehicle,

Plaintiff experienced further problems associated with the failure and replacement of the CP4 fuel pump. He took his truck to Barlow Buick GMC in Manahawkin, New Jersey, where they performed additional repairs including replacing the fuel injector and filter. Approximately a week and a half later, on or around November 28, 2016, with 48,656 miles on his odometer, Plaintiff noticed that fuel was leaking from the bottom of his vehicle in such volume that it destroyed the finish on the left running board of the truck. He returned to Barlow Buick GMC, where the service technician "found fuel coming from return lines at INJ#1, INJ#2, and #4" and found that the "return lines [were] not properly seated [sic]." The technician reinstalled the return lines and performed other checks, and returned the vehicle to Plaintiff.

52.     Plaintiff lost the use of his truck and the trailer it was towing for more than 40 days. Plaintiff was required to pay a third party to first tow his trailer to Jim Browne Chevrolet Buick GMC in Dade City, Florida, before the tow truck came back to tow the truck itself to the dealership—an expense that was never reimbursed by GM. Although GM covered the repair under warranty, GM failed to provide a replacement truck during the time when his vehicle was out of service. As a result, Plaintiff was forced to turn down boat hauling jobs that he would have accepted normally if he had the use of this vehicle. Plaintiff continued using the 2016 GMC Sierra until 2018, when he sold it with approximately 180,000 miles.

53.    At the time Plaintiff purchased his 2016 GMC Sierra 3500, and in purchasing the vehicle, Plaintiff relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Plaintiff relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, the vehicle's reputation for maintaining a high resale value, and the repeated assurances from GM dealership sales representatives that (1) the CP4 fuel pump in the Class Vehicles was not defective and (2) catastrophic CP4 failure would not happen to him again, caused Plaintiff to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of purchase, the 2016 GMC Sierra 3500 contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's

CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

54.    Plaintiff also paid a premium for his Class Vehicles. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 12.    Plaintiff John Tamburini

55.    Plaintiff John Tamburini (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of New Jersey, and is domiciled in Hillsborough, New Jersey. On August 25, 2015, Plaintiff purchased a new 2015 GMC Sierra 2500 Duramax diesel pickup truck (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") for approximately $55,428 from Barlow Buick GMC, an authorized GM dealership in Manahawkin, New Jersey. Tamburini, who is a certified boat engine mechanic, used this vehicle

as both his personal vehicle and for his business, On The Ramp Marine Trans LLC. In December of 2018, Tamburini traded in the vehicle, which had 158,725 miles on it at the time, for a new 2018 Dodge Ram 2500 pickup truck.

56.    On December 27, 2017, Tamburini's vehicle was driving on the New York State Thruway when the gas throttle pedal became hesitant and then nonresponsive and the vehicle lost its ability to accelerate. The engine warning light "Fuel Filter Blockage" flashed on, even though a new fuel filter had recently been installed. The "Check Engine" and "Service Engine Soon" warnings also flashed on. He pumped the breaks and coasted to the side of the road and the vehicle ceased operating entirely. The vehicle was then towed to Barlow Buick GMC at a cost of approximately $275. The Barlow technician diagnosed the vehicle as "crank no start" and "low fuel pressure while cranking," and told Tamburini the vehicle's current Bosch CP4 fuel pump had failed and that the vehicle would require a new one. The vehicle had 128,543 miles on it at the time.

57.    Tamburini then paid to have the vehicle towed to his residence. From January to March, 2018, he purchased original equipment manufacturer (OEM) and non-OEM parts from Barlow Diesel Power Service in Williamsport, PA and Xtreme Diesel Performance in North Wall Township, NJ, for a total cost of over $10,000, that enabled him to replace the defective Bosch CP4 fuel pump in his vehicle and fix the damage the defective fuel pump caused to his vehicle's engine. He also rented

a fuel tank polisher to clean out the fuel tank, which contained metal shavings that resulted from the failure of the Bosch CP4 fuel pump. Tamburini lost the use of this truck, with corresponding loss of business revenue, for about 60 days, when damage due to the defective Bosch CP4 pump was being repaired.

58.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its

agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

59.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 13.   Plaintiff William Fortmayer

60.   Plaintiff William Fortmayer (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of Louisiana, and is domiciled in Jefferson Parish, Louisiana. On or about December 29, 2014, Plaintiff purchased a new 2015 Chevrolet Silverado 3500 Duramax diesel (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") for approximately $58,682.60 from Leson Chevrolet, an authorized GM dealership in Harvey, Louisiana. Plaintiff purchased the vehicle to be able to haul trailers and cattle. Plaintiff still owns the vehicle, and it presently has approximately 162,000 miles on its odometer.

61.   On or about August 19, 2019, Plaintiff was traveling on the Paris Road "Green Bridge," in Orleans Parish, Louisiana, when suddenly and without warning, the "change fuel filter" light came on and the truck lost power and shut down. His Class Vehicle had approximately 145,798 miles on it at the time of the incident. Immediately after the truck lost power, Plaintiff had the truck towed to his hometown of Leson. Plaintiff was advised by a Leson Chevrolet service adviser that the pressure regulator screen was clogged with metal particles and all the contaminated components of the fuel system needed to be replaced. The Leson Chevrolet service adviser stated that he was aware of the defect, and that they had to fix the fuel pump

a few times per month. Plaintiff was without his truck for one week as the service provider fixed his truck, for which Plaintiff paid approximately $11,060.31.

62.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel

engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

63.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**14.     Plaintiff Ryan Begneaud**

64.     Plaintiff Ryan Begneaud (for purposes of this paragraph and the next three paragraphs, "Plaintiff") is a citizen of the state of Louisiana, and is domiciled

in Lafayette Parish, Louisiana. On or about February 3, 2017, Plaintiff purchased a used 2014 GMC Sierra 2500HD Duramax diesel (for purposes of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") for approximately $42,870.50 from Courtesy Automotive Group, a GM-authorized dealership in Lafayette, Louisiana. At the time of purchase, the vehicle had approximately 89,141 miles on its odometer. Plaintiff purchased the vehicle primarily for personal use and to haul boats and trailers. Plaintiff still owns the vehicle, and it presently has approximately 136,620 miles on its odometer.

65.     On or about April 27, 2017, and May 12, 2017, due to the check engine light coming on, Begneaud had his Sierra inspected, necessitating testing and ultimately new fuel injectors installed, with repairs totaling $3,916.34. The cause of the failed injectors was never determined.

66.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More fundamentally, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements

Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchase the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

67.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 15.    Plaintiff John Cappiello

68.    Plaintiff John Cappiello (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Pennsylvania, and domiciled in Lake Ariel, Pennsylvania. On or about November 14, 2016, Plaintiff purchased a new 2016 GMC Sierra 3500 HD Denali (for the purposes of this paragraph and the next three paragraphs, the "Class Vehicle") for approximately $66,705 from Jerry's GM, LLC, an authorized GM dealership in Weatherford, Texas. Plaintiff still owns the vehicle and it presently has approximately 210,000 miles on the odometer. Plaintiff purchased his Sierra for his common carrier business.

69.    In May 2018, with approximately 138,000 miles on the Class Vehicle's odometer, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump. Plaintiff was driving the Class Vehicle at the speed limit on Interstate 81, towing a load, when Plaintiff suddenly heard a big bang. The engine completely died at that

point, and Plaintiff—concerned about fast-approaching vehicles coming behind him—coasted over to the side of the road. No warning lights illuminated before the engine failed. He eventually towed his Class Vehicle back to an authorized dealership in Scranton, Pennsylvania for repair. Plaintiff had to replace the entire fuel system at his own expense, which included approximately $10,400 in out-of-pocket repair costs.

70.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased were "professional grade," had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel— but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American

vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system— which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

71. Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing

capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 16.   Plaintiff Nathan Howton

72.    Plaintiff Nathan Howton (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Illinois, and domiciled in Harrisburg, Illinois. On or about September 18, 2015, Plaintiff purchased a used 2015 Chevrolet Sierra 2500 HD, (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle") for approximately $52,214 from Laura Buick GMC, an authorized GM dealership in Collinsville, Illinois. The truck had approximately 15,510 miles on it at the time of purchase. Plaintiff still owns the vehicle and it presently has approximately 144,336 miles on the odometer. Plaintiff purchased his Sierra for personal use, including towing his sons' motocross bikes.

73.    On February 23, 2019, with approximately 113,000 miles on the Class Vehicle's odometer, Plaintiff experienced a catastrophic failure of his CP4 fuel injection pump. Plaintiff was traveling with his family, more than 500 miles from home, and had stopped to refuel. Two miles after refueling, the engine backfired, creating a plume of smoke. The truck lost all power, and Plaintiff was able to coast the truck onto the driveway of an unoccupied home. It was cold and late at night; Plaintiff and his family waited three hours in the truck for a mechanic to arrive. Upon

arrival the mechanic tested the fuel to see if the diesel fuel was contaminated with gasoline; he found no contamination. Plaintiff and his family spent the night in a trailer they were pulling. When Plaintiff finally got the truck to the dealer, the mechanic told him that there was a GM "Bulletin" on the CP4 pump, but that his truck was out of warranty and GM would not cover the expense, except for a $800 credit. Plaintiff—who was knowledgeable about diesel trucks—broke down the engine to the injection pump, and found an "enormous" amount of metal shavings. Below is a picture from Plaintiff's truck which shows the shavings:



Plaintiff ultimately installed a CP3 pump to replace the CP4 pump, at the cost of approximately $7,600 and 100 hours of labor.

74.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel

engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

75.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 17. Plaintiff Trisha Alliss

76.     Plaintiff Trisha Alliss (for the purposes of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of Illinois, and domiciled in Congerville, Illinois. On or about October 31, 2018, Plaintiff purchased a used 2012 Chevrolet Sierra 2500 HD (for the purposes of this paragraph and the next two paragraphs, the "Class Vehicle") for approximately $35,000 from Sam Lemen Chevy City, an authorized GM dealership in Bloomington, Illinois. Because of the catastrophic failure described below, Plaintiff traded in her truck in October 2019 for a trade-in value of $22,000 in order to purchase a 2019 Chevrolet Silverado HD which does not have the faulty CP4 pump. Plaintiff purchased her Sierra for her business and as her daily driver.

77.     On or about September 19, 2019, the Class Vehicle suddenly lost all power as it was driven down the road. Plaintiff and her husband had the truck towed, at the cost of $95; a mechanic diagnosed the catastrophic failure. When Plaintiff received an estimate of $9,200 to fix the truck, she decided to trade it in for the 2019 Silverado.

78.     In the days and weeks preceding Plaintiff's purchase, and in contemplating her vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel

truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through her research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate,

Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

79.    Plaintiff also paid a premium for her Truck. Based on her research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but she purchased the Truck based on her belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for her Truck by at least the value of this premium.

### 18.    Plaintiff Richard Egleberry

80.    Plaintiff Richard Egleberry (for the purposes of this paragraph and the next four paragraphs, "Plaintiff") is a citizen of the State of Oklahoma, and domiciled in Stillwater, Oklahoma. He purchased four Class Vehicles that he uses for his business, as follows:

- Two 2011 Chevrolet Silverado 3500 HDs. One truck was purchased on April 4, 2011, for $43,12700 from Wilson Chevrolet in Stillwater,

Oklahoma. The second truck was purchased on September 6, 2011, for $50,662.50 from Bob Howard Chevrolet in Edmond, Oklahoma.

- One 2015 Chevrolet Silverado 3500 HD, purchased on February 26, 2015 for $48,043.60 from Wilson Chevrolet in Stillwater, Oklahoma,

- One 2016 Chevrolet Silverado 3500 HD, purchased on November 30, 2016 for $51,000.50 from Wilson Chevrolet in Stillwater, Oklahoma.

81.    One of his 2011 Silverado trucks experienced *two* failures—one at about 74,415 miles, on June 4, 2014, and another at 147,872 miles, on August 31, 2017. In both cases, there was a catastrophic failures of the engine, requiring an entire replacement of the high pressure fuel system. The first failure was under warranty, and—although he did not pay out-of-pocket repair costs in that instance—he was forced to pay at least $200 for towing. The second failure was not under warranty, and he incurred about $14,000 in out-of-pocket expenses to repair the truck, in addition to the $200 for towing. In both instances, he also lost the use of the truck for at least three weeks during repair, which he used for his utility line business. In each instance, the loss of the trucks cost him several thousand dollars in lost business.

82.    Plaintiff decided to not use his second 2011 Silverado truck, because he is concerned about a catastrophic failure.

83.    Finally, his 2015 Silverado suffered a catastrophic failure, at approximately 105,000 miles. GM covered only half the cost under warranty; Plaintiff was required to pay approximately $5,000 to repair the truck.

84.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the

existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

85.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 19.   Plaintiff Calvin Smith

86.     Plaintiff Calvin Smith (for purposes of this paragraph and the next two paragraphs, "Plaintiff") purchased a new 2012 Duramax diesel Chevrolet Silverado 2500 (for purposes of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") from Folsom Chevrolet in January 2012, an authorized GM dealership located in Folsom, California. Mr. Smith sold the vehicle prior to his involvement in this litigation.  Prior to purchase, Mr. Smith researched the vehicle online, including on the Chevrolet website, and also spoke with dealership personnel about the Class Vehicle leading up to his purchase decision. Unbeknownst to Plaintiff, the Class Vehicle came equipped with a defective factory-installed Bosch CP4 fuel pump that was particularly unsuitable with U.S. diesel fuel. In October 2017, when the Vehicle had approximately 143,000 miles on the odometer, the Class Vehicle experienced catastrophic fuel-line failure, with the fuel pump sending metal shards throughout the fuel line. Mr. Smith was ultimately forced to pay approximately $3,800 for the resulting repairs after negotiating down the price with the dealer. Notably, Mr. Smith was told by his GM dealership after paying for the repairs that many other vehicles were experiencing the same problem. Had GM adequately disclosed the defect, Mr. Smith would not have purchased the Class Vehicle, or would have paid substantially less for it.

87.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his

research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

88.    Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 20.    Plaintiff Stacy Wade Sizelove

89.    Plaintiff Stacy Wade Sizelove (for the purpose of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of California, and

domiciled in Long Beach, California. On or around September 24, 2010 Plaintiff purchased a new 2011 Duramax diesel Chevrolet Silverado 2500 HD (for the purpose of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for $67,000 from Harbor Chevrolet, an authorized GM dealership in Long Beach, California. Plaintiff still owns the Class Vehicle which he uses as his daily transportation and occasionally uses to pull his trailer. The Class Vehicle has approximately 108,000 miles on the odometer at present. In June 2017, Plaintiff Sizelove experienced a catastrophic failure of the CP4 fuel injection pump in his vehicle approximately three months after the expiration of the time period through which GM told him his warranty extended, so GM would not cover replacement or repairs under warranty, despite the fact that his vehicle had 98,000 miles on it at the time of the failure. Plaintiff Sizelove has purchased thirteen Chevrolet vehicles in his life, and yet GM refused to cover the pump failure in this vehicle. Repairing the vehicle cost Mr. Sizelove at least $9,000 out-of-pocket, and it was in the shop for nine days. Moreover, as a result of his vehicle's failure, he was left stranded in the desert for seven hours on Highway 95 in middle of the summer heat.  He still owns the vehicle and believes it is unreliable, but does still use it only when he has to pull his trailer (he relies on another vehicle for all other travel).

90.    In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television

commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. Plaintiff further relied on representations from GM that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. In addition, on the day Plaintiff purchased the Class Vehicle, and prior to his purchase, Plaintiff relied on GM's specific representations concerning the Class Vehicle's fuel economy and reliability. At the dealership, the sales representatives told Plaintiff that the vehicle had superior fuel economy with American diesel fuel as compared to other trucks on the market and that is was more reliable. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly

defective nature of the GM diesel engine's CP4 high pressure fuel pump system—
which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the
defect, Plaintiff – through his research prior to purchase – would have received these
disclosures, and either would have not purchased the Class Vehicle, or would have
paid less for it. Accordingly, Plaintiff and each Class member suffered concrete
economic injury as a direct and proximate result of GM's wrongful, deceptive
conduct. As deemed appropriate, Plaintiff's and each other Class member's
ascertainable losses include, but are not limited to, paying a high premium for the
engine compared to what they would have paid for a gas-powered engine or other
non-defective diesel truck, out-of-pocket losses by overpaying for the vehicles at the
time of purchase, decreased performance of the vehicles, and diminished values of
the vehicles. There is a substantial difference in the market value of the Vehicle
promised by GM and the market value of the defective vehicle received by Plaintiff,
and Plaintiff did not receive the benefit of his bargain. Plaintiff thusly brings claims
individually and as a representative of the Class.

91.    Plaintiff also paid a premium for his Truck. Based on his research and
knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a
comparable truck that ran on gas, but he purchased the Truck based on his belief that
it would be more durable compared to a gas engine, with superior torque and towing
capabilities. The premium for a diesel truck compared to a gasoline equivalent is

approximately \$5,000-\$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**21.    Plaintiff Nicholas Allen Miller**

92.    Plaintiff Nicholas Allen Miller (for the purpose of this paragraph and the next three paragraphs, "Plaintiff"), is a citizen of the State of Florida, and domiciled in Orlando, Florida. In May 2018, Plaintiff purchased a used 2015 Chevrolet Duramax diesel Silverado 3500 HD (for the purpose of this paragraph and the next three paragraphs, the "Class Vehicle" or "Truck") from a private seller in Birmingham, Alabama for approximately \$33,500. Plaintiff purchased the vehicle because he needed a reliable truck for personal use and work. He has used the truck as his daily driving vehicle, and also to haul dump trailers, a Bobcat, and other construction equipment for work. At the time of purchase, the Class Vehicle had approximately 168,000 miles on the odometer, and it presently has approximately 230,000 miles on it.

93.    In the fall of 2018, Plaintiff experienced a catastrophic failure of the CP4 fuel injection pump in his Truck. Specifically, Plaintiff was pulling a trailer on a three-lane highway in Orlando, Florida, and had one employee with him at the time. The Truck suddenly lost power, forcing him to pull over. The Truck was towed to the closest Chevrolet dealership, where the service center informed Plaintiff that there was a malfunction in his CP4 pump, that there were metal shavings throughout

his engine and fuel injection system, and that the Truck needed to have its injectors, gaskets, and CP4 fuel pump replaced at a cost of nearly $9,000. Plaintiff was forced to pay this cost out-of-pocket.

94.   In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and heard (and recalled) GM's television commercials, internet advertisements, and radio advertisements wherein GM claimed that the Duramax diesel truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents or other representatives informed Plaintiff or Class members of the existence of the unlawfully and

unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchase the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

95. Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 22.    Plaintiff Kevin Allen Lawson

96.     Plaintiff Kevin Allen Lawson (for the purpose of this paragraph and the next two paragraphs, "Plaintiff") is a citizen of the State of California, and domiciled in Temecula, California.  In or around January 2013, Plaintiff purchased a new 2013 Duramax diesel Chevrolet Silverado 2500 HD (for the purpose of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $62,000 from Paradise Chevrolet, an authorized Chevrolet dealership in Temecula, California.  Plaintiff still owns the vehicle, and it presently has approximately 54,126 miles on the odometer. Plaintiff uses his Silverado 2500 HD as his personal vehicle to get to-and-from work and for daily activities, including hauling his trailer.

97.     In the days and weeks preceding Plaintiff's purchase, and in contemplating his vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicles were compatible with U.S. diesel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these

representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through his research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

98.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 23.   Plaintiff Holly Reasor

99.     Plaintiff Holly Reasor (for purposes of this paragraph and the next four paragraphs, "Plaintiff") is a citizen of the State of Florida, and is domiciled in Gainesville, Florida. In or around July 2018, Plaintiff purchased a certified pre-owned 2015 Chevrolet Duramax diesel Silverado 2500 HD with roughly 55,000 miles on its odometer (for purposes of this paragraph and the next four paragraphs, the "Class Vehicle" or "Truck") for approximately $43,000 from Gainesville Buick GMC, an authorized GM dealership in Gainesville, Florida. In addition to the certified pre-owned vehicle assurance that came with her Truck purchase, Plaintiff purchased an additional extended warranty on the Class Vehicle through her GM dealership. Plaintiff purchased the Truck to tow her RV cross-country, as she works as a traveling nurse and needs to bring her RV with her as she travels. Plaintiff still owns the vehicle, and its current approximate mileage is 107,000.

100.   On or around the evening of January 13, 2020, Plaintiff experienced a sudden catastrophic failure of her Truck's CP4 high-pressure fuel pump while she was traveling on Petaluma Hills Road between Cotati, California and Santa Rose, California. Specifically, while Plaintiff and her companion were driving in the Class Vehicle and turned out into traffic, the Truck suddenly decelerated without warning when the gas pedal was pushed, and quickly lost all power, shut off, and would not restart. The Class Vehicle completely stalled out just before a busy intersection, and with this total loss of power the power steering stopped working, making it difficult to steer the truck out of the way of high-speed traffic. Plaintiff had the Truck towed to Victory Auto Plaza, an authorized GM dealer and service center in Petaluma, California. The service center informed her that the CP4 fuel pump had catastrophically failed, and that the repair would cost her approximately $12,839.34. Plaintiff also incurred (1) at least $112.00 in tow costs; (2) at least $1,201.69 in rental car costs as the Truck was being repaired; and (3) approximately $100.00 in costs for having use an Uber to get to work and to eventually pick up the rental car. Throughout this period, Plaintiff repeatedly contacted the GM customer assistance line but was always transferred to an unanswering representative with a "voicemail box is full" message, and was eventually told by someone at GM that GM would not cover the repairs "because the vehicle is 2,000 miles out of warranty."

101.   To this day, Plaintiff has extreme apprehension about driving the Class Vehicle. Had she been towing her RV at the time, Plaintiff feels certain that the Truck would have jackknifed in the middle of the busy intersection. Based on the high purchase price of the Truck, she continues to drive the Truck because she has no viable alternative.

102.   In the days and weeks preceding Plaintiff's purchase, and in contemplating her vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel Truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability,

and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through her research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished values of the vehicles, and benefit of the bargain damages. GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

103.   Plaintiff also paid a premium for her Truck. Based on her research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but she purchased the Truck based on her belief that it would be more durable and have greater torque and towing capability than its gasoline-fueled peer vehicles. The premium for a diesel truck compared to a gasoline

equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for her Truck by *at least* the value of this premium.

### 24.   Plaintiff Melody Anne Dearborn

104.   Plaintiff Melody Anne Dearborn (for the purpose of this paragraph and the next two paragraphs, "Plaintiff"), is a citizen of the State of Florida, and domiciled in Pierson, Florida. On or around November 24, 2015, Plaintiff purchased a new 2015 Chevrolet Silverado 3500 HD (for the purpose of this paragraph and the next two paragraphs, the "Class Vehicle" or "Truck") for approximately $65,000 from David Maus Chevrolet, an authorized GM dealership in Sanford, Florida. Plaintiff uses the Class Vehicle to tow her 40-foot horse trailer and a 35-foot boat, and it presently has approximately 44,704 miles on the odometer.

105.   In the days and weeks preceding Plaintiff's purchase, and in contemplating her vehicle needs, Plaintiff saw and recalled GM's television commercials, internet advertisements, sales brochures, and heard statements from GM dealership sales representatives wherein GM claimed that the Duramax diesel Truck which Plaintiff ultimately purchased had superior fuel economy, reliability, and durability compared to other trucks in the American market. More importantly, Plaintiff relied on representations from GM through the means listed above that the Class Vehicle was compatible with American diesel fuel, as all GM advertisements Plaintiff ever observed contained representations of the Class Vehicles driving in

America as if they were compatible with U.S. diesel fuel—but they are not. Absent these representations, Plaintiff would not have purchased the vehicle, or would have paid less for it, because it is unfit for its ordinary use. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was particularly unsuitable for American vehicles, and consequently the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the GM diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Had GM disclosed the defect, Plaintiff—through her research prior to purchase—would have received these disclosures, and either would have not purchased the Class Vehicle, or would have paid less for it. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, the full purchase price of the truck, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance and fuel economy of the vehicles, diminished values of the vehicles, and benefit of the bargain damages.

GM has been unjustly enriched as a result, and Plaintiff is entitled to a pro rata share of GM's disgorged profits.

106.   Plaintiff also paid a premium for her Truck. Based on her research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but she purchased the Truck based on her belief that it would be more durable and have greater torque and towing capability than its gasoline-fueled peer vehicles. The premium for a diesel truck compared to a gasoline equivalent is approximately $5,000-$8,000. Plaintiff accordingly overpaid for her Truck by at least the value of this premium.

B.    **The Defendant.**

1.    **General Motors LLC**

107.   Defendant General Motors LLC ("GM") is a Delaware corporation with its headquarters and principal place of business located in Detroit, Michigan. Defendant GM can be served with process through its agent The Corporation Company, 30600 Telegraph Road Ste. 2345, Bingham Farms, Michigan, 48025. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

108.   Defendant GM, through its various entities, including Chevrolet and GMC, is in the business of designing, manufacturing, distributing, and selling GM-

brand automobiles in this District, in the jurisdictions of the Named Plaintiffs' Class Vehicle purchases and/or leases, and in the jurisdictions of all U.S. states whose Class claims are iterated herein. GM and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles. GM also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles. GM also designed advertising material that it sent to GM dealerships for the purpose of having dealers distribute these to consumers, GM authorized dealers to communicate with consumers about the performance of the vehicles, and GM ensured that the dealership was a place where GM could disclose material facts to prospective buyers.

## III.   JURISDICTION AND VENUE

109.   This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

110.    Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) GM is headquartered in this District, and GM has marketed, advertised, sold, and leased the Class Vehicles within this District; and (2) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* GM's design, manufacturing, promotion, marketing, distribution, and sale of Class Vehicles containing the Bosch CP4 high-pressure fuel injection pump. Further, a significant number of the Class Vehicles are registered in this District and thousands of Class Vehicles are in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because GM is subject to personal jurisdiction in this District as alleged, *infra*, and GM has multiple agents, *i.e.*, GM-certified dealerships, located in this District.

## IV.    FACTUAL ALLEGATIONS

A.    **The Class Vehicles.**

111.    For purposes of this Complaint, the "Class Vehicles" consist of the following GM-manufactured diesel-fueled U.S. automobiles:

- 2011–2016 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana van with Duramax LGH engines;

- 2010–2011 GMC Sierra trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines; and

- 2011–2012 Chevrolet 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

B.   **GM Profits from the Rise of Diesel Vehicles in the United States.**

112.   Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them

popular in buses, heavy-duty pick-ups, and vans, including commercial vehicles, farm trucks, and ambulances.

113.    The key benefits of diesel engines over their gasoline counterparts are the following:

> **(a) Durability:** Diesel (compression ignition) engines are, by design, stronger and more robust than gasoline (spark ignition) engines, and their long life and low maintenance are among the reasons for their popularity.

> **(b) Fuel Efficiency:** The diesel engine is 20-35% more efficient than a gasoline engine, because the compression ignition cycle (and greater compression ratio) is more thermodynamically efficient than the spark ignition cycle, and because diesel fuel has a greater energy content on a per gallon basis than gasoline. As a result, a diesel engine's fuel cost per mile is expected to be lower than gasoline.

> **(c) Torque and Power:** Diesel engines provide more torque, especially at low engine speeds, which leads to better acceleration and higher towing capacity. Modern diesel engines operating at higher speed can now match or exceed gasoline engines in terms of peak power. This combination of torque and power is another reason why some customers prefer diesel.

114.    Most Class 2A, 2B, and 3 (1500-3500) series pickup trucks, as well as certain sports utility vehicles sold by the Big Three Automakers (FCA, Ford, and GM)—including the Class Vehicles at issue in this case—offer both a gasoline and

diesel option. Because of the features and advantages listed above, buyers are willing to pay a premium of $5,000-$8,000 more for the diesel powered versions.[3]

115.   The diesel combustion process, invented by Rudolph Diesel over a century ago, uses a hydrocarbon-based fuel which is substantially different than gasoline. Diesel fuel is a heavier and less refined mix of hydrocarbons and is designed to self-ignite when mixed with air under elevated temperatures and pressures. In the diesel combustion process, the fuel is pumped to a very high pressure and then forced into an injector through very small spray holes. This fuel is atomized into spray plumes of fine droplets in the engine combustion chamber. The droplets rapidly evaporate and mix with heated air and spontaneously ignite, thus releasing the energy to drive the piston and pressurize the fuel.

116.   Since the invention and early development of the diesel engine more than 100 years ago, the injection of fuel into the cylinder has been one of its greatest technical challenges. Earlier versions of the fuel injection system were designed as a pump-line-nozzle arrangement where a fuel pump delivered fuel directly to each injector via its own fuel line. As emission and fuel economy standards have become more stringent, and customer demands for performance have increased, diesel

---

[3] *See* WorkTruckOnline.com, *supra* note 2; PickupTrucks.com, *supra* note 2.

manufacturers switched to a high-pressure, common rail system, starting in Europe in the 1990s.

117.   In a common-rail fuel system, a high-pressure pump supplies fuel to a reservoir (a pressure containment vessel) known as the fuel rail. The rail holds an ample supply of pressurized fuel available to be injected (or "metered") into the engine power cylinders by the fuel injectors. The flow of fuel in each injector is managed by a complex electronic control system, which is programmed by sophisticated algorithms and calibration files. The key advancement with the common rail system is that each injector is capable of injecting in multiple precise pulses of fuel and at varying times based on driving conditions.

118.   The most complex and expensive part of the common rail fuel injection system are the high-pressure components, including the high-pressure pump, the fuel rails, and the injectors.

119.   One of the key benefits of common rail technology is the ability to have multiple fuel injection events in a single injection cycle. Multiple injections, executed by lifting the injector nozzle needle, are used to carefully meter fuel into the cylinder which smooths out the combustion event resulting in lower noise and lower emissions.[4] Modern engines may have multiple injection events, including

---

[4] The injectors spray an exceedingly fine mist of diesel fuel into the cylinder, where it ignites and powers the engine. The finer the mist, the less emissions, because the combustion process is more homogenous, which has at least two

post injection of fuel used to release fuel into the exhaust stream for the purpose of heating up the aftertreatment components to reduce emissions.

120.    In sum, the key benefits of modern common rail fuel system are, among others:[5]

- Providing pressurized fuel to well above 2,000 bar[6] across most of the operating range of the engine (previous mechanical fuel systems could only achieve high pressure at high engine speeds).

- Multiple injection events, accurately timed and measured for the precise engine operating conditions to meet stringent noise and emissions regulations, including the following:

  o Cold-start ability can be improved by early pre-injections to avoid the need for glow plugs.[7]

---

beneficial effects: (1) the smaller droplets evaporate and mix more readily with the air, preventing the development of fuel-rich "pockets" which product particulate matter; and (2) homogenized levels of heat mean there are fewer high peak temperatures, which lead to formation of NOx. The net effect of the high-pressure system is less NOx and particular matter.

[5] *See* Bosch, *Common-rail system with piezo injectors*, available at https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/ (last accessed May 21, 2020).

[6] A bar is a unit for measure for pressure. One bar is about 14.8 pounds per square inch; 1,800 bar is equivalent to about 27,000 pounds per square inch.

[7] A glow plug is a heating device which aids in the starting of diesel engines.

- o Engine noise can be lowered by pre-injections of fuel prior to main injection to produce power.

- o Aftertreatment systems (particulate filters) can be regenerated by very late post injections.

- o Injection rates can be digitally "shaped" to give an optimum rate of injected fuel to better control the diesel heat release rate, which minimizes NOx emissions.

- o Exhaust particulates can also be lowered by injection "post" or late small amounts of fuel.

- High reliability and durability—common rail systems in Europe have been shown to be more reliable and durable than previous mechanical fuel systems if properly fueled and maintained.

- Less maintenance—modern common rail systems are designed to be self-adapting and require little maintenance.

- Less noise, vibration and handling problems—precise control over the injection and combustion events reduces engine noise, runs more quietly, produces less shaking and shock, and produces better operator control over the acceleration of the vehicle. High pressures are only generated in the centralized fuel pump rather than in individual

mechanical injectors, which reduces engine vibration and gear train torques and noises.

- Higher injection pressure—pressures up to 2,500 bar (36,000 pounds per square inch) are only achievable with common rail fuel systems. The higher pressures are necessary for improved fuel atomization and more complete combustion.

- Better engine combustion management—the precision control offered by common rail reduces the mechanical strains on the engine, including peak cylinder pressures, temperatures, and observing exhaust after-treatment system limits.

121. From the outset, GM was in competition with fellow "Big Three" auto manufacturers like Ford and Fiat Chrysler, each racing to dominate the growing American diesel vehicle market. GM looked to the international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's more durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. The reliability of the CP3 became key to the "million-mile" reputation of diesel truck engines in the United States.

122. Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and GM claimed to continue to deliver advances in diesel

engine technology. In its advertisements and press releases—both online and in printed material—GM claimed that Duramax engines, which contained the CP4, would maintain reliability while also increasing fuel efficiency and power. *See* infra Part IV.K. The over-simplified design of the CP4 rendered it cheaper to manufacture, but also increased its need for high lubricity fuel, and increased the likelihood that the ultimate failure would be catastrophic.

C.     **The Fragile CP4 Fuel Pump Design.**

123.   The Bosch CP4 fuel pump is directly coupled to the engine, which means it is operating whenever the engine is operating. Since the CP4 is a critical part of the engine system it must be designed for very long life and must be capable of operating with commercially available fuel. A sound and robust design would also make it tolerant to fuels that are commercially sold, but do not meet the proper requirements. It should also be designed to withstand some level of customer abuse and neglect, such as inadvertent misfueling, running out of fuel, delaying a filter change, or draining the water separator.

124.   The CP4 operates at higher pressures than its predecessor, the CP3, and has inherently higher Hertz contact stresses than the CP3, which exacerbates the wearing of the pump parts. The CP3 pump has three pumping cylinders and plungers, and as the cam shaft turns, a polygon ring on an eccentric camshaft. As the camshaft rotates, the polygon is moved in a sliding manner against the plunger foot

plate and converting rotational (circular) motion into linear (up and down) motion.

Below is a diagram of the CP3 pump:

### **Figure 1: CP3 Pump**



125.   Because of its sliding foot contact area and lower stresses, the CP3 is more tolerant of poor fuel quality.

126.   The CP4 pump design was a radical departure from the CP3, and it relies on a fragile cam-roller-tappet mechanism which did not exist in the CP3. Instead of the wide plunger foot plates sliding against the wide polygon cam to drive the plungers (as shown in Figure 1 above), the CP4 pump uses a small, 10 mm roller pin (about the size of a AAA battery) as the only source of contact with the camshaft. With this system, the CP4 system is placing a lot of pressure on the contact point between the roller and the cam. This very small area of contact carries all the forces required to transfer the energy to generate the very high pumping pressures. In

addition, since the 10 mm diameter roller is about one quarter the size of the camshaft lobe on which it rotates, the smaller roller must rotate 4 times as fast as the CP4.2 camshaft. Since the Power Stroke engine drives the CP4.2 at the same speed as the engine, this means the roller must rotate at 4 times the engine speed, or in the range of 11,200 revolutions per minute (for an engine speed of 2,800 rpm). Below is a schematic of the tappet holding the roller pin, which contacts the cam:

**Figure 2: Roller, Cam shaft, and Tappet**



127.   Below is a photograph showing a side-by-side comparison of the CP3 and CP4 pumps, which illustrates how the contact area between the CP4's cam and roller is much smaller than the area between the CP3's ring and plunger foot:

**Figure 3: Comparison of CP3 and CP4 Pumps**



128. The design differences are further illustrated in the graphic below, which again shows the large surface contact area between the polygon and the plunger of the CP3 as compared to the small line contact between the cam and the roller of the CP4:

**Figure 4: Schematic Comparison of CP3 and CP4 Pumps**



129. The CP3 pump's sliding foot design distributes the load and reduces stresses on the polygon cam follower. It slides back and forth and does not need to

roll to create a lubricating fluid film. Conversely, the CP4 cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface or else the roller will not rotate (or spin); instead it will slide. The roller also creates a hydrodynamic lubrication film of fuel between the roller and cam. This film is very thin, on the order of 1 micron or less (1 micron = 40 millionths of an inch). If the roller stops rotating and sticks or slips on the cam, it loses this lubrication film and starts to wear. In real world operating conditions, the result of all these factors is a lack of robustness because of the susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

130.   The critical roller pin design of the CP4 creates very high stress (called Hertz stresses) as diagramed below:

### Figure 5: Hertz Stresses on CP4 Roller and Cam



Contact between two cylinders

131.    Comparing relative Hertz stresses of CP3 and CP4, the CP4 roller-to-cam contact Hertz stresses are about two times higher than the CP3. These higher stresses will increase contact fatigue and wear of the metal parts that come in contact with each other. In the case of the CP4, these parts are the roller and camshaft. Accordingly, use of the CP4 pump for the same amount of force would be more likely to wear and fail than the CP3 for same lubrication conditions of lubricity, viscosity and fuel quality. This would be aggravated and increase wear dramatically if the roller pin stops rotating and starts sliding. Aggressive roller and cam wear changes the roller diameter to more of a slider and generates wear debris.

132.    Unlike the CP3 pump, which uses a sliding elephant's foot design to spread stresses and shortened distance of metal on metal travel, the CP4's cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface. The result of all these factors is fragility, and susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

133.    The CP4 pump was first introduced in Europe in the 2007 timeframe, and criticism of the pump began almost immediately based on its fragile design and its sensitivity to fuel quality. In addition to the design limitations referenced above, the tappet which houses the roller pin is not prevented from rotating around in its

own axis inside the cylindrical pump housing. If the tappet does rotate out of position, the roller pin rotates from parallel to the camshaft, to perpendicular to the camshaft. Once rotated the roller will no longer rotate, and instead the cam slides across the roller, leading to wear and erosion, as a trough is being carved into the cam. The wear and erosion will generate metal shavings that are carried by the fuel throughout the fuel system, including downstream to the sensitive high pressure fuel injectors. The photograph below shows the severe wear and gouging caused by rotation of the tappet:[8]

**Figure 6: Wear on the Cam and Roller**



134.   The second issue is additional wear due to the metal-to-metal surface contact between the cam and roller, and metal-to-metal contact between the roller

---

[8] Tomasz Osipowicz, *Testing of Modern Fuel Injection Pumps*, 15 TEKA COMM'N OF MOTORIZATION AND ENERGETICS IN AGRICULTURE 57-60 (2015), available at http://www.pan-ol.lublin.pl/wydawnictwa/TMot15_1/Osipowicz.pdf.

and roller shoe. This wear inevitably results in the creation of metal filings which can contaminate the fuel system and damage the injectors. The metal-to-metal wear can occur any time the roller stops rotating inside the tappet shoe. Metal particles that lodge inside the roller shoe can effectively jam the rolling pin in a stuck position. In addition, low viscosity caused by water in the fuel can reduce the film layer thickness the roller depends on to ride above the shoe.

135.   When the particles enter the roller shoe, the hard diamond-like coating of the tappet roller shoe begins to wear off. As the coating wears, damage becomes progressively worse, even as the wearing generates more hard and fine particles that can make their way through the fuel system to the injectors. Below is a close-up of a CP4 tappet roller shoe, showing abrasive wear of the coating:

**<u>Figure 7: Wear on the Diamond Coating</u>**

136.   Finally, the pump depends upon the fuel to lubricate the roller pin and the cam shaft and prevent wear. U.S. diesel fuel (as explained further below) is refined to a less lubricous specification limit as compared to Europe.

137.   Small wear particles (small enough to pass through the engine's filters, or created downstream of the filters through corrosion or wear) are problematic—and potentially catastrophic—for the CP4 for two reasons. First, when the wear particles come in between the cam and the roller, they create increased point-contact stresses which can damage the ultra-smooth faces of the components, eventually leading to spalling, cracking or loss of material. Second, when the wear particles lodge between the roller and the roller shoe they can cause the roller to stick. When the roller sticks or stops rolling it can cause the tappet to slide between the cam and the roller or to rotate out of alignment with the cam. Any of these conditions causes stress, metal fatigue, wear, and ultimately catastrophic failure.

138.   "Catastrophic" failure can occur through accumulation of wear when the roller skids on the camshaft and aggressively wears to the point of complete roller and tappet breakdown. Large fragments of the worn parts can crack the fuel pump housing and cause fuel leakage to the engine compartment. Migration of wear particles into the common rail, injectors and engine can cause progressive or sudden damage to the pump, injectors, engine, turbocharger and aftertreatment systems.

Engine stall or failure to start can also occur which leads to a "mission disabling" failure and vehicle limping to a repair shop or on the side of the road.

139.   Catastrophic failure also occurs when the level of wear is so severe the pump plunger is not able to complete the full pressurizing stroke and the fuel pressure target is not achieved. If the pump is completely unable to pressurize the fuel the engine will either not start, or if it is running the engine will stop. As a result, the vehicle must be towed as it is no longer operable.

140.   When a catastrophic CP4 pump failure is confirmed, not only must the pump itself be replaced, the entire high pressure sub-system consisting of fuel lines, fuel rails, sensors, and injectors must be replaced as well. On the low pressure side, the fuel tank must be drained and thoroughly cleaned, the fuel lines much be flushed, and the both fuel filters replaced.

141.   Even if the pump does not catastrophically fail, small, micron-sized metal filings from the wearing process enter into the high pressure fuel system. This can lead to fuel injector damage, which could impact the precise control of fuel flow. Additional and unwanted excess fuel also leads to a number of issues including damaging or prematurely ageing the pistons, cylinders, turbo charger, or the downstream aftertreatment components.

142.   The defective CP4 pump has been the subject of numerous scholarly and analytical industry articles, which describe how the pump can catastrophically

fail, as well as how wear in the pump generates metal shavings which can cause injector problems and engine over-fueling. For example, a Polish academic investigator described the problem as follows:

> Fuel injection pump Bosch CP4 is composed of: a drive shaft, a roller in the holder and a plunger pumping section. The most durable component of the tested fuel injection pump tested is its plunger pumping section. The roller with its holder is in the pump body. _A defect of this component is lack of stabilization, which causes that the whole roller can rotate 360° in the pump body_.
>
> If the roller starts rotating around its own axis during the pump operation, it is no longer possible for it to return to its original position. Then, it starts destroying a cam on the pump drive shaft. As a result of friction on a cam and a roller, metal filings are generated, fouling and destroying the whole fuel supply system.[9]

143.   A second report, presented to the International Congress on Combustion Engines, stated as follows:

> An improper cam-roller-pusher solution is a **fundamental flaw** of this generation of [CP4] pumps. The applied roller significantly contributed to reducing forces in the mechanism by utilizing rolling friction, however the pusher with a circular cross-section had a tendency to rotate, particularly when contaminants were present, friction was elevated by inferior fuel quality or insufficient fuel quantity. When the roller's position changes to perpendicular relative to the shafts' axis, rolling friction changes to sliding friction, which exponentially accelerates the mechanism's wear. Metal filings from the damaged roller destroy inter-operating element of the

---

[9] Osipowicz, _supra_ note 9.

pumping section, and cause seizing when they penetrate into injectors.[10]

144. The figure below from one of the academic reports shows the orientation of a rotated tappet and the damage that occurs when the roller rotates on its axis, causing the cam to slide across the roller, rather than rolling together with it:

**Figure 8: Effects of Rotation of the Roller**



145. These same academics summarized the problem as one of design that is highly sensitive to the quality of fuel:

> Due to the high precision of injection process control, with high pressure or fuel compression, these systems are characterized by sensitively to the quality of applied fuel due to the large faces acting on the system's elements.

---

[10] Mateusz Bor, et al., *Analysis of Hypocycloid Drive Application in a High-Pressure Fuel Pump*, 118 MATEC WEB OF CONFERENCES: VII INTERNATIONAL CONGRESS ON COMBUSTION ENGINES, 00020 (2017), available at https://www.matec-conferences.org/articles/matecconf/pdf/2017/32/matecconf_icce2017_00020.pdf (emphasis added).

> Numerous design solutions are susceptible to damage resulting from defective design of a given element, beside damage generated by fuel of insufficient quality. In the case of pump defects, leading to the creation of filings with diameters below several micrometers, other elements of the injection systems are also damaged very frequently, which increase repair costs significantly.[11]

146.    As Diesel Tech Magazine, an industry publication, aptly explained in its December 2017 article entitled, "Common Problems: The CP4 Time Bomb:"

> It's always frustrating to finally get your hands on a brand-new truck (or at least, new to you) and find out there's something wrong with it. It's even more frustrating to learn that not only are you not alone in your suffering, but that it's a common problem to your vehicle. . . . To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump. . . . Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a *really* good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system.

147.    Rather than remedy the problem it caused, GM chose to extract a second round of profits from the consumers it has already duped. GM created a licensing scheme to market premium diesel fuels with greater lubricity that is more compatible with its CP4 pumps, in markets where most profitable. GM named this higher lubricity fuel "TOP TIER™," GM's registered trademark brand. In markets

---

[11] *Id.*

where available, GM's TOP TIER diesel is sold for a premium, costing a few cents more per gallon. GM then double dips, profiting again, from its wrongdoing, by charging a licensing fee to fuel marketers who sell TOP TIER diesel.

D.    **Characteristics of U.S. Diesel Fuel**

148.    As the foregoing suggests, the properties and quality of diesel fuel are very important. Key fuel properties such as minimum levels of lubricity and viscosity must be met at all times throughout the life of the engine in order to at least partially mitigate the damage from the defective pump.

149.    The CP4 relies on diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007 the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen-based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel accelerates the breakdown and wear of the pump, and the

fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[12]

150. Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100–200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

151. The main body that sets standards for diesel fuel is the ASTM;[13] the specific standard for U.S. diesel fuel is known as the ASTM-D975, which has been adopted by the EPA as a binding regulation.[14] Lubricity in diesel fuel is quantified as measurement of wear. A test method called a high frequency reciprocating rig (HFRR) involves oscillating a weighted ball across a flat plate and measuring the scratches or "wear scar" pattern on the surface. The diameter of the wear scar is thus

---

[12] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE, Aug. 26, 2007, available at http://www.jatonkam35s.com/DeuceTechnicalManuals/ Diesel_fuel_additive_test.pdf (last accessed Oct. 31, 2019).

[13] "ASTM" previously stood for the American Society for Testing and Materials. Now, however, the ASTM standards are negotiated and implemented worldwide. The governing body is currently known as ASTM International.

[14] 40 C.F.R. § 80.1468.

an indicator of lubricity, with larger diameters indicating low (poor) lubricity fuel and smaller diameters indicating high (better) lubricity fuels.

152.   In the U.S., the minimum HFRR wear scar diameter is 520 um, compared to the European standard of 460 wear scar. Since the CP4 pump is self-lubricating with the diesel fuel it is pumping, the lack of lubricity of U.S. diesel significantly diminishes the pump's durability and longevity. And since the lubricity of the diesel fuel is an important factor in the durability of the pump, careful attention should have been paid to the difference in U.S. and European fuels

153.   Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

4/22/2002 Truck & Engine Manufacturers' Association ("EMA"), Position Statement titled, "EMA Consensus Position Pump Grade Specification." GM is a member of the EMA.[15]

---

[15] *See* EMA, *supra* note 3.

154. Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties." [16]

155. In a September 2009 Common Position Statement published by the Joint Diesel Fuel Injection Equipment Manufacturers (or "Joint FIE Manufacturers") regarding Fuel Requirements for Diesel Fuel Injection Systems, the Joint FIE Manufacturers expressed the following comments to their colleagues in the automotive industry:

> The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets. Rising injection pressures and

---

[16] U.S. automotive industry-wide knowledge of the need to manufacture vehicles with equipment capable of handling the U.S.'s low-lubricity diesel fuel many years before the manufacture of the vehicles at issue here confirms GM's knowledge of the problem from the company's very inception. *See, e.g.*, *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 879 (N.D. Cal. 2019) (upholding Plaintiffs' CP4-defect-based fraudulent concealment claims against GM based on the allegations which are substantially the same as the allegations here).

multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . . Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.

Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.[17]

156. Likewise, in a July 2014 study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

-------------------

[17] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009* (Sept. 2009), available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last accessed Oct. 31, 2019) (emphasis added).

The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher. . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection.[18]

---

[18] Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration*, PARKER RACOR & AVL (Jan. 7, 2015), available at https://www.parker.com/literature/Racor/RSL0194%20 Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (last accessed Oct. 31, 2019), at i; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components. . . . This issue has become a significant concern in the industry").

157.   Most diesel fuel in the United States is produced by distillation of petroleum oil in a refinery. The fuel is refined and processed to meet certain specifications outlined in regulations and guidelines adopted by the EPA. The refinery also blends additives into the fuel to meet the applicable specifications. Once U.S. diesel fuel is produced in the refinery it enters a distribution system where it travels to terminals and then ultimately to a fuel pumping station. In the US, fuel may be transported in a variety of ways included pipelines, trucks, and rail. The figure below is a schematic showing the flow of fuel from its source (crude oil) through refining and distribution:

**<u>Figure 9: Transport of Fuel from Source to Gas Station</u>**



---

[19] *See* U.S. Energy Information Administration, *Diesel fuel explained: Where our diesel comes from*, available at https://www.eia.gov/energyexplained/diesel-fuel/where-our-diesel-comes-from.php (last updated June 12, 2019).

158.   Fuel is tested to ensure it meets ASTM specification once it leaves the refinery and again when it leaves the bulk terminal. Fuel may be blended (with biodiesel for example), or enhanced with various additives at either the refinery or the terminal. Although there is a system in place to try to achieve uniformity of fuel quality, as described below, in practice there are a number of factors that lead to the frequent production of substandard quality fuel.

E.   **The Unreliability of U.S. Diesel Fuel.**

159.   Despite EPA requirements, in reality, U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry.

160.   Notably, according to Infineum's[20] 2014 Worldwide Winter Diesel Fuel Quality Survey testing 341 diesel fuel samples from around the world, **all** diesel fuel samples the organization collected and tested from the U.S. and Canada contained sulfur levels of 10 ppm or less.[21]

161.   Other fuel surveys indicate that U.S. diesel scar differs drastically across the continental U.S. For example, in 2018 Infineum conducted a survey of the

---

[20] Infineum is a company that is globally recognized as the leader in diesel fuel quality surveys.

[21] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014* at 6–7, INFINEUM INT'L LTD. (2014), available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf.

lubricity of U.S. diesel fuel from various regions of the continental U.S. and found the following:

**Table 1: Survey of lubricity of U.S. diesel fuel (2018).[22]**

|  | Minimum lubricity scar score | Maximum lubricity scar score | Mean | Sample size | Locations exceeding 520 wear scar | Locations exceeding 460 wear scar | Locations exceeding 400 wear scar |
|---|---|---|---|---|---|---|---|
| **East Coast** | 219 | 506 | 385 | 10 | 0 | 1 | 5 |
| **Midwest** | 198 | 526 | 390 | 37 | 1 | 9 | 24 |
| **West Coast** | 289 | 526 | 448 | 10 | 1 | 6 | 7 |
| **Total** |  |  |  | 57 | 2 | 16 | 36 |

162.   Based on this chart, it is clear that there are certain locations where the fuel's lubricity will further accelerate the breakdown and wear of the pump. Over the course of a truck's lifetime, a truck driver will likely use diesel fuel that is "dry," which will accelerate the damage to the engine outlined herein.

163.   However, with the advent of ULSD fuel, high lubricity fuels are hard to obtain and the consumer has no way of knowing the lubricity of the fuel at a standard retail filling station. To that extent, the numbers listed in Table 1 are troubling: nearly two thirds of all diesel fuel stations sell diesel fuel that exceeds the maximum lubricity score that Bosch indicated was "strongly recommended." About

---

[22] *See Infineum Worldwide Winter Diesel Fuel Quality Survey 2018*, INFINEUM INT'L LTD. (2018), available at https://www.infineuminsight.com/media/2228/infineum-wdfqs-2018-v10-14112018.pdf.

three in 10 diesel fuel stations exceed European standards. Based on this data, it seems all but inevitable that truck owners will eventually fill up their trucks with diesel fuel that is "dry" and accelerate the harm to the trucks' engines.

F.    **Water in U.S. Diesel Fuel.**

164.   U.S. diesel fuel can also easily degrade and move off specification during transportation and storage, including from the entry of water into the fuel.[23] Water can seep into the fuel supply, which decreases the fuel's viscosity.[24] During transfer of fuel—either from refinery to storage tanker, or from tanker to the pump— air can get into the fuel. When the air cools, water condenses and drops into the tank. If this occurs, the fuel loses viscosity, which has a directly negative effect on its lubricity, resulting in an insufficient layer of protection between the roller pin and the tappet shoe.

165.   The potential for water to get into the fuel supply is a well-known and easily anticipatable problem for OEMs such as GM. Diesel fuel tanks "breathe" through filler caps and vents, and as fuel is withdrawn by the fuel pump, humid air

[23] Rick Chapman, *Why Fuel Quality Standards are Important*, STI Webinar – Petroleum Storage Tank Maintenance, INNOSPEC (Dec. 18, 2013), available at https://www.steeltank.com/Portals/0/Shop%20Fab/12.18.13STI%20webinar%20 Fuel%20Specs%20FINAL.pdf.

[24] Viscosity is a measure of the thickness of a liquid, which can affect the lubricity. Generally, a viscous liquid is more lubricious, although there are many exceptions: corn syrup is viscous but not lubricious; cooking spray is not viscous but is lubricious.

can enter the fuel tank and water can condense when the fuel tank cools. Yet GM continues to blame customers for water in the fuel, based on the flimsy assumption that the consumers are at fault for what is a foreseeable condition.

G.    **Dirt/Corrosion Particles and Gasoline Contamination in U.S. Diesel Fuel.**

166.   Diesel fuel can become contaminated by dirt or corrosion particles. Fuel tanks can become rusty through exposure to air. The net result of contamination is the particles clog up the two filters in the fuel injection system.

H.    **Pre-Class Period Failures and Industry Knowledge.**

167.   The genesis of the problem began when GM set out to design a modern diesel engine for its pickup trucks. In 2000, GM formed a joint venture with Isuzu, called "DMAX" to create the 6.6L Duramax V8 engine. DMAX then teamed up with Robert Bosch GmbH to incorporate Bosch's high pressure common-rail for fuel injection. Two years later, the Duramax engine had garnered 30% of the U.S. market for diesel pickup trucks. The Duramax engine has long been an option on GM pickups, vans, and medium-duty trucks, and has undergone many changes over the years.

168.   For 2010, GM created the LGH version of the Duramax engine. It featured increased power, increased torque, and greater fuel efficiency. But, in order to achieve greater fuel efficiency, the Duramax LGH engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

169.    The Bosch CP4 fuel injection pump was defective and particularly incompatible with U.S. diesel fuel from the very beginning, even prior to its usage in the Class Vehicles. For example, on February 7, 2011, the National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation ("ODI") opened a safety investigation based on 160 complaints "alleging incidents of engine stall and/or loss of power that appear to be related to high pressure fuel pump ("HPFP") failures in certain model year (MY) 2009 through 2010 Volkswagen Jetta and MY 2010 Volkswagen Gold and Audi A3 vehicles equipped with [turbo diesel engine] clean diesel engines. Approximately half of the reports indicate that the failure resulted in an engine stall incident, with many of these alleging stall incidents at highway speeds in traffic with no restart." During this investigation, ODI requested documents not only from Volkswagen and Bosch, but also from GM, Ford, and FCA. Documents that the OEMs produced were subsequently published on NHTSA's website.

170.    These documents demonstrate widespread and early knowledge of the defect and its potentially catastrophic effects. Among the documents' disclosures are the following:

- In September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news

from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[25] Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[26]





---

[25] *See* Ex. 14 at EA11003EN-00639[0].

[26] *Id.* at EA11003EN-00639[2]-[4].



- In August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . . We need to determine if component failure or bad fuel is to blame."[27] Thereafter, on September 1, 2009, Bosch responded to Audi with the following analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. ***Defect caused by customer***."[28]

---

[27] *See* Ex. 17 at EA11003EN-00660[2].

[28] *Id.* at EA11003EN-00661[1] (emphasis added). *See also id.* at EA1103EN-00646[0] (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative states, "Can you (panel of experts)

- In May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine equipped with a CP4 fuel pump and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[29]

- In a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in an 2010 Audi A3 TDI diesel vehicle (published on NHTSA's website), Audi asked Bosch, "[W]hy are the defects mentioned below still present

---

explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); Ex. 16 at EA1103EN-00197[0]-[1] (July 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); Ex. 15 at EA11003EN-01558[0] (emphasis added) (June 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

[29] Ex. 15 at EA11003EN-01578[0]-[2] (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, all lines) need to be changed . . . . I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[30]

- In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from [sic] a 2.0L TDI. I

---

[30] *See, e.g.*, Ex. 16 at page 1 (July 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"); *id.* at EA11003EN-01875[0] (July 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets)"); *id.* at EA11003EN-01888[0]-01893[0] (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[31]

171.   By the end of 2011, it was well known that Bosch CP4 failures in U.S. Audi and Volkswagen vehicles were widespread and catastrophic.[32]

172.   Although many of the communications cited above in the NHTSA investigation involved Bosch and Audi or Volkswagen, GM engineers almost certainly would have heard about these problems early on. Vehicle manufacturers such as GM, FCA, and Ford, and component manufacturers such as Bosch, Delphi, and Cummins, have significant and dedicated departments which continuously monitor regulatory compliance with safety, emissions, customs, and tax laws. Their marketing departments monitor their competitors and public domain information to track emerging trends which may impact their business, such as the release of new

---

[31] *See* Ex. 17 at EA11003EN-00641[0] (June 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

[32] See Ex. 15 at EA11003EN-02261[0] (Sept. 15, 2011 email from Volkswagen to Bosch: "I think the [CP4] failures are well known. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[REDACTED] caused by chip contamination") (emphasis added). *See also* Ex. 14 at EA11003EN-00639[0] (Mar. 22, 2011 email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, showing that, by March 2011, Bosch was continuing to receive "a respectable number" of CP4 "mechanical breakdowns" in the U.S.); id. at EA11003EN-00757[0] and unnumbered pages (spreadsheet showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

competitive products or problems with commonly used components on other manufacturer's products. These departments maintain extensive databases of competitive information including design details, teardown analyses and reverse engineering to maintain their competitive edge or comparative advantage. These databases are searchable by employees and information is pushed to new product development teams.

173. Specific departments in OEMs (including Product Compliance, Liability, and Environmental Management) will monitor many public (and subscription) sites such as truckandenginemanufacturers.org, NHTSA.gov, EPA.gov, the California Air Resources Board (ww2.arb.ca.gov), and international agencies (e.g., www.cen.eu, ASTM.org) to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

174. In addition, the federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents

involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[33]

175. Emerging problems (such as the NHTSA investigation of Volkswagen/Audi CP4 pump failures) would certainly be tracked by GM and other OEMs. There are federal regulatory requirements mandating such tracking. Relevant information would then be condensed and pushed to design, development, testing, service and quality departments to ensure that they were aware of these emerging problems. These global firms maintain extensive bodies of knowledge such as "lessons learned" or "engineering standard work" databases to ensure that problems encountered internally or externally are codified into their own standards and disseminated to working levels of engineering, design, quality and service. "Lessons learned" from competitors are invaluable since they avoid similar problems during development and production. These "lessons learned" databases are particularly important when OEMs develop global products at multiple engineering centers around the world. "Lessons learned" and competitive benchmarking are key steps in the Design Validation Planning of all major OEMs and part of their "Value Analysis" studies for New Product Introduction.

---

[33] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

176.   In addition, working level engineers and designers also are encouraged to join trade organizations such as the Society of Automotive Engineers, American Society of Mechanical Engineers, and ASTM, and to subscribe to many trade publications and tradeshows to stay current with changing requirements and competitive information. When a new product, regulation, standard, or issue is being announced or rumored, all major automotive news organizations will investigate and report on these developments since they are crucial for the OEMs' business. Product problems are also tracked closely since they affect stock market valuations and warranty accruals in SEC filings.

177.   Government organizations such as NHTSA, EPA, and CARB routinely push information to OEMs and require responses to ensure that they are on notice of emerging safety issues, recalls, emissions and safety compliance changes. This information is required to be published broadly by OEMs within their internal websites to employees to put them on notice, and there are compliance audits to ensure that employees are trained and certified where necessary.

178.   NHTSA recalls and investigations would certainly be communicated to the product development, quality, purchasing, and service teams.

179.    Accordingly, information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to GM.[34]

180.    The field data GM itself submitted to NHTSA from October-December 2011 was already sufficient to detect a serious defect involving Class Vehicles' fuel pumps. Among other things, GM responded that in the 2nd quarter of 2011 *alone*, it was aware of at least ***ninety-nine*** field reports of high-pressure fuel pump failure in the 2011 Chevrolet Silverado HD, thirty of which involved moving stalls.[35]

181.    Importantly, the data showed a significant uptick in fuel pump failure-related claims beginning with the 2011 model year (the first year the CP4 was implemented). GM counted sixteen fuel pump-related warranty claims in the 2011 GMC Sierra HD by October 2011, compared to just eight in the two preceding years

---

[34] This industry-wide knowledge demonstrates GM's knowledge of the defect. *See In re: General Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 880-81 (N.D. Cal. 2019) (quoting *Zuehlsdorf v. FCA US LLC*, 2019 WL 2098352, at *9 (C.D. Cal. Apr. 30, 2019)) (internal punctuation omitted) ("'Plaintiff gives several plausible explanations of how Defendant became aware of the alleged defect, including 'pre-production testing, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers,' and alleges that 'this knowledge and information was exclusively in the possession of FCA US and its network of dealers.' . . . At this stage, the Court finds that Plaintiffs have adequately pled knowledge.").

[35] Ex. 18 at 3 (Dec. 9, 2011 Letter from Carmen Benavides, head of GM Product Investigations and Safety Regulations, to Frank Borris, head of NHTSA's Office of Defects Investigations (ODI), in response to ODI Inquiry No. EA11-003, available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50067P.pdf).

of Sierras combined.[36] Likewise, GM reported thirty catastrophic fuel pump failures in the 2011 Chevrolet Silverado HD compared to just eight in the two preceding model years of Silverados combined.[37]

182.   Likewise, the data GM provided comparing warranty claims in 2011 model year Class Vehicles with their predecessors is illuminating in terms of the increase in fuel pump-related claims. Whereas the 2011 model year Silverado had already generated 68 warranty claims for the fuel pump, the 2010 model year Silverado only had 20. And whereas the 2011 model year Sierra had generated 35 warranty claims, the preceding model year only had 2.[38]

183.   A major quality control measure used by GM and other automotive manufacturers is to compare a particular model year vehicle's warranty claims and other aggregate information (such as driver complaints and field reports) with the preceding model year vehicle's data to evaluate whether there is a measurable uptick in the failure rate. In modern day vehicle production, failures are typically measured per thousand vehicles or sometimes even per hundred thousand vehicles, and defect trends are frequently identified after just one or several reported failures. Where, like here, the early warranty rates reflected between a three-fold and seventeen-fold

---

[36] *Id.*

[37] *Id.*

[38] *Id.* at 8.

increase over the previous year, GM must have recognized the existence of a defect no later than December 2011 at the time it compiled this information for NHTSA (though it was likely conducting internal analysis of its own even earlier).

184.   In addition, for many decades, GM has conducted durability and reliability testing of its new vehicles before introducing them to the market. This means that GM trucks, including Class Vehicles, are exposed to lengthy and comprehensive physical testing that reveals how the vehicles and component parts (including the engines and fuel pumps) will last when driven for tens of thousands of miles.

185.   Through this testing, GM also would have discovered the defect— before selling the first Class Vehicle. As the driver complaints to NHTSA show,[39] it is not uncommon for the Class Vehicle fuel pump to fail before the vehicle has driven 50,000 miles, with some failing at as low as 7,000 miles of driving. Likewise, it is not uncommon for the Class Vehicle fuel pump to fail within the first year or two of driving. These early failures are well within the scope of GM's durability and reliability testing.

186.   Despite this knowledge, beginning with the 2011 model year GM was touting the improved durability of its all-new Duramax LML engine, which was

---

[39] *See infra* ¶¶ 192-215 (customer complaints regarding catastrophic CP4 fuel pump failure in the Class Vehicles).

installed in many of the subject Class Vehicles and incorporated the CP4 fuel pump. Indeed, GM claimed that the Duramax LML improve durability while increasing fuel injection pressure to 29,000 psi, increasing noise reduction and also tolerating up to 20% biodiesel fuel mixtures, and added a urea-based diesel exhaust fluid ("DEF") system to treat its exhaust. The Duramax LML continued to use the new lower-volume Bosch CP4 fuel injection pump, as did some of the Duramax LGH's, including but not necessarily limited to the following vehicles:

- 2011–2016 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 GMC 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana Van with Duramax LGH engines;

- 2010–2011 GMC Sierra Trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011-2012 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011-2012 Chevrolet 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

187. Some of these vehicles are modified for commercial purposes, such as cargo vans, specialized work trucks, and a variety of ambulances offered by GM. The CP4 has long experienced problems, and the failure of these pumps can be devastating to people and businesses alike. The CP4 performed terribly from the start, but GM put it into more and more engines.

188. Importantly, GM was on notice—and indeed, has repeatedly *admitted*—that the safety risks of moving stalls or "no-starts" such as those associated with the CP4 fuel pump pose an inherent risk to vehicle occupant safety. In 2014, GM issued a series of safety recalls for approximately 30 million vehicles due to an ignition switch defect which caused, among other things, loss of engine

- 126 -

power (in other words, moving stalls), which "increase[e] the risk of a crash."[40]

Because the Class Vehicles have an inherent safety defect (as evidenced by the

customer complaints cited herein),[41] the purchasers and lessors of the Class Vehicles

have been economically injured, because a vehicle which later turns out to have a

safety defect is clearly worth less than it was at the point-of-sale while the defect

was still being concealed.

I.    **The CP4 Defect Poses an Inherent Risk to Vehicle Occupant Safety and Renders the Class Vehicles *Per Se* Defective.**

189.   The federal Safety Act and related regulations require the quarterly

submission to NHTSA of "early warning reporting" data, including claims relating

to property damage received by the automotive manufacturer, warranty claims paid

by the automotive manufacturer, consumer complaints, incidents involving injury or

death, and field reports prepared by the automotive manufacturer's employees or

---

[40] *See, e.g.*, Ex. 53, GM 573 Ltr. to NHTSA re: NHTSA Recall No. 14V346, Jun. 19, 2014, available at https://www.autosafety.org/wp-content/uploads/import/14V-346%20Camaro.pdf (last accessed May 22, 2020).

[41] Other federal courts have recognized that Plaintiffs plausibly alleged the CP4 high-pressure fuel pump defect presents an inherent risk to vehicle occupant safety. *See, e.g.*, Order on Def.'s Mot. to Dismiss 22, *Click v. GM LLC*, No. 2:18-cv-00455 (S.D. Tex. Mar. 27, 2020), ECF No. 83 ("The worst case scenario of a truck spontaneously stalling at high speeds is not a mere inconvenience. Nor is it a mere inconvenience to spend between $8,000 to $20,000 on repairs to make the trucks fit for their ordinary purpose. The Court rejects GM's suggestion that the risk of spontaneous engine failure while driving is not, as a matter of law, unreasonably dangerous, depriving the vehicles of fitness for their purpose of transportation."); *see also In re: Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 883 (N.D. Cal. 2019).

representatives concerning failure, malfunction, lack of durability, or other performance issues.[42]

190.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.[43] A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."[44] Within five (5) days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicle does not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.[45] Then, "within a reasonable time" after deciding that a safety issue exists,

_____

[42] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

[43] *See United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).

[44] 49 U.S.C. § 30102(a)(8).

[45] 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c).

the manufacturer must notify the owners of the defective vehicles.[46] Violating these

notification requirements can result in a maximum civil penalty of $15,000,000.[47]

191.   Based on its duty to monitor safety-related complaints or concerns, GM

assuredly saw *scores* of consumer complaints regarding the now-notorious CP4

pump failure.

192.   For example, on October 5, 2010, a Duramax Forum member posted

the following regarding a nearly brand-new 2011 Chevrolet Silverado 3500 Crew

Cab 6.6L Duramax:

> I[']ve got 3200 miles on my 2011 3500 srw, crew cab, 4x4,
> z71, duramax. And [I']ve already got- in my opinion a
> serious[] problem- it won[']t start. Cranks and Cranks and
> cranks. Usually it finally starts. After extensive diagnostic
> review, the dealer and the chief duramax engineer from
> gm feel it[']s an Injector Pump issue . . . . Of course the
> part is back ordered. Any one else had similar issues?
> I[']m pretty frustrated.[48]

193.   In the same vein, on October 13, 2013, the owner of a 2011 GMC Sierra

HD   2500   posted   the   following   on   the   diesel   enthusiast   website

TheDieselPageForums.com: "My 2011 GMC 2500HD recently experienced what

has been diagnosed at a GM dealership as a high pressure fuel pump failure [...] a

---

[46] 49 C.F.R. §§ 577.5(a), 577.7(a).

[47] 49 U.S.C. § 30165(a)(1).

[48] 3duramax, Forum post #1 re: "2011 Injector Pump failure,"
DURAMAXFORUM.COM (Oct. 5, 2010), https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/72500-2011-injector-pump-failure.html.

bit of a loss of confidence in the reliability of the bullet proof 6600 Durmax here

. ."[49] The truck owner went on to note the following diagnosis from his GM service

advisor:

> CONTAMINATED FUEL SYSTEM CAUSED BY HIGH PRESSURE PUMP FAILURE[.] CRANK NO START-SCAN PCM, NO FAILURE CODES. CHECK CRANK SENSOR OPERATION AND CRANKING RPM'S-HAS NORMAL CRANKING SPEED AND RPM'S. CHECK FUEL API RATING-API OF 40. INSPECT FOR FUEL LEAKS AND AIR IN FUEL SYSTEM-NO AIR AND NO FUEL LEAKS. CHECK FUEL PRESSURE WHILE CRANKING...INSTALL PRESSURE GUAGE AT FUEL TEST PORT AND PUMP TO 10 PSI WITH FUEL PRIMER PUMP-CRANK ENGINE FUEL PRESSURE DOES NOT DROP. CALL TAC. **INSPECT FUEL PRESSURE REGULATOR AND SENSORS FOR METAL DEBRIS. FOUND FUEL SYSTEM CONTAMINATED WITH METAL FROM HIGH PRESSURE FUEL PUMP**. SEE PIP5133, PIP5151, PIP4949C . . . ."[50]

194.    Similarly, on July 2, 2014, the following customer complaint involving

a 2012 GMC Sierra 3500 HD was filed with NHTSA:

> DRIVING FROM GM DEALER FOR TWO MILES CHANGE FUEL FILTER MESSAGE APPEARED AND

---

[49] InvaderLane, Forum post re: "High Pressure Fuel Pump Failure at 50K," THEDIESELPAGEFORUMS.COM (Oct. 30, 2013, 11:58 a.m.), available at https://www.thedieselpageforums.com/tdpforum/archive/index.php/t-42676.html.

[50] InvaderLane, Forum post re: "High Pressure Fuel Pump Failure at 50K," THEDIESELPAGEFORUMS.COM (Dec. 12, 2014, 12:17 a.m.), available at https://www.thedieselpageforums.com/tdpforum/archive/index.php/t-42676.html. (emphasis added).

> ENGINE DIED. TOWED TO A DEALER DIAGNOSED
> AS A HIGH PRESSURE INJECTOR PUMP FAILURE
> WITH METAL CONTAMINATION TO FUEL
> SYSTEM. I HAVE FOUND A BULLETIN DATED 2009
> FROM EQUIPMENT MANUFACTURERS. THIS
> JOINT STATEMENT HAS INFORMATION ABOUT
> THE FUEL USED IN THE USA THAT I WAS NOT
> AWARE OF AND MAY HAVE AVOIDED THIS
> FAILURE. THIS IS A VERY EXPENSIVE REPAIR AS
> I USE MY TRUCK FOR WORK. *TR[51]

195.  Likewise, on August 5, 2014, the owner of a 2012 Chevrolet Silverado

2500 filed a complaint with NHTSA about the following incident which occurred

on July 11, 2014, in Chualar, California:

> VEHICLE WOULD NOT START. WHEN THEY PUT
> IT ON SCOPE THEY FOUND THAT THE FUEL RAIL
> PRESSURE WAS TO LOW. **THEY FOUND METAL
> SHAVINGS THROUGHOUT THE FUEL SYSTEM
> AS IF A PART WAS COMING APART FROM THE
> INSIDE**. THEY HAD TO REPLACE ENTIRE FUEL
> SYSTEM FROM PUMP TO INJECTORS PLUS ALL
> THE LINES AND INJECTION PUMP. THIS VEHICLE
> IS 2 YEARS OLD. *TR[52]

196.  On December 26, 2014, the following report regarding another 2012

Chevrolet Silverado 2500 was sent to NHTSA:

> THE CONTACT OWNS A 2012 CHEVROLET
> SILVERADO 2500. THE CONTACT STATED THAT
> WHILE DRIVING AT APPROXIMATELY 35 MPH,
> **THE VEHICLE STALLED**. **THE VEHICLE WAS
> NOT ABLE TO RESTART.** THE VEHICLE WAS
> TOWED TO A DEALER, WHO DIAGNOSED THAT

---

[51] Ex. 1 (NHTSA ID No. 10607796).

[52] *Id.* (NHTSA ID No. 10619113) (emphasis added).

- 131 -

THE FUEL PUMP NEEDED TO BE REPLACED. THE TECHNICIAN MENTIONED THAT **THE FUEL PUMP FRACTURED AND DEBRIS WENT THROUGH THE FUEL SYSTEM CAUSING INTERNAL DAMAGES**. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 47,000.[53]

197.   On February 7, 2015, the following "catastrophic failure" caused by the

CP4 pump in a 2012 GMC Sierra Duramax truck was reported to NHTSA:

**THE FUEL INJECTION PUMP CP4 HAD A CATASTROPHIC FAILURE AS I WAS DRIVING ON A HEAVILY TRAVELED FOUR LANE HIGHWAY**, US RT.20. I LOST POWER STEERING AND BRAKES. I FELT FORTUNATE THAT I WAS NOT TOWING A 16,000 LB. FIFTH WHEEL CAMPER DOWN A MOUNTAIN ROAD. I SAY THIS BECAUSE IT WAS EXTREMELY DIFFICULT TO MAINTAIN CONTROL OVER THE TRUCK STEERING IT AND BRINGING IT TO A CONTROLLED STOP. I HAVE READ ABOUT THESE PUMPS FAILING ON NUMEROUS DIESEL FORD AND GM TRUCKS. I ALSO FEEL IF A WOMAN OR SMALL PERSON HAD THIS HAPPEN TO THEM THE OUTCOME COULD END IN LOSS OF CONTROL RESULTING IN INJURIES EVEN DEATHS. THE ONLY ONE THAT KNOWS THE ACTUAL NUMBER OF PUMPS THAT HAVE FAILED IS THE MANUFACTURERS, WHO WILL NOT SHARE THAT INFORMATION WILLINGLY. *JS[54]

---

[53] *Id.* (NHTSA ID No. 10668322) (emphasis added).

[54] *Id.* (NHTSA ID No. 10681960) (emphasis added).

198.   On May 4, 2015, the following report regarding a 2011 GMC Sierra

Duramax HD was filed with NHTSA:

> VEHICLE WAS TRAVELING DOWN ACCESS ROAD
> COMING UP TO INTERSTATE OFFRAMP. **RIGHT**
> **BEFORE YIELD SIGN BOSCH CP4 PUMP FAILED**
> **STOPPING MOTOR**. BRAKES AND STEERING
> AFFECTED. JUST ENOUGH MOMENTUM TO FIGHT
> TRUCK INTO ADJACENT PARKING LOT RIGHT
> AFTER RAMP. *TR[55]

199.   On June 29, 2015, the following incident involving a 2011 GMC Sierra

3500 was reported to NHTSA:

> WHILE DRIVING UP HILL THE TRUCK JUST SHUT
> OFF. COULD NOT START IT AGAIN. THERE WAS
> NO WARNING SIGNS IT TOOK OVER 2 WEEKS
> AND 2 DIFFERENT GM DEALERS TO FIGURE OUT
> IT WAS A FUEL INJECTOR PUMP THAT
> EXPLODED. THERE WERE NO CODES ON THE
> TRUCKS COMPUTER TO ACKNOWLEDGE THERE
> WAS ANY PROBLEM WITH THE TRUCK EVEN
> AFTER IT WOULD NOT START. COULD HAVE
> BEEN EXTREMELY DANGEROUS IF OUR
> CIRCUMSTANCE WE'RE DIFFERENT. 5 MILES
> EARLIER AND WE WOULD HAVE BEEN ON AN
> EXPRESS WAY.[56]

200.   On October 29, 2015, the following complaint involving a 2013

Chevrolet Silverado 2500 was reported to NHTSA:

> ON AUG 2, 2015 ABOUT 25 MILES EAST OF GRAND
> JUNCTION CO. DRIVING SPEED WAS ABOUT 65
> MPH   ON   INTERSTATE   I-70.   MY   CHEVY

---

[55] *Id.* (NHTSA ID No. 10714457) (emphasis added).

[56] *Id.* (NHTSA ID No. 10730877).

SILVERADO 2500 WENT INTO A COMPUTER SHUT
DOWN. BEING A SKILLED PROFESSIONAL
DRIVER, WITH A CLASS A CDL I JUST MADE IT TO
THE SHOULDER BEFORE TRUCK SHUT DOWN,
TRUCK AND TRAVEL TRAILER I WAS TOWING
NEEDED TO BE TOWED TO ED BOZARTH GM
DEALER. ON MONDAY I WAS INFORMED WOULD
NEED TO PAY $ 775 TO DETERMINE POINT OF
FAILURE. AT THE TIME A COMPANY CALLED
SPEEDCO WAS AND MAYBE SUSPECT AS TO
CAUSE. THE DID A OIL CHANGE AND FUEL
FILTER IN W. MEMPHIS AR. THIS SERVICE WAS
DONE ON JULY 24,2015. ON JULY 25,2015 TRUCK
NO START, SPEEDCO CAME OUT WITH ANOTHER
FUEL FILTER. WHEN FIRST FUEL FILTER TAKEN
OFF , THERE WERE NO GASKETS. HOWEVER GM
APPEARS TO BE CONCEALING MATERIAL FACTS
AS TO INTERNAL SERVICE BULLETINS. THIS
BULLETIN AS TO POINT FAILURE WAS PRINTED
AUG 3, 2015 , 5 PAGES . A ESTIMATE BY SAID
DEALER WAS GIVEN TO SPEEDCO AND MYSELF
IN THE AMOUNT OF $ 8,692.02. WHEN THE FUEL
INJECTION PUMP WENT , SENT METAL SHAVINGS
THOUGH MY WHOLE SYSTEM ENGINE, FUEL OIL,
COOLING SYSTEM ETC. GM HAS KNOW ABOUT
THIS PROBLEM FOR A LONG TIME, HOWEVER
FAILED TO DISCLOSE TO ITS CUSTOMERS. IN MY
OPINION TO ALLOW FOR WARRANTY TO EXPIRE.
ONCE SPEEDCO WAS PRESENTED WITH SERVICE
BULLETIN THEY BACKED DOWN FROM PAYING.
GM HAD PROVED TO SPEEDCO THAT GM IS THE
PROBLEM. I HAVE CONTACTED GM IN DETROIT
MANY TIMES WITH DIFFERENT CASE NUMBERS.
ONE PHONE CALL I GOT FROM GM, STATED THE
ORIGINAL ESTIMATED STATED ABOVE WAS FAR
LOW. WHEN I ASKED HOW MUCH, STATED TO ME
COULD NOT SAY HOWEVER MUCH HIGHER. I'M
IN POSSESSION OF A LOT OF DOCUMENTATION. I
HAVEN'T SCANNED THE DOCUMENTS YET. THIS
TRUCK WAS PURCHASED IN OCT. OF 2013 FOR $

56,000, BANK FINANCING. ALSO THIS TRUCK WAS PURCHASED TO EARN A LIVING PULLING NEW TRAVEL TRAILERS. MY EXCELLENT CREDIT IS ON THE LINE DUE TO THIS LEMON. TRUCK HAD 20K, WITH WARRANTY.[57]

201. Similarly, on June 13, 2016, the owner of a 2012 Chevrolet Silverado

submitted the following complaint to NHTSA regarding the defective condition:

I WAS DRIVING DOWN A HIGHWAY ROAD WHEN MY VEHICLE ABRUPTLY LOST POWER, I RECEIVED A WARNING FROM MY DASHBOARD SAYING FUEL FILTER NEEDS REPLACING AND SUBSEQUENTLY LOST ENGINE POWER WHICH RESULTED IN NO POWER STEERING AND NO BRAKES. I WAS ABLE TO KEEP THE VEHICLE UNDER CONTROL AND GOT IT TO THE SIDE OF THE ROAD BEFORE IT BECAME DEAD. **AFTER GETTING THE VEHICLE TOWED TO A GARAGE IT WAS DETERMINED THAT THE CP4 FUEL INJECTION PUMP HAD FAILED RESULTING IN FUEL BEING STARVED FROM THE ENGINE AND THE RESULT WAS THE ENGINE SHUTTING OFF.** THE REPAIRS ALONE FOR THIS SINGLE FAILURE ARE $8550 BECAUSE THIS PUMP HAS FOULED ALL THE FUEL INJECTORS AND REGULATORS IN THE FUEL SYSTEM. MOST IMPORTANTLY THOUGH, I WAS FORTUNATE ENOUGH TO BE IN A POSITION ON HIGHWAY WHERE I HAD NO TRAFFIC BEHIND ME, AND ON A RELATIVELY STRAIGHT ROAD WHERE I WAS ABLE TO GET TO THE CURB BEFORE IT BECOME A BIGGER PROBLEM. FROM WHAT I HAVE FOUND THIS IS BECOMING A COMMON PROBLEM ON ALL OF THE DURAMAX 6.6L LML ENGINES UTILIZING THIS TYPE OF FUEL INJECTION PUMP AND GM

---

[57] *Id.* (NHTSA ID No. 10787120).

NEEDS TO RECALL THESE SYSTEMS AND REPAIR THEM.[58]

202.   On December 19, 2016, the owner of a 2012 Chevrolet Silverado 2500 reported the following failure to NHTSA:

> TL* THE CONTACT OWNS A 2012 CHEVROLET SILVERADO 2500. WHILE DRIVING 10 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO THE DEALER TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THERE WAS METAL CONTAMINATION IN THE FUEL SYSTEM DUE TO A FUEL PUMP FRACTURING IN THE FUEL TANK. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 130,000.[59]

203.   On December 28, 2016, the owner of a 2016 GMC Sierra 2500 reported the following to NHTSA regarding an incident that occurred on November 27, 2016:

> TL* THE CONTACT OWNS A 2016 GMC SIERRA 2500. WHILE DRIVING APPROXIMATELY 15 MPH, THE ENGINE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FUEL INJECTOR PUMP FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANU-FACTURER WAS INFORMED OF THE FAILURE. THE VIN WAS UNKNOWN. THE APPROXIMATE FAILURE MILEAGE WAS 11,000.[60]

---

[58] *Id.* (NHTSA ID No. 10873931) (emphasis added).

[59] *Id.* (NHTSA ID No. 10936256).

[60] *Id.* (NHTSA ID No. 10937972).

204.   Likewise, on January 9, 2017, the owner of a 2013 GMC Sierra 2500

submitted the following complaint to NHTSA regarding the defective condition:

> **BOSCH CP4 FUEL PUMP FAILURE**. PLEASE
> REFERENCE EA11-003 AND FIND THE SAME FUEL
> PUMPS THAT WERE FOUND TO FAIL ON AUDI/VW
> VEHICLES ARE ALSO USED ON GM, FORD, AND
> DODGE VEHICLES. SAID PUMP FAILED DURING
> DRIVING      WITHOUT      WARNING      CAUSING
> COMPLETE ENGINE SHUTDOWN AND LOSS OF
> POWER. CERAMIC AND METAL INTERNALS OF
> THE PUMP DISINTEGRATED AND TRAVELED
> THROUGH THE FUEL SYSTEM, SUBSEQUENTLY
> CAUSING THE INJECTORS TO FAIL. SIMILAR TO
> THE FINDINGS IN EA11-003, PAGE 16 PARAGRAPH
> 2, THE REPAIR IS TO COST APPROXIMATELY
> $10,000 TO FIX THE ENTIRE FUEL SYSTEM. *TR[61]

205.   Similarly, on March 15, 2017, the owner of a 2012 Chevrolet Silverado

3500  submitted  the  following  complaint  to  NHTSA  regarding  the  defective

condition:

> WHILE DRIVING ON A FOUR-LANE HIGHWAY
> TOWING   OUR   15,500   LB   FIFTH   WHEEL,
> SUDDENLY,   WITHOUT   ANY   WARNING,   WE
> HEARD RATTLING, LOST POWER, AND THE
> ENGINE SHUT DOWN. THE NOISE AND LOSS OF
> PROPULSION, POWER STEERING AND POWER
> BRAKES ALL OCCURRED WITHIN ABOUT 2-3
> SECONDS. GRATEFULLY, THE DRIVER HAD THE
> FORTITUDE TO IMMEDIATELY BEGIN PULLING
> ONTO   THE   SHOULDER   OF   THE   SLIGHT
> DOWNWARD SLOPE ON WHICH WERE [SIC]
> DRIVING. LUCKILY, WE WERE ON A STRETCH OF
> ROAD   THAT   WAS   NOT   INCLINED,   NOT   IN   A

---

[61] *Id.* (NHTSA ID No. 10943828) (emphasis added).

CONSTRUCTION ZONE WITH BARRIERS, NOT IN A SNOWY MOUNTAIN PASS OR IN OTHER INCLEMENT WEATHER, NOT IN THE LEFT LANE PASSING, ETC. HAD ANY OF THESE FACTORS PREVENTED US FROM SIMPLY PULLING ONTO THE SHOULDER OF THE ROAD, THE POTENTIAL FOR A LIFE THREATENING ACCIDENT WOULD HAVE BEEN SIGNIFICANT. **THE CHEVROLET/ GM SERVICE CENTER CONFIRMED THE BOSCH CP4 HPFP SUFFERED A CATASTROPHIC FAILURE, DESTROYING THE ENTIRE FUEL SYSTEM OF THE TRUCK.** GM IS COVERING PART OF THE REPAIR COSTS (TRUCK IS AT 119,705 MILES), BUT OUR BILL WILL REMAIN SUBSTANTIAL. RESEARCH OF DIESEL, TDI, AND OTHER FORUMS DOCUMENT THIS PROBLEM AS WELL-KNOWN AND BROADER THAN THE EXISTING 9 COMPLAINTS IN THE NHSTA PUBLIC DATABASE AND THE INVESTIGATION OF VW/AUDI. SOME PEOPLE ARE EVEN REPORTING MULTIPLE FAILURES. THE MOST COMMON BELIEVABLE CAUSE OF THE FAILURES SEEMS TO BE A MISMATCH OF LUBRICITY SPECS BETWEEN THE BOSCH CP4 AND THE DIESEL FUEL IN THE U.S. PLEASE OPEN AN INVESTIGATION, AND ORDER GM, FORD, VW, BOSCH AND OTHERS TO RECALL THESE VEHICLES TO PROVIDE THE NECESSARY REPAIRS.[62]

206.   On May 26, 2017, the owner of a 2012 GMC Denali Duramax Sierra

2500 posted the following on DuramaxForum.com:

So I have a 2012 GMC Denali Duramax with 116k on the odometer. A couple of weeks it just stopped working while driving. We had it towed to the dealer and they took a look at it and stated the fuel pump 'blew' up and contaminated the entire fuel delivery system. They want to replace the

---

[62] *Id.* (NHTSA ID No. 10966092) (emphasis added).

entire fuel system as well as put in an 'upgraded' GM pump for about $7100.[63]

207.   In the same vein, diesel truck owners in the online forum DieselPlace.com lamented their woes in the following conversation thread entitled, *"Have they fixed the CP4 issue yet?"*

- "[My 2015 GMC LML] just blew up at 68k. Sent metal through the whole fuel system. [$]10.5K to fix."[64]

- "There is nothing NORMAL about a +$10k repair bill . . . . If CP4s failed like CP3['s] nobody would be talking about it. But the fact they puke with no [failsafe] is the real issue. When people are having to take out 2nd mortgages to get their truck repaired there's a problem with that."[65]

208.   Along these same lines, in January 2015, the owner of a 2015 GMC Sierra 3500 began a thread on the DuramaxForum.com stating as follows:

---

[63]   martyisokay, Forum post #1 re: "Injection CP4 pump failure," DURAMAXFORUM.COM (May 26, 2017,), https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/909393-injection-cp4-pump-failure.html.

[64]   FlagLML, Forum post #4 re: "Have they fixed it yet?", DIESELPLACE.COM (Dec. 20, 2015), https://www.dieselplace.com/forum/63-gm-diesel-engines/365-duramax-fifth-generation-2011-2016-lml/794162-have-they-fixed-cp4-issue-yet.html.

[65]   NorCal2500HD, Forum post #6 re: "Have they fixed it yet?", DIESELPLACE.COM (Dec. 21, 2015), https://www.dieselplace.com/forum/63-gm-diesel-engines/365-duramax-fifth-generation-2011-2016-lml/794162-have-they-fixed-cp4-issue-yet.html.

> I have a new 2015 GMC 3500 with 14k miles that the
> injection pump crapped out on me. Dealer has had it for 3
> 1/2 weeks. Was told if they find any metal they would have
> to tear the engine down. Well they found metal but didn't
> tear it all the way down. Has anyone else had an issue
> [with] the injection pump on the 2015 Duramax[?][66]

209.   Shortly thereafter, the following response comes in from a fellow
DuramaxForum.com user: "[L]ots of LML's have had injector pump issues in the
states[,] go down to the LML [forum] and read, it[']s caused by the new cp4.2 pump
that needs better fuel then what you can buy."[67]

210.   Notably, the initial complainant then explained how he finally got his
truck back after a series of fuel line/tank line/chassis line flushes and replacements
by the dealership, including a fuel pump injector replacement: "[I]t was around [an
$]8000.00 job and that was warranty price."[68] One DuramaxForum.com user

---

[66]   ditch, Forum post #1 re: "2015 DuraMax Injection pump troubles,"
DURAMAXFORUM.COM   (Jan.   4,   2015),   https://www.duramaxforum.com/
forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html.

[67]   budtoh3zo, Forum post #2 re: "2015 DuraMax Injection pump troubles,"
DURAMAXFORUM.COM   (Jan.   7,   2015),   https://www.duramaxforum.com/
forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html.

[68]   ditch, Forum post #4 re: "2015 DuraMax Injection pump troubles,"
DURAMAXFORUM.COM   (Jan.   7,   2015),   https://www.duramaxforum.com/
forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html.

responded, "To[o] bad the dealers won['] t just install a cp3 instead of the crappy cp4 when these go out in the lml[]s. It only makes sense!!!"[69]

211.   Along the same lines, on August 3, 2017, the owner of a 2012 Chevrolet Silverado 2500 submitted the following complaint to NHTSA regarding the defective condition:

> **BOSCH CP4.2 FUEL PUMP MALFUNCTIONED AND CONTAMINATED THE ENTIRE FUEL AND INJECTION SYSTEM WITH METAL SHAVINGS.** THE TRUCK ENGINE STOPPED WHILE TRAVELING AT 50 MPH ON A CITY STREET AND LEFT ME WITH NO POWER STEERING. THE ENTIRE FUEL SYSTEM NEEDS TO NOW BE REPLACED AND NOT COVERED BY THE MANUFACTURER. REPAIR BILL OF OVER $7,000.[70]

212.   On November 13, 2017, the following incident involving a 2014 GMC Sierra 2500HD Duramax truck was filed with NHTSA:

> MY FUEL PUMP AND INJECTORS FAILED WHILE I WAS DRIVING, STRANDING MY TRUCK IN THE MIDDLE OF TRAFFIC RIGHT WHERE A CITY STREET WAS CHANGING TO A COUNTRY ROAD. THE GMC DEALERSHIP FALSELY CLAIMED THAT THIS WAS CAUSED BY USING UNAPPROVED FUEL. THE FUEL I USED WAS B20 BIODIESEL, WITH 80% RENEWABLE DIESEL, WHICH MEETS DIESEL SPECIFICATIONS AND IS A LEGAL ROAD FUEL IN CALIFORNIA. THEY ALSO CLAIMED

---

[69] Carter7, Forum post #10 re: "2015 DuraMax Injection pump troubles," DURAMAXFORUM.COM (Jan. 7, 2015), https://www.duramaxforum.com/forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html.

[70] Ex. 1 (NHTSA ID No. 11012551) (emphasis added).

THAT A CASCADE OF OTHER PROBLEMS WERE
ALL CAUSED BY MY FUEL AND REFUSED TO
APPLY MY WARRANTY.[71]

213.    On April 10, 2018, the following customer complaint involving a 2016

Chevrolet Silverado 3500 diesel truck was filed with NHTSA:

> THE CONTACT OWNS A 2016 CHEVROLET
> SILVERADO 3500. WHILE DRIVING 40-45 MPH,
> THE REDUCED ENGINE SPEED WARNING
> INDICATOR ILLUMINATED AND THE VEHICLE
> STALLED. THE CONTACT WAS UNABLE TO
> RESTART THE VEHICLE. THE VEHICLE WAS
> TOWED TO HERB EASLEY MOTORS (1125
> CENTRAL E FWY, WICHITA FALLS, TX 76306, (940)
> 723-6631) WHERE IT WAS DIAGNOSED THAT THE
> FAILURE WAS DUE TO CONTAMINATION OF
> METAL SHAVINGS IN THE FUEL PUMP AND FUEL
> RAILS. IN ADDITION, THE FAN CLUTCH FAILED
> AND NEEDED TO BE REPLACED, INCLUDING THE
> ENTIRE FUEL SYSTEM. THE VEHICLE WAS
> REPAIRED, BUT THE FAILURE RECURRED
> SEVERAL MONTHS LATER. THE VEHICLE WAS
> TAKEN BACK TO THE DEALER WHERE IT WAS
> DIAGNOSED THAT THE FUEL SYSTEM NEEDED
> TO BE REPLACED AGAIN. THE VEHICLE WAS NOT
> REPAIRED DUE TO COST. THE MANUFACTURER
> WAS NOTIFIED OF THE FAILURES AND CASE
> NUMBER: 8-4064184145 WAS OPENED. THE
> APPROXIMATE FAILURE MILEAGE WAS 38,000.[72]

214.    On April 17, 2018, the following report was submitted to NHTSA on

behalf of the owner of a 2013 GMC Sierra 3500:

---

[71] *Id.* (NHTSA ID No. 11045708).

[72] *Id.* (NHTSA ID No. 11084287).

THE CONTACT OWNS A 2013 GMC SIERRA 3500. THE CONTACT STATED THAT THE VEHICLE FAILED TO START. THE VEHICLE WAS TOWED TO KUHIO CHEVROLET CADILLAC HYUNDAI NISSAN (3033 AUKELE ST, LIHUE, HI 96766, (808) 245-6731) WHERE IT WAS DIAGNOSED THAT THE FUEL PUMP AND INJECTORS FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED AND DID NOT ASSIST. THE APPROXIMATE FAILURE MILEAGE WAS 34,500.[73]

215.   On November 12, 2018, the owner of a 2011 Chevrolet Silverado 2500 submitted the following complaint to NHTSA regarding the defective condition:

I WAS TRAVELING TO WORK IN THE FAST LANE OF THE FREEWAY WHEN I HEARD A FAINT SQUEALING NOISE AND THE TRUCK SUDDENLY STARTED RUNNING ROUGH. I BEGAN CROSSING ALL 4 LANES AND BY THE TIME I MADE IT TO THE [SIC] SLOW LANE THE TRUCK COMPLETELY DIED. I WAS ABLE TO SAFELY COAST OFF OF THE FREEWAY DUE TO MY QUICK REACTION AND LACK OF TRAFFIC AT THE TIME, BUT THE SITUATION WAS VERY DANGEROUS AND COULD HAVE BEEN MUCH MORE SO WITH HEAVIER TRAFFIC OR A LESS AWARE DRIVER. **LATER DIAGNOSIS AT THE CHEVROLET DEALERSHIP TOLD ME THAT THE CP4 FUEL PUMP DISINTEGRATED INSIDE. AFTER SPEAKING WITH THE DIESEL TECHNICIAN AT THE DEALER I LEARNED THAT IT IS A VERY COMMON PROBLEM AND THE REPAIR COMES WITH A $10,000 PRICE TAG.** I WAS ALSO VERY SURPRISED THAT THERE HAS NEVER BEEN A RECALL FOR THIS PROBLEM AND GM CONTINUED TO USE THEM UNTIL 2017...7 YEARS!

---

[73] *Id.* (NHTSA ID No. 11088735).

MY TRUCK IS A 2011 WITH ONLY 54K MILES, AND THEY JUST FIXED A 2017 WITH ONLY 7K MILES! I HAVE SINCE DONE A LOT OF RESEARCH FINDING HUNDREDS OF LOW MILEAGE GM DURAMAX DIESEL BETWEEN 2011-2017 WITH THE EXACT SAME FAILURE. I WAS ABLE TO GET THE BOTTOM OF THE FAILURE ITSELF AND I FOUND THE FOLLOWING...THE BOSCH CP4 FUEL PUMPS THAT WERE USED IN THESE TRUCKS (ALSO FOUND IN LATE FORD AND VW DIESELS) ARE MADE IN EUROPE TO DIFFERENT SPECIFICATIONS. THE PUMPS RELY ON LUBRICANT FOUND IN DIESEL #1 TO OPERATE SMOOTHLY AND LAST A LONG TIME. HERE IN THE U.S. WE ONLY HAVE DIESEL #2 WHICH LACKS THAT LUBRICANT AND CAUSES THE INTERNAL PARTS OF THE PUMP TO DISINTEGRATE SENDING METAL SHAVINGS THROUGHOUT THE ENTIRE FUEL SYSTEM. THIS IS WHY THE REPAIR AVERAGES $10,000 ACROSS THE COUNTRY, THE ENTIRE FUEL SYSTEM BECOMES CONTAMINATED AND HAS TO BE REPLACED. I CONTACTED GM AND THEY DON'T BELIEVE THIS IS A SAFETY ISSUE. A VEHICLE SUDDENLY DYING WITH SECONDS NOTICE ON THE FREEWAY IS CERTAINLY A SAFETY ISSUE IN MY EYES. ESPECIALLY WHEN IT'S A COMMON FAILURE THAT CAN BE PREVENTED."[74]

216. Notably, in August 2014, GM issued an internal "Preliminary Information" service bulletin to dealers—but *not* consumers—regarding the following vehicles equipped with the 6.6L Duramax Diesel RPO codes LGH and LML: 2010–15 Chevrolet Express van, 2010–15 Chevrolet Silverado, 2010–15

---

[74] *Id.* (NHTSA ID No. 11150932) (emphasis added).

GMC Savana van, and the 2010–15 GMC Sierra.[75] The bulletin's subject was "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump Replacement," and stated that if a customer with one of the aforementioned vehicles came into a dealership with "a hard start or a no start" problem, and the normal diagnostic procedure led the dealer to conclude that fuel injection pump replacement was necessary, "Fuel Pressure Regulator 1 must be inspected for magnetic metal debris" as well.[76] In other words, simply replacing the fuel injection pump would not completely solve the problem because metal shavings would have contaminated the entire fuel injection system. The bulletin directed dealers to remove the fuel injection pump and pressure regulator and "inspect[] for magnetic metal debris," and if metal debris was found, GM required its dealers to retain the affected fuel system components which "will be requested back for an engineering inspection."[77] The following photographs of a contaminated fuel pressure regulator were provided as examples of the condition having manifested—and metal shavings can be seen throughout:[78]

---

[75] *See* GM Service Bulletin PIP4949D, Preliminary Information regarding "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump Replacement," (Aug. 2014), available at https://static.nhtsa.gov/odi/tsbs/2014/SB-10044240-3551.pdf.

[76] *Id.* at 1.

[77] *Id.* at 1, 3.

[78] *Id.* at 2–3.



217.   Rather than issue a recall, in March 2017 GM went on to reissue the Preliminary Information as Technical Service Bulletin #16-NA-102, expanding the affected model years to include the 2016 model year.[79]

218.   Tellingly, GM stopped equipping the Class Vehicles with the CP4 pump after the 2016 model year, opting instead for the Denso HP4 fuel injection pump[80]—a design that has been available for medium and large-sized trucks since at least the 2004 model year.[81] This proves that the core issue is use of the CP4 pump—not the fuel used by customers.

---

[79] GM Technical Service Bulletin #16-NA-102: Duramax Diesel Hard Start, No Start, DTCs P0087, P0088, P0191, P128E or Injection Pump Replacement, Document ID: 4474673 (Mar. 2, 2017), available at https://f01.justanswer.com/Bluegorilla/53288260-1d95-4c61-94ef-9cbd4868f4c1_My_Boot_Camp_printed_document.pdf.

[80] *See, e.g.*, Mike McGlothlin, *Duramax History, Lesson 6: L5P*, DRIVINGLINE.COM (Dec. 26, 2018), available at https://www.drivingline.com/articles/duramax-history-lesson-6-l5p/.

[81] *See, e.g.*, Sept. 2007 Denso Diesel Injection Pump Service Manual for Common Rail System (CRS) Operation, Sec. 1.5 ("Common Rail System And Supply Pump

J.     **The Cost and Damage from "Progressive" CP4 Failures Are Significant.**

219.   In addition to catastrophic CP4 failure, there are harmful consequences from the progressive failure that the pump exhibits. Early symptoms of progressive failure of the Bosch CP4 pump include malfunction and failure of the precision common rail fuel injectors. Microscopic metal debris from the CP4 pump may slip past the filter in the metering valve and into the pumping chambers of the CP4 pump, and then flow out to the downstream fuel pipes, fuel rails, and to the injectors, thereby contaminating the whole fuel system with microscopic debris. The openings in the injectors are very small (a few microns), and microscopic pump wear debris can either hold the injector nozzle needle open, or closed, or slow its opening and closing rate.

220.   If the injector nozzle needle is left open too long or stuck open, this will result in gross over-fueling of the combustion chamber, which can lead to progressive damage of the power cylinder (including the piston, rings, block, connecting rod, and crankshaft). Over-fueling can overheat the piston and result in a twisted or melted piston, or burn a hole in the piston. Over-spray penetration can

---

Transitions"), available at http://steldiesel.ru/files/crdensoservismanual.pdf (last accessed Aug. 5, 2019) ("In 2004, the three-cylinder HP4 based on the HP3 was introduced"); Dec. 2013 Denso Diesel Systems & Diagnostics, Technical News Bulletin, Issue 1, at 1, available at http://www.denso.ro/media/151806/2013_technical-service-bulletin_no-01.pdf (last accessed Aug. 5, 2019) (showing different types of Denso high-pressure pumps and their range of applications, including the HP4, beginning in the 2004 2nd Generation Common Rail System).

also result in dilution of the lube oil on the power cylinder walls and lead to scuffing and eventual failure of the piston, connecting rod, and the engine block. Severe dilution of the lube oil can also damage engine and rod main bearings and other oil-lubed running surfaces.

221.   A stuck or sticking injector which causes over-fueling can also increase fuel consumption and thereby reduce fuel economy. The air-fuel ratio of modern diesels is 18 parts air to one part fuel or higher (18:1—70:1 or what is called "lean burn") for optimal combustion. But when the injectors are sticking open or blocked open, the fueling becomes uncontrolled (by the electronic control unit) and air/fuel ratios can become much richer than design calibration. This increases the potential for white smoke (unburned fuel), black smoke (burned but wasted fuel), combustion pressures, and temperatures and emissions (NOx, particulate matter, CO, CO2, and unburned hydrocarbons) beyond capabilities of exhaust aftertreatment systems to control. Fuel economy will also likely decline since the wasted fuel to produce the smoke is not doing work to produce power, and so miles per gallon should be reduced.

222.   In addition, a blocked closed injector (due to wear debris) forces the engine control system to demand more fueling from the remaining functional injectors to compensate for the loss of a power cylinder, and this can also cause reduced performance and increased fuel consumption/reduced fuel economy.

223. In some cases, injector nozzle tips can be broken by wear debris trapped in spray holes or under the nozzle needle seat, essentially turning the injector into an open fuel hose. A broken nozzle tip can result in gross over-fueling which may cause hydraulic lock[82] and bending of the connecting rods. Over-fueling also causes over-temperature conditions which can damage exhaust valves, cylinder heads, exhaust manifolds, turbochargers and aftertreatment systems. These progressive damages can occur before the CP4 pump catastrophically fails, and causes noticeable loss of fuel pressure warnings, engine stall, or no start conditions which forces the consumer to seek a repair and pump replacement. Fuel systems contaminated with microscopic wear debris must be completely replaced including fuel pressure pipes, rails, pressure sensors and injectors.

224. In short, the Class Vehicles are inherently less durable than previous models because of the CP4 fuel pump defect. Less durability means that Class Vehicle owners will experience more repair costs. CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles.

225. The Bosch CP4 Pump problem is so prevalent that several automotive parts sellers now provide kits to mitigate the inevitable harm. "Disaster Preventer

---

[82] "Hydraulic lock" refers to a condition when the piston hits solid fuel, rather than air or a fuel/air mix.

Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system. But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine. The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system—in other words, a "Band-Aid" solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "[p]revent CP4 failures from contaminating the high pressure fuel system."[83] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

226. Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel. With Duramax engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place of the Bosch CP4 Pump. Indeed, the CP4 pump is so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least

---

[83] Online sales listing for "2011-2016 LML CP4 Fuel Bypass Kit," PERFORMANCEFUELED.COM, available at http://performancefueled.com/cp4-fuel-bypass-kit/ (last accessed Aug. 5, 2019).

$3,000 per vehicle for the replacement parts alone.[84] Resorting to this "remedy" fails to make consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium. Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was implemented by GM in the Class Vehicles. The use of the CP3 pump, however, again demonstrates that the real problem is the CP4 pump—not "bad" fuel.

227.   Another potential "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure.[85] But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

---

[84] *See, e.g.*, http://www.engineered-diesel.com/lml-duramax-cp3-conversion-kit-with-re-calibrated-pump-50-state-carb-certified (last accessed Aug. 5, 2019) (selling "LML Duramax CP3 Conversion Kit with re-calibrated Pump[s]" for $3,000.00 and noting that the "[k]it is designed to replace the less reliable CP4 that comes stock on the LML"); https://www.dieselpowerproducts.com/p-15627-industrial-injection-436403-cp4-to-cp3-injection-pump-conversion-kit-tuning-required-11-16-66l-gm-duramax-lml.aspx (last accessed Aug. 5, 2019) (selling an "Industrial Injection CP4 to CP3 Injection Pump Conversion Kit" for 2011-2016 6.6L GM Duramax LML and noting, "With the release of the LML Duramax in 2011, GM made the switch from the reputable CP3 injection pump to the lower output CP4 pump, simply because they deemed it was 'good enough.' Is 'good enough' good enough for you and your truck? We've seen numerous failures on the CP4 on stock trucks, let alone even slightly modified trucks that chew them up and spit them out. Industrial Injection has this complete conversion kit that delivers everything you need to swap out your failure prone CP4 to a dependable CP3").

[85] *See* Sinister Diesel, *Lift Pumps & Fuel System for Duramax*, https://sinisterdiesel.com/c-955075-shop-by-vehicle-gm-duramax-lift-pumps-fuel-systemfor-duramax.html (last accessed May 21, 2020).

- 151 -

228.   The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel. So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

229.   A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel. This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.[86]

230.   In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.

---

[86] Indeed, GM has tacitly acknowledged the need for diesel fuel additives as recently as October 2019 via GM internal Service Bulletin No. 03-06-04-017N. *See* GM Service Bulletin No. 03-06-04-017N at 2 (Oct. 2019), https://static.nhtsa.gov /odi/tsbs/2019/MC-10166665-9999.pdf (emphasis added) (under the subsection entitled, "**Poor Lubricity**"): "[T]he 6.6L Duramax® Diesel engines are designed to operate on today's low sulfur fuel without the use of additives. A fuel additive designed to increase lubricity is not a fix for poor quality or contaminated fuel, *but some customers may desire to use a lubricity additive to aid in the longevity of their fuel system components.* If such an additive is to be used, it must not contain any metal based additives, alcohol or other water emulsifiers."); *id.* (under the subsection entitled, "**Fuel Stability**"): "Fuel Stability and degradation may be a concern for diesel fuels, especially for diesel fuel containing biodiesel . . . . [S]ome customers may desire to use a stability additive to increase the shelf life of their fuel. If such an additive is to be used, it must not contain any metal based additives, alcohol or other water emulsifiers.").

K.    **GM Knew Durability and Superiority Were Material to Consumers and Falsely Promised its Trucks Were Durable and Superior.**

231.   When it first came on the scene in 2010, GM announced that its new 6.6 liter Duramax V-8 diesel engine for 2011 model year Chevrolet Silverado and GMC Sierra heavy duty trucks would be 11 percent more fuel efficient than its previous Duramax diesel engines, with "a mind-blowing 765 pounds-feet of torque."[87] In a press release, GM's chief Duramax engineer, Gary Arvan, proclaimed, "[W]e've enhanced the Duramax to make it one of the most competitive engines in the segment—one that takes performance and fuel economy to the next level. Whether it's a new Sierra Denali HD or an ambulance based on a Sierra chassis cab, customers will find the Duramax is the power behind the greater capability these trucks offer."[88]

232.   GM's 2011 Chevrolet Silverado HD truck brochure boasted of an eleven-percent increase in fuel efficiency while claiming the durability of its

---

[87] Mike Levine, *GM Announces Best-in-Class Power Figures for 2011 6.6-liter Duramax V-8 Diesel*, PICKUPTRUCKS.COM (Mar. 9, 2010), available at https://news.pickuptrucks.com/2010/03/gm-announces-best-in-class-power-figures-for-2011-duramax-v8-diesel.html.

[88] GM, Press Release, *GMC's 2011 Heavy-Duty Trucks Build on Proven Heritage with New Duramax 6.6L Turbo Diesel Engines* (Mar. 10, 2010), https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2010/Mar/0310_gmc_sierra_hd/0310_duramax.html.

predecessors, "PROVEN DURABILITY[:] The Duramax-Allison combination continues to build on its proven reliability."[89]

233.   GM's 2011 Chevrolet Silverado HD brochure further emphasized that GM had "engineered the new 2011 Silverado HD with durable, advanced technology that makes this [their] **most powerful heavy-duty ever.**" GM also provided an express "100,000 mile/5-year Powertrain Warranty to guarantee the quality." The brochure further stated "[t]he new Silverado HD. From Chevrolet—the most dependable, longest-lasting full-size pickups on the road." This brochure also expressly stated that the Duramax diesel engine in the 2011 Silverado could run on "B20 biodiesel. . . which is composed of 20% biodiesel mixed with regular diesel."[90]

234.   Likewise, for the 2012 GMC Sierra HD, GM actively touted the Duramax diesel engine's "advanced" high-pressure diesel direct injection system "that helps it start in as little as 3.0 seconds . . . [and] can give you a maximum

---

[89] GM, Press Release, *New 2011 Chevrolet Silverado Heavy Duty Trucks Deliver Best-In-Class Diesel Torque and Horsepower* (Mar. 10, 2010), available at https://media.chevrolet.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2010/Mar/0310_silverado_power1.html

[90] 2011 Chevrolet Silverado HD Vehicle Brochure, at 5, available at http://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2011.pdf (last visited Aug. 5, 2019).

highway range of up to 680 miles on a single fill-up, thanks to its extra-large 36-gallon fuel tank."[91]

235. GM's 2012 Chevrolet Silverado HD brochure highlights the "dependable, long-lasting workhorse of a truck that comes with the best coverage of any size pickup—a 100,000 MILE/5-YEAR POWERTRAIN WARRANTY. Because [they know] it's one thing to talk quality and quite another to back it up[:]"[92]

---

[91] 2012 GMC Sierra Vehicle Brochure, at 28, available at https://cdn.dealereprocess.net/cdn/brochures/gmc/2012-sierra.pdf (last accessed Aug. 5, 2019).

[92] 2012 Chevrolet Silverado Vehicle Brochure, at 3, available at https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2012-silveradohd.pdf (last accessed Aug. 5, 2019).



Silverado 3500HD Dually,
Crew Cab Long Box LTZ 4x4
shown in Black Granite Metallic
with available features.

AT A GLANCE
Choice of 2WD or 4x4 models
Available Duramax 6.6L Turbo-Diesel V8 engine
and Allison 6-speed automatic transmission
Tows up to 23,000 lbs.
Fully boxed heavy-duty frame

JOB
READY

Brute strength solves a lot of problems. Reason enough to build the 2012 Silverado HD—**OUR MOST POWERFUL HEAVY DUTY** yet. By teaming an available **DURAMAX® 6.6L TURBO-DIESEL V8** powerhouse with the legendary Allison® 6-speed transmission, Silverado HD delivers **397 HORSEPOWER, 765 LB.-FT. OF TORQUE** and a **MAXIMUM TOWING CAPACITY OF UP TO 23,000 LBS.** Factor in a high-strength, fully boxed steel frame that's capable of hauling up to 7,215 lbs. of payload and the phrase "**THE STRONGEST SILVERADO HD EVER**" takes on a much deeper meaning.

Want to configure your rig? Silverado HD gives you the choices you need to carry both cargo and crew. Choose from Regular Cab, Extended Cab or Crew Cab, all available in 2WD or 4x4 models to help you get the right people to the job.

The 2012 Silverado HD. This dependable, long-lasting workhorse of a truck comes with the best coverage of any full-size pickup—a **100,000-MILE/5-YEAR POWERTRAIN WARRANTY.** Because we know it's one thing to talk quality and quite another to back it up.

236.    GM's 2013 Chevrolet Silverado HD brochure indicated that it is

"ingrained in the bold design, spirited performance, proven durability, and

- 156 -

exceptional value [their] drivers enjoy."[93] Moreover, GM touted its 2013 1500 HD

trucks as the "most dependable[,] longest-lasting full-size pickups on the road[:]"[94]



237.   GM's 2014 Chevrolet Silverado HD brochure emphasized that

consumers could "EXPECT THE BEST" and guaranteed that "every Silverado

2500HD and 3500HD is backed by the Best Pickup Coverage in America, including

a 100,000-mile/5-year Powertrain Limited Warranty and 24,000-mile/2-year

scheduled maintenance. That's long-lasting dependability you can believe in."[95]

---

[93]   2013 Chevrolet Silverado Vehicle Brochure, at 2, available at
https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2013-silverado1500.pdf
(last accessed Aug. 5, 2019).

[94]   *Id.* at 4.

[95]   2014 Chevrolet Silverado HD Vehicle Brochure, at 2, available at
https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2014-silverado2500hd.pdf
(last accessed Aug. 5, 2019).

238.   For the 2015 Chevrolet Silverado HD, which GM touted as "our most advanced heavy-duty pick-up ever," GM's vehicle brochure proclaimed, "You don't get to be part of the most dependable, longest-lasting full-size pickups on the road by tampering with what works. You build on proven success. You make your best even better[:]"[96]

**THE STRENGTH OF EXPERIENCE. SILVERADO HD.** /

Introducing the new Silverado HD. Built heavy-duty strong to help get you through the most demanding jobs, the 2015 Silverado HD offers the proven power of our Duramax 6.6L Turbo-Diesel V8 mated to the legendary Allison® transmission—produced by the makers of military tank transmissions. Or there's the muscle of our standard Vortec 6.0L V8. The new Silverado HD is heavy-duty smart, too. With its advanced exterior and interior designs, plus safety innovations including the available Safety Alert Driver Seat, the 2015 Silverado 2500HD and 3500HD move the strong tradition of Chevy trucks decisively forward.

Got something serious to tow? Got a mountain to climb? Silverado 3500HD can tow up to 23,200 lbs¹—without breaking a sweat. With advanced technology like Trailer Sway Control, Silverado HD is a tow vehicle that combines brute strength with engineering refinement.

You don't get to be part of the most dependable, longest-lasting full-size pickups on the road² by tampering with what works. You build on proven success. You make your best even better.

239.   Additionally, in the Duramax diesel supplement to the owners' manual for the 2015 Duramax diesel Chevrolet Silverado and GMC Sierra, GM specifically represented that, "This vehicle is approved to use . . . diesel and biodiesel blends [which] must meet all the requirements as defined in the most current versions of the local fuel standards."[97]

---

[96] 2015 Chevrolet Silverado HD Vehicle Brochure, at 3, available at https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2015-Chevrolet-Silverado-HD.pdf (last accessed Aug. 6, 2019).

[97] 2015 Chevrolet/GMC Duramax Diesel Supplement, Sec. 9-21 ("Fuel"), available at https://my.chevrolet.com/contentdam/gmownercenter/gmna/dynamic/manuals/2015/gmc/sierra_1500/2015-Silverado%20HD%20&%20Sierra%20HD-Duramax-Diesel-Manual.pdf (last accessed Aug. 5, 2019).

240.   Likewise, GM touted the longevity and reliability of the Duramax 6.6L Turbo-Diesel engines in 2016 Chevrolet Silverado HD 2500 and 3500 vehicles by proclaiming that, "There are over 1 million Duramax diesels with Allison transmissions on the road today with over 100 billion miles of experience . . . . [The] Duramax Turbo-Diesel engine lets Silverado HD offer you best-in-class maximum conventional towing capability. That's power you can trust to go the distance[:]"[98]

241.   GM similarly touted the capability of the 2011 Chevrolet Express van by noting that its new 6.6L Duramax diesel engine had "up to 11-percent greater fuel economy" than previous models, along with a "new 30,000-psi (2,000 bar) piezo-actuated fuel injection system—capable of operating on ASTM grade B20 biodiesel[—]ensur[ing] more precise fuel delivery, improving emission performance."[99]

242.   Likewise, GM advertised the 2011 GMC Savana van as having a "new Duramax 6.6L turbo diesel" engine that was "more fuel-efficient—up to 11-percent greater fuel economy than the outgoing model," as well as having a "new 30,000-

---

[98]   2016 Chevrolet Silverado HD Vehicle Brochure, at 9, available at https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2016-Chevrolet-Silverado-HD.pdf (last accessed Aug. 5, 2019).

[99]   "2011 Chevrolet Express Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," GM PRESSROOM, available at https://media.gm.com/media/us/en/chevrolet/vehicles/express-psgr/2011.html (last accessed Aug. 5, 2019).

psi (2,000 bar) piezo-actuated fuel injection system—capable of operating on ASTM grade B20 biodiesel—ensur[ing] more precise fuel delivery, improving emission performance."[100]

243.   GM also provided an express 60-month, 100,000-mile written warranty with the Class Vehicles it manufactured.

244.   GM has repeatedly refused to honor its warranties, claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.

245.   GM induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design GM has long known would cause fuel contamination—a condition GM now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

L.   **GM's "Certified Pre-Owned" Vehicle Sales Allow GM to Further Profit Off of its Fraudulent Conduct.**

246.   While GM has ostensibly ceased production of new diesel trucks containing the defective Bosch CP4 fuel pump, it continues to market and sell the Class Vehicles through its "Certified Pre-Owned" program. In so doing, GM continues to conceal the fact that the Class Vehicles are defective and contain serious

---

[100] "2011 GMC Savana Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," GM PRESSROOM, available at https://media.gmc.com/media/us/en/gmc/vehicles/savana/2011.html (last accessed Aug. 5, 2019).

safety and functionality defects, while fraudulently representing that these "Certified Pre-Owned" vehicles are free from safety defects and were built with "premium" and superior engineering and design.

247.    Indeed, GM's "Certified Pre-Owned" website promises that the vehicles "[m]ust pass our 172-Point Vehicle Inspection and Reconditioning Process"[101] to give you "172 Reasons to Feel Confident."[102] And this Certified Pre-Owned 172-Point Vehicle Inspection expressly comes with the promise that the vehicle's fuel system has been professionally evaluated[103] so that the vehicle can "meet our premium manufacturing standards to earn the Certified title."[104] The Certified Pre-Owned package also purports to include an "[i]mproved 6-Year/100,000-Mile Powertrain Limited Warranty"[105] which only *further* perpetuates GM's fraud by noting that this warranty coverage does "[n]ot [i]nclude[] . . . [d]amage due to contaminated or poor-quality fuel."[106] In other words, GM will

---

[101]  https://www.gmcertified.com/certified-benefits/built-in-value (last visited Aug. 5, 2019).

[102]  https://www.gmcertified.com/certified-benefits/vehicle-car-inspection (last visited Aug. 5, 2019).

[103]      *See*      https://storage.static-gm.com/aa/a025aeed-72c4-4e86-9289-964422138cbe/8154502a-6403-4112-beb5-1b280b5dc92f/172-Point_Inspection_Checklist_02_2016.pdf (last visited Aug. 5, 2019).

[104]  https://www.gmcertified.com/certified-benefits (last visited Aug. 5, 2019).

[105]      https://www.gmcertified.com/certified-benefits/used-car-warranty (last visited Aug. 5, 2019).

[106]  *Id.*

continue to blame customers when their CP4 fuel pumps catastrophically fail in a "Certified Pre-Owned Vehicle," instead of taking responsibility for the fact that GM manufactured the Class Vehicles with a fuel pump that is particularly incompatible with U.S. diesel fuel.

248.   And yet countless Class members who have purchased Certified Pre-Owned Class Vehicles have received none of the "happily ever after"[107] GM promised, when Class members later come to learn that they have been duped into buying an American vehicle that is particularly incompatible with the only diesel fuel they can reasonably expected to use in America.

## M.   Allegations Establishing Agency Relationship Between Manufacturer GM and GM Dealerships.

249.   Upon information and belief, Manufacturer Defendant GM has impliedly or expressly acknowledged that GM-authorized dealerships are its sales agents, the dealers have accepted that undertaking, GM has the ability to control authorized GM dealers, and GM acts as the principal in that relationship, as is shown by the following:

   i.    Manufacturer GM can terminate the relationship with its dealers at will;

   ii.   The relationships are indefinite;

   iii.  Manufacturer GM is in the business of selling vehicles as are its dealers;

---

[107] *See* https://www.gmcertified.com/certified-benefits/customer-satisfaction-3-day-150-mile (last accessed Aug. 6, 2019).

iv.   Manufacturer GM provides tools and resources for GM dealers to sell vehicles;

v.   Manufacturer GM supervises its dealers regularly;

vi.   Without Manufacturer GM, the relevant GMs dealers would not exist;

vii.   Manufacturer Principal GM requires the following of its dealers:

    a.   Reporting of sales;

    b.   Computer network connection with Manufacturer GM;

    c.   Training of dealers' sales and technical personnel;

    d.   Use of Manufacturer GM-supplied computer software;

    e.   Participation in Manufacturer GM's training programs;

    f.   Establishment and maintenance of service departments in GM dealerships;

    g.   Certify GM pre-owned vehicles;

    h.   Reporting to Manufacturer GM with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

       i.   Displaying Manufacturer GM logos on signs, literature, products, and brochures within GM dealerships.

viii.   Dealerships bind Manufacturer GM with respect to:

       a.  Warranty repairs on the vehicles the dealers sell; and

       b.  Issuing service contracts administered by Manufacturer GM.

 ix.   Manufacturer GM further exercises control over its dealers with respect to:

       a.  Financial incentives given to GM dealer employees;

       b.  Locations of dealers;

       c.  Testing and certification of dealership personnel to ensure compliance with Manufacturer GM's policies and procedures; and

       d.  Customer satisfaction surveys, pursuant to which Manufacturer GM allocates the number of GM cars to each dealer, thereby directly controlling dealership profits.

 x.   GM dealers sell GM vehicles on Manufacturer GM's behalf, pursuant to a "floor plan," and Manufacturer GM does not receive payment for its cars until the dealerships sell them.

 xi.   Dealerships bear GM's brand names, use GM's logos in advertising and on warranty repair orders, post GM-brand signs for the public to see,

and enjoy a franchise to sell Manufacturer GM's products, including the Class Vehicles.

xii.    Manufacturer GM requires GM dealers to follow the rules and policies of Manufacturer GM in conducting all aspects of dealer business, including the delivery of Manufacturer GM's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.   Manufacturer GM requires its dealers to post GM's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized GM dealers and servicing outlets for Manufacturer GM cars.

xiv.    Manufacturer GM requires its dealers to use service and repair forms containing Manufacturer GM's brand names and logos.

xv.     Manufacturer GM requires GM dealers to perform Manufacturer GM's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Manufacturer GM.

xvi.    Manufacturer GM requires GM dealers to use parts and tools either provided by Manufacturer GM, or approved by Manufacturer GM, and

to inform GM when dealers discover that unauthorized parts have been installed on one of Manufacturer GM's vehicles.

xvii. Manufacturer GM requires dealers' service and repair employees to be trained by GM in the methods of repair of GM-brand vehicles.

xviii. Manufacturer GM audits GM dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix. Manufacturer GM requires its dealers to provide GM with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer GM's vehicles.

xx. Manufacturer GM provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi. Manufacturer GM provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer GM to consult when dealers are unable to correct a vehicle defect on their own.

xxii.    Manufacturer GM requires GM-brand vehicle owners to go to
authorized GM dealers to obtain servicing under GM warranties.

xxiii.   GM dealers are required to notify Manufacturer GM whenever a car is
sold or put into warranty service.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

250.   As of the date of this Complaint, GM continues to market the Class
Vehicles based on superior durability, performance, and fuel efficiency, despite its
knowledge that the Class Vehicles are defective and have failed or will fail—in fact,
GM still has not disclosed and continues to conceal that the Class Vehicles are
defective, particularly incompatible with American diesel fuel, and will experience
catastrophic and costly failure.

251.   Until shortly before the filing of this Complaint, Plaintiffs and other
Class members had no way of knowing about GM's wrongful and deceptive conduct
with respect to their defective Class Vehicles.

252.   With respect to Class Vehicles that have not experienced a catastrophic
CP4 pump failure, Plaintiffs and other Class members did not discover and could
not reasonably have discovered that their Class Vehicles are defective, that their
Class Vehicles are out of specification and particularly incompatible with American
diesel fuel, that this heightened incompatibility has resulted in the breakdown of fuel
components and contamination of fuel caused by the defective CP4 fuel pump, that

their CP4 fuel pumps will fail, that the durability and performance of their Class Vehicles is impaired by this defect and heightened incompatibility and that such durability and performance is far less than GM promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

253.   With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to GM or that such failure was due to an heightened incompatibility between the Class Vehicle and the fuel intended by GM to be used in the Class Vehicles.

254.   Within the period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

255.   As pleaded herein, GM knew of and failed to disclose a major, inherent product defect, and thus any imposition of "durational limitations" on the warranty

breaches or claims alleged herein constitute "overreaching," and therefore any such durational limitations are unconscionable. When a manufacturer is aware that its product is inherently defective, but the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relevant bargaining power. In such a case, Plaintiffs' acceptance of any limitations on his/her contractual remedies, including any warranty disclaimers, cannot be said to be "knowing" or "voluntary," and thereby renders such limitations unconscionable and ineffective. GM's superior knowledge of the CP4 defect over the weaker-situated Plaintiffs and Class members demonstrates that the underlying vehicle transactions involved elements of deception such that there was significant unconscionability in the bargaining process, and any durational limitations that GM may purport to assert on Plaintiffs' claims are unconscionable as a matter of law.

256.   Further, Plaintiffs and other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that GM did not report information within their knowledge to consumers, dealerships, or relevant authorities; nor would a reasonable and diligent investigation have disclosed that GM was aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated. Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles, and of GM's

scheme to design and sell such non-conforming and defective fuel pumps and vehicles, shortly before this action was filed.

257.   All applicable statutes of limitation and repose have also been tolled by GM's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the period relevant to this action.

258.   Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, GM falsely represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

259.   In reality, GM's conduct in designing, manufacturing, marketing, or selling Class Vehicles for use with American diesel fuel, with which GM knew the Class Vehicles were particularly incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

260.   GM, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to GM's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members, and/or contaminated fuel when GM, even before the design, manufacture, or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

261.  GM was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality, and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure. Instead, GM knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, GM is estopped from relying on any statutes of limitation or repose as a defense in this action.

262.  For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by GM's fraudulent concealment with respect to all claims against GM; and, GM is estopped from asserting any such defenses in this action.

## VI.    CLASS ACTION ALLEGATIONS

263.  Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of the class of persons (collectively, the "Class") who purchased or leased one or more of the "Class Vehicles," which include the following CP4-equipped, GM-manufactured, diesel-engined vehicles:

- 2011–2016 Chevrolet Silverado 2500 HD / 3500 HD 6.6L V8 Duramax Diesel Trucks;

- 2011-2016 GMC Sierra 2500 HD / 3500 HD 6.6L V8 Duramax Diesel Trucks;

- 2010-2011 Chevrolet Express Duramax Diesel Vans;

- 2010-2011 GMC Savana 6.6L V8 Duramax Diesel Vans; and

- 2010-2011 GMC Sierra Duramax Diesel Vans

264. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Class and Sub-Classes:

> **Nationwide Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles."
>
> **Alabama Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Alabama.
>
> **Alaska Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Alaska.
>
> **Arizona Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Arizona.
>
> **Arkansas Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Arkansas.
>
> **California Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of California.

**Colorado Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Colorado.

**Connecticut Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Connecticut.

**Delaware Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Delaware.

**Florida Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Florida.

**Georgia Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Georgia.

**Hawaii Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Hawaii.

**Idaho Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Idaho.

**Illinois Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Illinois.

**Indiana Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Indiana.

**Iowa Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Iowa.

**Kansas Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Kansas.

**Kentucky Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Kentucky.

**Louisiana Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Louisiana.

**Maine Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Maine.

**Maryland Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Maryland.

**Massachusetts Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Massachusetts.

**Michigan Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Michigan.

**Minnesota Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Minnesota.

**Mississippi Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Mississippi.

**Missouri Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Missouri.

**Montana Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Montana.

**Nebraska Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Nebraska.

**Nevada Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Nevada.

**New Hampshire Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of New Hampshire.

**New Jersey Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of New Jersey.

**New Mexico Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of New Mexico.

**New York Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of New York.

**North Carolina Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of North Carolina.

**North Dakota Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of North Dakota.

**Ohio Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Ohio.

**Oklahoma Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Oklahoma.

**Oregon Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Oregon.

**Pennsylvania Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Pennsylvania.

**Rhode Island Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Rhode Island.

**South Carolina Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of South Carolina.

**South Dakota Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of South Dakota.

**Tennessee Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Tennessee.

**Utah Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Utah.

**Vermont Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Vermont.

**Virginia Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Virginia.

**Washington Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Washington.

**West Virginia Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of West Virginia.

**Wisconsin Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Wisconsin.

**Wyoming Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Wyoming.

**District of Columbia Sub-Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the District of Columbia.

265. Excluded from the Class are GM and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which GM has a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

266. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

267.   The Class Representatives are asserting claims that are typical of claims of their respective Classes, and they will fairly and adequately represent and protect the interests of the Classes in that they have no interests antagonistic to those of the putative Class members.

268.   The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them. Plaintiffs and other members of the Classes have all suffered harm and damages as a result of GM's unlawful and wrongful conduct. Absent a class action, GM will likely not have to compensate victims for GM's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

269.   **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The members of the Class are so numerous that individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the tens of thousands, and are numerous and geographically dispersed across the country. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that

they may self-identify. The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

270. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

      a.    Whether GM engaged in the conduct alleged herein;

      b.    Whether GM knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long GM knew or should have known as much;

      c.    Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

      d.    Whether the GM diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

      e.    Whether GM omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

f.      Whether GM designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

g.      Whether GM's conduct violates the state consumer protection statutes identified herein, and constitutes breach of contract or warranty and fraudulent concealment/misrepresentation, as asserted herein;

h.      Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

i.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

271.   **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through GM's wrongful conduct as described above.

272.   **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent. Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

273.   **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CAUSES OF ACTION

A.   **Multi-State Claims.**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *ET. SEQ.*

274.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

275.   Plaintiffs bring this Count on behalf of all persons who are members of the Class set forth in Section (VI.) above (collectively for purposes of this Count, the "Magnuson-Moss Class").

276.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

277.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

278.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

279.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

280.   GM provided Plaintiffs with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe, American-diesel-fuel-compatible motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

281.   GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a Bosch CP4 high-pressure fuel injection pump which is particularly incompatible with the lubricity of American diesel fuel. This heightened incompatibility causes the Class Vehicles to suddenly fail during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death. Even where death or serious injury does not occur, the CP4's heightened incompatibility with American diesel fuel renders the Class Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving in America with standard American diesel fuel.

282.   In its capacity as warrantor, GM had knowledge of the inherently defective nature of the high-pressure fuel-injection system in the Class Vehicles. Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit such liability is null and void.

283.   Any limitations GM might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from GM.

284.   Any limitations GM might seek to impose on its warranties are substantively unconscionable. GM knew that the Class Vehicles were defective and particularly incompatible with U.S. diesel fuel, and that the Vehicles would fail when used as intend. Moreover, GM knew the Class Vehicles would pose safety risks after the warranties purportedly expired. GM failed to disclose this defect to Plaintiffs. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

285.   Plaintiffs have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract between GM and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as catastrophic CP4 fuel pump failure can cause the vehicle to stall while in motion and then subsequently become unable to be restarted, which increases the risk of a crash and presents an unreasonable risk to vehicle occupant safety.

286. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

287. Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

288. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Magnuson-Moss Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class members in connection with the commencement and prosecution of this action.

289.   Plaintiffs also seek the establishment of a GM-funded program for Plaintiffs and Magnuson-Moss Class members to recover out of pocket costs incurred in attempting to rectify and/or mitigate the effects of the CP4 incompatibility defect in their Class Vehicles.

B.   **Texas Allegations**

290.   In addition to the separate claims for violations of the implied warranty of merchantability included herein (which cover all states except Texas ), Plaintiffs further allege that GM's conduct violated an implied warranty of merchantability under Texas law.

291.   Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code Ann. § 17.45.

292.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

293.   Specifically, the Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and Sub-Class members), in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and Sub-Class members) causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design

and sale of the Class Vehicles), which causes metal shards to wear off the pump and disperse throughout the Class Vehicles' fuel injection system, leading to fuel contamination, ultimate and catastrophic failure of the Bosch CP4 Pump, and self-destruction of the Class Vehicles' engine and fuel delivery system (oftentimes while the Class Vehicle is in motion, causing a moving stall and subsequent inability to restart the Class Vehicle), thereby causing an increased likelihood of serious injury or death.

294.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters or communications by Plaintiffs or Sub-Class Members to GM, including GM dealerships, either orally or in writing, Plaintiffs' counsel, on behalf of Plaintiffs, to GM, to GM either orally or in writing.

295.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Sub-Class members have been damaged in an amount to be proven at trial.

## COUNT II

### FRAUDULENT CONCEALMENT
### (Common Law)

296.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

297.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of each State Sub-Class enumerated in section VI. above (collectively referred to as the "Fraudulent Concealment Class" for purposes of this Count).

298.   As set forth above, Plaintiffs and Fraudulent Concealment Class members have suffered from a defect that existed in the Class Vehicles at the time of purchase and which began damaging the Class Vehicles and their fuel delivery systems upon first use.

299.   GM intentionally concealed and suppressed material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and facts concerning the Class Vehicles' compatibility with American diesel fuel, in order to defraud and mislead the Fraudulent Concealment Class members about the true nature of the Class Vehicles and reap the financial benefits of that deception.

300.   GM knew that there was a significant uptick in the number of high-pressure fuel pump failures from the moment it introduced the CP4 fuel pump into certain of its diesel vehicle models beginning in the 2010 model year, but it did not disclose this information to Plaintiffs or Fraudulent Concealment Class members.

301.   GM had knowledge by at least 2010 that its diesel fuel injection systems were particularly incompatible with American diesel fuel specifications. Specifically, the CP4 fuel pump specifications for lubricity allow a maximum of 460

wear scar, whereby the required specification for American diesel fuel is 520 wear scar. By definition, the CP4 fuel pump will not be adequately lubricated by American diesel fuel.

302.   As alleged above, prior to the design, manufacture and sale of the Class Vehicles, GM knew that the Bosch CP4 Pumps were prone to quickly and catastrophically fail in the Class Vehicles, and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which GM would refuse to cover under its warranties.

303.   Despite this knowledge, GM marketed the Class Vehicles in advertising and other forms of communication, including the standard and uniform material provided with each Class Vehicle, touting the increased durability, fuel economy and performance qualities of the Class Vehicles and that the Class Vehicles had no significant defects and were compatible with U.S. diesel fuel. Marketing and advertising materials of GM asserted that the Class Vehicles Would be "11 more fuel efficient than its previous Duramax diesel engines." According to GM, the Class Vehicles "take[s] performance and fuel economy to the next level." GM also promoted its "PROVEN DURABILITY," and the ability of the Class Vehicles to run on B20 biodiesel.

304.   The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and Fraudulent Concealment Class members, because those facts directly impacted the decision regarding whether or not Plaintiffs and Fraudulent Concealment Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and Fraudulent Concealment Class members to purchase a Class Vehicle. Longevity, durability, performance, safety, and compatibility with U.S. diesel fuel are material concerns to U.S. diesel vehicle consumers and to reasonable consumers, like Plaintiffs and Fraudulent Concealment Class Members. GM represented to Plaintiffs and Fraudulent Concealment Class Members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time-bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

305.   Plaintiffs and Fraudulent Concealment Class members did not know of the CP4 fuel pump defect in their Class Vehicles and could not have discovered it through reasonably diligent investigation.

306.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to its false representations regarding the increased durability and fuel efficiency of the Class Vehicles, and due to its partial

and inadequate disclosures of the Class Vehicles' defects, GM had a duty to disclose to the Fraudulent Concealment Class members that their vehicles were particularly incompatible with the use of U.S. diesel fuel and the consequences of that heightened incompatibility, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other vehicles or of their namesake predecessor engines, that catastrophic failure of the Bosch CP4 Pumps will damage Class Vehicle engines and engine systems, and that Fraudulent Concealment Class members would be required to bear the cost of the damage to their vehicles.

307.   As alleged above, GM made specific disclosures and representations to Plaintiffs and Fraudulent Concealment Class members through the marketing and advertising materials used nationally, and specifically within each U.S. state and the District of Columbia, during the timeframe prior to the Plaintiffs and Fraudulent Concealment Class members purchasing or leasing the Class Vehicles. GM had a duty to disclose because: (1) GM made disclosures about the Class Vehicles; (2) GM made earlier representations that were misleading or untrue; and (3) GM made a partial disclosure that conveyed a false impression about the Class Vehicles. As outlined above, GM made disclosures and representations that were false and misleading, therefore GM had a duty to disclose the whole truth about the CP4 fuel pumps installed in the Class Vehicles and their heightened incompatibility with American diesel fuel.

308.   GM knew that Plaintiffs and Fraudulent Concealment Class members would and did reasonably rely upon GM's false representations and omissions. Plaintiffs and Fraudulent Concealment Class members had no way of knowing that GM representations and omissions were false and misleading, that an internal component of the Class Vehicles is devastatingly defective to the entire fuel and engine system, that the Class Vehicles were particularly incompatible with the fuel GM knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Class Vehicles to fail, or that GM would refuse to repair, replace or compensate Plaintiffs and Fraudulent Concealment Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicles engines.

309.   GM knew that Plaintiffs and Fraudulent Concealment Class members could not have known that Class Vehicles will fail when used as intended by GM.

310.   GM falsely represented the durability, quality, and nature of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the heightened incompatibility of the Class Vehicles with the fuel intended by GM to be used in the Class Vehicles, and the consequences of that heightened incompatibility, for the purpose of inducing Plaintiffs and Fraudulent Concealment Class members to purchase Class Vehicles, and to increase GM's revenue and profits.

311.   GM's scheme to design, market and sell Class Vehicles with defective CP4 pumps, knowing that U.S. diesel fuel that was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing its fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, Fraudulent Concealment Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

312.   Had Plaintiffs and Fraudulent Concealment Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, that the Class Vehicles were particularly incompatible with the fuel intended by Plaintiffs, Fraudulent Concealment Class members and GM to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and Fraudulent Concealment Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and Fraudulent Concealment Class members would not have purchased or leased a Class Vehicle, or would have paid substantially less for their Class Vehicles than they paid based on GM's false representations and omissions, or, in the case of Plaintiffs and Fraudulent Concealment Class members whose vehicles experienced catastrophic CP4 pump failure, would have taken affirmative steps to mitigate the impact of or prevent failure.

313.   Because of GM's false representations and omissions, Plaintiffs and Fraudulent Concealment Class members have sustained damages because they own vehicles that are diminished in value. They did not receive the benefit-of-the-bargain, as a result of GM's concealment of the true nature and quality of the Class Vehicles.

314.   GM's failure to disclose the heightened incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and Fraudulent Concealment Class members to operate Class Vehicles with U.S. diesel fuel; and, as a result, Plaintiffs and Fraudulent Concealment Class members have been harmed resulting in damages including but not limited to the decrease in fuel economy caused by progressive CP4 failure, the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by a catastrophic failure of the CP4 fuel pump, loss of use of the Class Vehicles, diminished value of the Class Vehicles, loss of earnings, benefit-of-the-bargain damages, the purchase price of the vehicle, and other damages.

315.   GM has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Fraudulent Concealment Class Members by concealing material information regarding the heightened incompatibility of the Class Vehicles with U.S. diesel fuel.

316.   Accordingly, GM is liable to Plaintiffs and the Fraudulent Concealment Class members for damages in an amount to be proved at trial.

317.   GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Fraudulent Concealment Class members' rights and the representations and omissions made by GM to them were made in order to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (Common Law)

318.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

319.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of each State Sub-Class enumerated in section VI. above (collectively referred to as the "Breach of Contract Class" for purposes of this Count).

320.   GM's misrepresentations and omissions alleged herein, including but not limited to GM's concealment and suppression of material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and the Class Vehicles' compatibility with American diesel fuel, and GM's affirmative

misrepresentations touting the increased durability, fuel economy and performance qualities of the Class Vehicles, and compatibility of the Class Vehicles with U.S. diesel fuel, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Trucks.

321.    Absent those misrepresentations and omissions, Plaintiff and Breach of Contract Class  members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have purchased or leased a different vehicles that did not contain the defective CP4 pump. Accordingly, Plaintiff and Breach of Contract Class members overpaid for their Trucks and did not receive the benefit of their bargain.

322.    Each and every sale or lease of a Truck constitutes a contract between GM and the purchaser or lessee. GM breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and the Class Vehicles' compatibility with American diesel fuel, and by affirmatively making misleading statements concerning the increased durability, fuel economy and performance qualities of the Class Vehicles, and compatibility of the Class Vehicles with U.S. diesel fuel.

323.    As a direct and proximate result of GM's breach of contract, Plaintiff and Breach of Contract Class members have been damaged in an amount to be

proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

C.  **Claims Brought on Behalf of the Alabama Class.**

### COUNT I

### VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1, *ET SEQ.*)

324.  Plaintiffs (for purposes of all Alabama Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

325.  Plaintiffs and the Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

326.  Plaintiffs, the Class members, and GM are "persons" within the meaning of Ala. Code § 8-19-3(5).

327.  The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

328.  Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

329.  The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services

are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

330.   GM participated in unfair and deceptive trade practices that violated the Alabama DTPA as described herein. In the course of its business, GM knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

331.   Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, GM engaged in deceptive business practices prohibited by the Alabama DTPA, including:

    a.   Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.      Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

c.      Advertising the Class Vehicles with the intent not to sell them as advertised; and

d.      Engaging in unconscionable, false, or deceptive act or practice in connection with the sale of the Class Vehicles.

332.   GM's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Alabama Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

333.   As alleged above, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead the Alabama Class Members.

334.   GM knew or should have known that its conduct violated the Alabama DTPA.

335.   To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

336.   GM owed the Alabama Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM:

a.      Possessed exclusive knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles;

b.      Intentionally concealed the foregoing from the Alabama Class Members; and/or

c.      Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Alabama Class Members that contradicted these representations.

337.   Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and failed to disclose to the Alabama Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 that GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by the Alabama Class members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or

would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

338.   The Alabama Class Members suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. The Alabama Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

339.   As a direct and proximate result of GM's violations of the Alabama DTPA, the Alabama Class Members have suffered injury-in-fact and/or actual damages.

340.   Pursuant to Ala. Code § 8-19-10, Plaintiffs seek monetary relief against GM measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $100 for each Alabama Class Member.

341.   Plaintiffs also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1 *et seq.*

342.   In accordance with Ala. Code § 8-19-10(e), Plaintiffs sent a letter to GM with notice of their allegations regarding GM's violations of the Alabama DTPA relating to the Class Vehicles and the Alabama Class Members' demand that GM correct or agree to correct the actions described therein. As GM has failed to do

so within the statutorily required fifteen days, Plaintiffs now seek compensatory and

monetary damages to which Plaintiffs and Alabama Class Members are entitled.

<h1 style="text-align:center">COUNT II</h1>

<h2 style="text-align:center">BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY<br>(ALA. CODE § 7-2-314)</h2>

343.   Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

344.   This claim is brought on behalf of the Alabama Class members.

345.   GM was a merchant with respect to motor vehicles within the meaning

of Ala. Code § 7-2-314.

346.   Under Ala. Code § 7-2-314, a warranty that the Class Vehicles were in

merchantable condition was implied by law in the transactions when Plaintiffs or

other Class members purchased or leased their Class vehicles.

347.   The Class Vehicles, when sold and at all times thereafter, were not

merchantable and are not fit for the ordinary purpose for which cars are used.

348.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently

defective in that they are particularly incompatible with U.S. diesel fuel such that

the normal use of the Class Vehicles causes metal shards to wear off of the pump

and disperse throughout the vehicle's fuel injection system, leading to certain

component wear and potential catastrophic engine failure (oftentimes while the

vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

349. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

350. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

351. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

352. This claim is brought on behalf of the Alabama Class members against GM.

353. This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs.

354. GM has received and retained a benefit from Plaintiffs and inequity has resulted.

355.    GM has benefitted from selling and leasing the Class Vehicles, for more than they were worth as a result of GM's actions, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

356.    Thus, all Plaintiffs conferred a benefit on GM.

357.    It is inequitable for GM to retain these benefits.

358.    Plaintiffs were not aware of the true facts about the Class Vehicles prior to purchase or lease, and did not benefit from GM's conduct.

359.    GM knowingly accepted the benefits of its unjust conduct.

360.    As a result of GM's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

D.    **Claims Brought on Behalf of the Alaska Class.**

## COUNT I

## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)

361.    Plaintiffs (for purposes of all Alaska Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

362.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") proscribes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471.

363. Pursuant to Alaska Stat. Ann. § 45.50.531, Plaintiffs will amend their Complaint to seek monetary relief against GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff.

364. Plaintiffs will also amend to seek an order enjoining GM's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

365.   Plaintiffs will make a demand in satisfaction of Alaska Stat. Ann. § 45.50.535, and may amend this Complaint to assert claims under the Alaska CPA once the required notice period has elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Alaska CPA.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (ALASKA STAT. § 45.02.314)

366.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

367.   Plaintiffs bring this Count on behalf of the Alaska Class members against GM.

368.   GM was a merchant with respect to motor vehicles within the meaning of Alaska Stat. § 45.02.314.

369.   Under Alaska Stat. § 45.02.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs or other Class members purchased or leased their Class vehicles from GM.

370.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

371.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump

and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

372.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

373.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

E.   **Claims Brought on Behalf of the Arizona Class.**

### COUNT I

### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*)

374.   Plaintiffs (for purposes of all Arizona Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

375.   Plaintiffs bring this Count on behalf of the Arizona Class members.

376.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or

- 207 -

omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

377.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

378.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear

and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

379.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

380.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

381.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

382.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

383.   Defendant knew or should have known that its conduct violated the Arizona CFA.

384.    Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

385.    Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel

vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

386.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

387.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class

Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

388.    Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

389.    Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind.

390.    Plaintiffs also seek attorneys' fees and any other just and proper relief available.

## COUNT I

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

391.    Plaintiffs (for purposes of all Arkansas Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

392.    This claim is brought on behalf of the Arkansas Class members.

393.    GM, Plaintiffs, and Arkansas Class members are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

394.    The "Class Vehicles" are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

395.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

396.    In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any

- 213 -

material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

397.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

398.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

399.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

400. Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

401. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

402. Defendant knew or should have known that its conduct violated the Arkansas DTPA.

403. Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a. Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b. Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c. Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

404.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

405.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

406.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

407.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

408.   Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendant carried out despicable conduct with willful and conscious disregard of the rights of others. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages

409.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (ARK. CODE ANN. § 4-2-314)

410. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

411. Plaintiffs bring this count on behalf of the Arkansas Class members.

412. GM was a merchant with respect to motor vehicles within the meaning of the Ark. Code Ann. § 4-2-314.

413. Under Ark. Code Ann. § 4-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

414. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

415. The Bosch CP4 fuel pumps are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

416.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

417.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

F.   **Claims Brought on Behalf of the California Class.**

## COUNT I

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

418.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

419.   Plaintiffs bring this Count on behalf of the California Sub-Class members against GM.

420.   California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

421.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's

fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

422.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

423.    Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles'

high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

424.  Defendant's actions as set forth above occurred in the conduct of trade or commerce.

425.  Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

426.  Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

427.  Defendant knew or should have known that its conduct violated the California UCL.

428.  Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

> a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

429.    Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity,

durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

430.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

431.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

432.   The CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which GM has admittedly recognized through, *inter alia*, its 2014 Ignition Switch Defect recalls in which GM recalled millions of vehicles for that very risk. Defendant's violations present a continuing risk to Plaintiffs as

- 223 -

well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

433. Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil mind. Indeed, Defendant carried out despicable conduct with willful and conscious disregard of the rights of others. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages

434. Plaintiffs also seek attorneys' fees and any other just and proper relief available.

435. The CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which GM has admittedly recognized through, *inter alia*, its 2014 Ignition Switch Defect recalls in which GM recalled millions of vehicles for that very risk. Put simply, defective cars are just not worth as much.[108] Further,

---

[108] *See, e.g.*, *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("[O]nce the safety defect is sufficiently and plausibly pled by all Plaintiffs, the economic losses resulting from the defect are readily established: defective cars are simply not worth as much").

even without a safety issue, Plaintiffs overpaid at the point of sale as these vehicles have impaired performance due to the defect.

**COUNT II**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")
(CAL. CIV. CODE § 1750, *ET SEQ.*)**

436.  Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

437.  Plaintiffs (for purposes of all California Sub-Class member Counts) incorporate by reference all paragraphs as though fully set forth herein.

438.  Plaintiffs bring this Count on behalf of the California Sub-Class members against GM.

439.  GM is a "person" under Cal. Civ. Code § 1761(c).

440.  Plaintiffs and California Sub-Class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

441.  The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer . . . ." Cal. Civ. Code § 1770(a).

442.  In the course of Defendant's business, GM willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly

- 225 -

incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

443.   In purchasing or leasing the Class Vehicles, Plaintiffs and the Sub-Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

444.   Plaintiffs and Sub-Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant

engaged in extremely sophisticated methods of deception. Plaintiffs and Sub-Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

445. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

446. Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

447. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Sub-Class.

448. Defendant knew or should have known that their conduct violated the California CLRA.

449. Defendant owed Plaintiffs and Sub-Class Members a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a. Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

       b.    Intentionally concealed the foregoing from Plaintiffs and the Sub-Class Members; and/or

       c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Sub-Class that contradicted these representations.

450.  Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and Sub-Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and Sub-Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Sub-Class members, GM had the duty to disclose not just the partial truth, but the entire truth.

These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Sub-Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Sub-Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

451.   Defendant's conduct proximately caused injuries to Plaintiffs and the Sub-Class members.

452.   Plaintiffs and the Sub-Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct, Plaintiffs and the Sub-Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

453.   The CP4 fuel pump defect involves a safety defect which presents an actual and/or imminent risk to vehicle occupant safety; specifically, the risk of a moving stall, which is a known consequence of the CP4 fuel pump defect, presents a risk to occupant safety which GM has admittedly recognized through, *inter alia*,

its 2014 Ignition Switch Defect recalls in which GM recalled millions of vehicles for that very risk. Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

454.   Under Cal. Civ. Code § 1780(a), Plaintiffs and California Sub-Class members seek monetary relief against GM for the harm caused by GM's violations of the CLRA as alleged herein.

455.   Under Cal. Civ. Code § 1780(b), Plaintiffs and California Sub-Class members seek an additional award against GM of up to $5,000 for each Plaintiff who qualifies as a "senior citizen" or "disabled person" under the CLRA. GM knew or should have known that their conduct was directed to one or more Plaintiffs or Sub-Class members who are senior citizens or disabled persons. GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiffs or Sub-Class members who are senior citizens or disabled persons are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

456.   Plaintiffs also seek punitive damages against GM because their unlawful conduct constitutes malice, oppression, and fraud under Cal. Civ. Code § 3294.

457.   Plaintiffs and California Sub-Class members seek an order enjoining GM's unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees under Cal. Civ. Code § 1780(e). and any other just and proper relief available under CLRA.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(CAL. COM. CODE §§ 2314 AND 10212)

458.   Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

459.   Plaintiffs bring this Count individually and on behalf of the Class against GM.

460.   As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

461.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law pursuant

to Cal. Com. Code §§ 2314 and 10212. "The core test of merchantability is fitness for the ordinary purpose for which such goods are used. Such fitness is shown if the product is in safe condition and substantially free from defects." *Isip v. Mercedes-Benz, USA, LLC,* 155 Cal. App. 4th 19, 26 (2007); *see also Mexia v. Rinker Coat Co., Inc.*, 174 Cal. App. 4th 1291 (2009). Thus, "where a car can provide safe, reliable transportation, it is generally considered merchantable." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291 (1995). As demonstrated herein, the Class Vehicles are not substantially free from defects; the Class Vehicles contain an existing, manifested defect which can destroy the engines and other fuel system components and which renders the Class Vehicles unreliable.

462. GM is and was at all times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

463. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

464. The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

465. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

466. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel GM intended and expected Plaintiffs and other Class members to use) in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and other Class members) causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to its design and sale of the Class Vehicles), resulting in fuel contamination of the fuel delivery system, failure of components in the Class Vehicle, and, often, catastrophic failure of the Bosch CP4 Pump.

467. It was reasonable to expect that Plaintiffs may use, consume, or be affected by the defective vehicles, regardless of contractual privity with GM.

468. The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

469. Plaintiffs were and are third-party beneficiaries to the defendant manufacturer's contracts with GM-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.[109]

_____

[109] *See In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 922 (N.D. Cal. 2018) ("[California law] allow[s] plaintiffs to bring implied warranty claims in the absence of privity if the plaintiff shows that he was a beneficiary to a contract between the defendant and a third party."); *id.* (internal citations omitted) ("Because third party beneficiary status is a matter of contract interpretation, a person seeking

470. In addition, or in the alternative, Plaintiffs directly relied upon Defendant GM's advertising, as alleged above.[110]

471. GM was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

472. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

---

to enforce a contract as a third party beneficiary must plead a contract which was made expressly for his [or her] benefit and one in which it clearly appears that he [or she] was a beneficiary."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983 (N.D. Cal. 2014) (internal citations omitted) ("[T]here is an exception to the privity requirement that applies when a plaintiff is the intended beneficiary of implied warranties in agreements linking a retailer and a manufacturer").

[110] *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (holding that, for purposes of a breach of implied warranty claim, a Plaintiff need not stand in vertical contractual privity with the defendant when the plaintiff relies on written labels or advertisements of a manufacturer).

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. CIV. CODE § 1791, *ET SEQ.*)

473.    Plaintiffs Calvin Smith incorporate by reference the paragraphs above as if fully set forth herein.

474.    Class Vehicles are "consumer goods" and Plaintiffs and the Proposed Class are "buyers" within the meaning of Cal. Civ. Code § 1791. GM is also a "manufacturer," "distributor," or "retail seller" under Cal. Civ. Code § 1791.

475.    The implied warranty of merchantability included with the sale of each Class Vehicle means that GM warranted that each Class Vehicle (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

476.    The Class Vehicles would not pass without objection in the automotive trade because of the defect affecting the Bosch CP4 fuel pump, which also makes them unfit for the ordinary purpose for which a Class Vehicle would be used.

477.    The Class Vehicles are not adequately labeled because their labeling fails to disclose the defect and risk of stalling and does not advise the members of the proposed California Class of the existence of the issue prior to experiencing failure firsthand.

478.   GM's actions have deprived Plaintiffs and the members of the proposed California Class of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiffs and other members of the proposed California Class paid.

479.   As a direct and proximate result of GM's breach of implied warranty, members of the proposed California Class received goods whose condition substantially impairs their value. Plaintiffs and members of the proposed California Class have been damaged by the diminished value of their Class Vehicles.

480.   Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff and members of the proposed California Class are entitled to damages and other legal and equitable relief, including, at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to all incidental and consequential damages resulting from GM's breach, as well as reasonable attorneys' fees and costs.

G.   **Claims Brought on Behalf of the Colorado Class.**

## COUNT I

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)

481.   Plaintiffs (for purposes of all Colorado Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

482.   Plaintiffs bring this Count on behalf of the Colorado Class members.

483.    Colorado's Consumer Protection Act (the "Colorado CPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." Colo. Rev. Stat. § 6-1-105(1)(b), (e). The Colorado CPA further prohibits "represent[ing] that goods . . . are of a particular standard, quality, or grade . . . if he knows or should know that they are of another," "advertis[ing] goods . . . with intent not to sell them as advertised," and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(1)(g), (i), & (u).

484.    Defendant is a "person" under § 6-1-102(6) of the Colorado CPA, Colo. Rev. Stat. § 6-1-101 *et seq.*

485.    Plaintiffs and Colorado Class members are "consumers" for the purpose of Colo. Rev. Stat. § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles.

486.    In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles

causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of Defendant's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

487.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

488.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not,

and could not, unravel Defendant's deception on their own, as the Class Vehicles'
high-pressure fuel injection systems are a deeply internal component part in the
Class Vehicles and Plaintiffs and other Class members were not aware of the
defective nature of the CP4 fuel pump in that high-pressure fuel injection system
prior to purchase or lease.

489.   Defendant's actions as set forth above occurred in the conduct of trade
or commerce.

490.   Defendant's deception, fraud, misrepresentation, concealment,
suppression, or omission of material facts were likely to and did in fact deceive
reasonable consumers.

491.   Defendant intentionally and knowingly misrepresented material facts
regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

492.   Defendant knew or should have known that its conduct violated the
Colorado CPA.

493.   Defendant owed Plaintiffs and the Class a duty to disclose the truth
about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles
with U.S. diesel fuel because Defendant:

a.   Possessed exclusive knowledge of the design of the Class
Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

494.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and

concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

495.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

496.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

497.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has

significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

498.    Defendant's widespread false and deceptive advertisement directed to the market generally implicates a significant public impact under Colorado law.[111]

499.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs and the Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for Plaintiffs and each Class member.

500.    Plaintiffs and the Class also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (COLO. REV. STAT. § 4-2-314)

501.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

502.    Plaintiffs bring this Count on behalf of the Colorado Class members.

---

[111] *See Electrology Lab., Inc. v. Kunze,* 169 F. Supp. 3d 1119, 1162 (D. Colo. 2016); *see also Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

503.   GM was a merchant with respect to motor vehicles within the meaning of the Colo. Rev. Stat. § 4-2-314.

504.   Under Colo. Rev. Stat. § 4-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

505.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

506.   The Bosch CP4 fuel pumps are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

507.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

508.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

509.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

510.   Plaintiffs bring this Count on behalf of the Colorado Class members against GM.

511.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

512.   GM has received and retained a benefit from Plaintiffs and inequity has resulted.

513.   GM has benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of their concealed defects, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

514.   Thus, all Plaintiffs conferred a benefit on GM.

515.   It is inequitable for GM to retain these benefits.

516.   Plaintiffs were not aware of the true facts about their Class Vehicles, and did not benefit from GM's conduct.

517.   GM knowingly accepted the benefits of its unjust conduct.

518.   As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

H.    **Claims Brought on Behalf of the Connecticut Class.**

## COUNT I

## VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. ANN. § 42-110A *ET SEQ.*)

519.   Plaintiffs (for purposes of all Connecticut Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

520.   Plaintiffs bring this Count on behalf of the Connecticut Class members.

521.   Defendant and Plaintiffs are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

522.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The Connecticut UTPA further provides a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a).

523.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and

subsequent inability to restart the vehicle). Accordingly, Defendant engaged in unfair and deceptive trade practices because its conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other business persons. The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and Defendant fraudulently concealed the defective nature of the Class Vehicles from consumers.

524.  Defendant has also engaged in deceptive conduct because (1) it made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct.

525.  Particularly in light of Defendant's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

526.    In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

527.    Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations and omissions. They had no way of knowing that Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

528.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

529.    Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

- 247 -

530. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

531. Defendant knew or should have known that its conduct violated the Connecticut UTPA.

532. Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

533. Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

534. Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

535.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

536.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

537.   Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil motive.

538.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

## COUNT II

## UNJUST ENRICHMENT

539.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

540.   Plaintiffs bring this claim on behalf of the Connecticut Class members.

541. This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

542. GM has received and retained a benefit from Plaintiffs and inequity has resulted.

543. GM has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

544. Thus, all Plaintiffs conferred a benefit on GM.

545. It is inequitable for GM to retain these benefits.

546. Plaintiffs were not aware of the true facts about the Class Vehicles and did not benefit from GM's conduct.

547. GM knowingly accepted the benefits of its unjust conduct.

548. As a result of GM's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

I. **Claims Brought on Behalf of the District of Columbia (D.C.) Class.**

## COUNT I

**VIOLATIONS OF THE CONSUMER PROTECTION PROCEDURES ACT (D.C. CODE § 28-3901, *ET SEQ.*)**

549. Plaintiffs (for purposes of all D.C. Class Counts) hereby incorporate by reference all paragraphs as though fully set forth herein.

550. Plaintiffs bring this Count on behalf of the D.C. Class members.

551.   GM is a "person" under the Consumer Protection Procedures Act ("D.C. CPPA"), D.C. Code § 28-3901(a)(1).

552.   The Class members are "consumers," as defined by D.C. Code  § 28-3901(1)(2), who purchased or leased one or more Class Vehicles.

553.   GM's actions as set forth herein constitute "trade practices" under D.C. Code § 28-3901.

554.   The D.C. CPPA deems it unlawful for "any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to: (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . . (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; (e) misrepresent as to a material fact which has a tendency to mislead; . . . (f) fail to state a material fact if such failure tends to mislead; . . . [or] (h) advertise or offer goods. . . without the intent to sell them as advertised or offered." D.C. Code § 28-3904.

555.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's

fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Accordingly, Defendant engaged in unfair and deceptive trade practices because its conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other business persons. The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and Defendant fraudulently concealed the defective nature of the Class Vehicles from consumers.

556. Defendant has also engaged in deceptive conduct because (1) it made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct, and did indeed affect said decisions.

557. Particularly in light of Defendant's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

558.   In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure.

559.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations and omissions. They had no way of knowing that Defendant's representations were false and gravely misleading. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

560.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

561.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

562.   Defendant knew or should have known that its conduct violated the Delaware Consumer Fraud Act.

563.   Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

564.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly

incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

565.  Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

566.  Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their

Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

567. Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil motive.

568. Plaintiffs also seek attorneys' fees and any other just and proper relief available.

**COUNT II**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(D.C. CODE § 28:2-314)**

569. Plaintiffs incorporate by reference all paragraphs as if fully set forth herein.

570. Plaintiffs bring this Count on behalf of the D.C. Class members.

571. GM was a merchant with respect to motor vehicles within the meaning of D.C. Code § 28:2-104(1).

572. Under D.C. Code § 28:2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class members purchased or leased the Class Vehicles.

573.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which automobiles are used.

574.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

575.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

576.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

J.    **Claims Brought on Behalf of the Delaware Class.**

## COUNT I

## VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT (DEL. CODE §§ 2513, *ET SEQ.*)

577.   Plaintiffs (for purposes of all Delaware Class Counts) hereby incorporate by reference all paragraphs as though fully set forth herein.

578.   Plaintiffs bring this Count on behalf of the Delaware Class members.

579.   GM is a "person" within the meaning of 6 Del. Code § 2511(7).

580.   The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

581.   In the course of Defendant's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Accordingly, Defendant engaged in unfair and deceptive trade practices because its conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers, competitors, or other business persons. The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated

with such practices, and Defendant fraudulently concealed the defective nature of the Class Vehicles from consumers.

582.   Defendant has also engaged in deceptive conduct because (1) it made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct, and did indeed affect said decisions.

583.   Particularly in light of Defendant's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

584.   In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

585.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations and omissions. They had no way of knowing that Defendant's representations were false and gravely misleading. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

586.   Defendant's actions as set forth above occurred in the conduct of trade or commerce.

587.   Defendant's deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

588.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

589.   Defendant knew or should have known that its conduct violated the Delaware Consumer Fraud Act.

590.   Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

591.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles.

Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

592.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

593.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

594.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

595.   Plaintiffs and the Class seek monetary relief against Defendant in an amount to be determined at trial. Plaintiffs and the Class also seek punitive damages because Defendant engaged in aggravated and outrageous conduct with an evil motive.

596.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (6. DEL. CODE § 2-314)

597.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

598.   This Count is brought on behalf of the Delaware Class members.

599.   GM was and is a "merchant" with respect to motor vehicles within the meaning of 6 Del. Code § 2-104(1).

600.   Under 6 Del. Code § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and Class members purchased or leased the Class Vehicles from GM.

601.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which automobiles are used.

602.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

603.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

604.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

K.   **Claims Brought on Behalf of the Florida Class.**

## COUNT I

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), (FLA. STAT. ANN. § 501.201, *ET SEQ.*)**

605.   Plaintiffs incorporate all Paragraphs as though fully set forth herein.

- 265 -

606.    Plaintiffs and other Class Members who purchased their vehicles new are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.203(7).

607.    GM engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

608.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.204(1). GM participated in unfair and deceptive trade practices that violated the FDUTPA as described herein. In the course of its business, GM concealed and suppressed material facts concerning the CP4 fuel pump. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

609.    The facts concealed and omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs

and other Class Members known of the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), and the defective nature of the CP4 fuel pump at the time they purchased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

610. Plaintiffs and the other Class Members were injured and suffered ascertainable injury in act, and/or actual damages as a proximate result of GM's conduct in that Plaintiffs and the other Class Members overpaid for their vehicles, did not get the benefit of their bargain, and their vehicles are equipped with a defective and destructive CP4 fuel pump. These injuries are the direct and natural consequence of GM's representations and omissions.

611. GM's violations present a continuing risk to Plaintiffs as well as the other Class Members.

612. Accordingly, GM is liable to Plaintiffs and the other Class Members for damages in an amount to be proven at trial.

## COUNT II

## UNJUST ENRICHMENT

613. Plaintiffs incorporate all paragraphs as though fully set forth herein.

614.   Plaintiffs bring this Count individually and on behalf of the Class against GM.

615.   As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

616.   As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 pump and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

617.   GM has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by GM's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false representations related thereto.

618.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

619.   GM has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

620.   It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

621.   Because GM concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

622.   GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

623.   As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial.

624.   Plaintiffs and other Class members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, (FLA. STAT. ANN. §§ 672.314 AND 680.212)

625.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

626.   Plaintiffs bring this Count individually and on behalf of the Class against GM.

627.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

628.    GM was at all times a "merchant" with respect to motor vehicles under Fla. Stat. Ann. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

629.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

630.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

631.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Fla. Stat. Ann. §§ 672.314 and 680.212.

632.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel

(the only fuel reasonably available to Plaintiffs and other Class Members) causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery system.

633.   It was reasonable to expect that Plaintiffs may use, consume or be affected by the defective vehicles.

634.   The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

635.   Plaintiffs were and are third-party beneficiaries to the defendant manufacturer's contracts with GM-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.

636.   In addition, or in the alternative, Plaintiffs directly relied upon Defendant GM's advertising, as alleged above.

637.   GM was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate

sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

638.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

L.     **Claims Brought on Behalf of the Georgia Class.**

## COUNT I

### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*)

639.   Plaintiffs (for purposes of all Georgia Counts) hereby incorporate all paragraphs as though set forth herein.

640.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code. Ann. § 10-1-393(b).

641. Plaintiffs and Georgia Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-393(b).

642. At all relevant times, GM has engaged in "trade or commerce" within the meaning of Ga. Code Ann. § 10-1-393(b).

643. GM participated in unfair and deceptive trade practices that violated the Georgia FBPA as described herein. In the course of its business, GM knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

644. Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, GM engaged in deceptive business practices prohibited by the Georgia FBPA, including:

      a.    Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.      Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade; and

c.      Advertising the Class Vehicles with the intent not to sell them as advertised.

645.   GM's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Georgia Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

646.   As alleged above, in the course of its business, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead the Georgia Class Members.

647.   GM knew or should have known that its conduct violated the Georgia FBPA.

648.   To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

649.   GM owed the Georgia Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM:

a.   Possessed exclusive knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles;

b.   Intentionally concealed the foregoing from the Georgia Class Members; and/or

c.   Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Georgia Class Members that contradicted these representations.

650.   Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and failed to disclose to the Georgia Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 which GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by the Georgia Class members at the time of purchase or lease. Indeed, the consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

651.   The Georgia Class Members suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. The Georgia Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

652.   As a direct and proximate result of GM's violations of the Georgia FBPA, the Georgia Class Members have suffered injury-in-fact and/or actual damages.

653.   The Georgia Class Members are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

654.   The Georgia Class Members also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

655.   On August 9, 2019, Plaintiffs' counsel, on behalf of Plaintiffs, sent a letter to GM with notice of their allegations regarding GM's violations of the Georgia FBPA relating to the Class Vehicles and the Georgia Class Members' demand that GM correct or agree to correct the actions described therein, in accordance with Ga. Code Ann. § 10-1-399(b). GM has failed to do so. Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and Georgia Class Members are entitled.

## COUNT II

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (GA. CODE ANN. § 10-1-370 *ET SEQ.*)

656.   Plaintiffs hereby incorporate all paragraphs as though fully set forth herein.

657.   This claim is brought on behalf of the Georgia Class members.

658.   Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b).

659.   Defendant, Plaintiffs, and Georgia Class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

660.   Plaintiffs seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT III

## UNJUST ENRICHMENT

661.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

662.   Plaintiffs bring this Count on behalf of the Georgia Class members.

663.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

664.   GM has received and retained a benefit from Plaintiffs and inequity has resulted.

665.   GM has benefitted from selling and leasing the Class Vehicles for more than they are worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

666.   Thus, all Plaintiffs conferred a benefit on GM.

667.   It is inequitable for GM to retain these benefits.

668.   Plaintiffs were not aware of the true facts about the Class Vehicles and did not benefit from GM's conduct.

669.   GM knowingly accepted the benefits of its unjust enrichment.

670.   As a result of GM's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

M.     **Claims Brought on Behalf of the Hawaii Class.**

## COUNT I

## UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
### (HAW. REV. STAT. ANN. §§ 480, *ET SEQ.*)

671.   Plaintiffs (for purposes of all Hawaii Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

672.   Plaintiffs bring this Count on behalf of the Hawaii Class members.

673.   Haw. Rev. Stat. Ann. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

674.   GM is a "person" under Haw. Rev. Stat. Ann. § 480-1.

675.   Plaintiffs and Hawaii Class members are "consumer[s]" as defined by Haw. Rev. Stat. Ann. § 480-1, who purchased or leased the Class Vehicles.

676.   GM's acts and omissions, as set forth above, occurred in the conduct of trade or commerce.

677.   In the course of GM's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and

subsequent inability to restart the vehicle). Particularly in light of Defendant's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel; representing otherwise had the tendency and capacity to mislead, and did in fact mislead Plaintiffs and other Hawaii Class members. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

678.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

679.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations and omissions, and would not have purchased the vehicles (or would have paid less for them) had they known of the Class Vehicles' susceptibility to catastrophic CP4 fuel pump failure. They had no way of knowing that Defendant's representations were false and gravely misleading.

680. Defendant's deception, fraud, misrepresentation, concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

681. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

682. Defendant knew or should have known that its conduct violated Hawaii law regarding unfair or deceptive acts in trade or commerce.

683. Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a. Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b. Intentionally concealed the foregoing from Plaintiffs and the Class; and

c. Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

684.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

685.   Defendant's conduct proximately caused injuries to Plaintiffs and the other Class members.

686.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

687.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest, as its actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

688.   Pursuant to Haw. Rev. Stat. Ann. § 480-13, Plaintiffs seek monetary relief against GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

689.   Under Haw. Rev. Stat. Ann. § 480-13.5, Plaintiffs seek an additional award against GM of up to $10,000 for each violation directed at a Hawaii elder. GM knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care

and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (HAW. REV. STAT. ANN. § 490:2-314)

690. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

691. Plaintiffs bring this Count on behalf of the Hawaii Class members.

692. GM was and is a "merchant" with respect to motor vehicles within the meaning of Haw. Rev. Stat. Ann. § 490:2-104(1).

693. Under Haw. Rev. Stat. Ann. § 490:2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles.

694. The Class Vehicles, at the time of sale or lease and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which automobiles are used.

695. The Class Vehicles are inherently defective in the Bosch CP4 fuel pumps installed therein are particularly incompatible with U.S. diesel fuel, such that

- 284 -

the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

696.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

697.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

N.    **Claims Brought on Behalf of the Idaho Class.**

**COUNT I**

**VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
(IDAHO CIV. CODE § 48-601 *ET SEQ.*)**

698.   Plaintiffs (for purposes of all Idaho Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

699.   Plaintiffs bring this Count on behalf of the Idaho Class.

700.   GM is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Civ. Code § 48-602(1).

701.   GM's acts and practices as set forth above and herein occurred in the conduct of "trade" or "commerce" under Idaho Civ. Code § 48-602(2).

702.   Idaho Civ. Code § 48-603 prohibits deceptive business practices, including but not limited to (1) representing that the Class Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. Idaho Civ. Code § 48-603.

703.   In the course of GM's business, it willfully failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel; representing otherwise had the tendency and capacity to mislead, and did in fact mislead Plaintiffs and other Idaho

Class members. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

704.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

705.   Plaintiffs and Class members reasonably relied upon Defendant's false misrepresentations, and would not have purchased the vehicles (or would have paid less for them) had they known of the Class Vehicles' susceptibility to catastrophic CP4 fuel pump failure. They had no way of knowing that Defendant's representations were false and gravely misleading.

706.   Defendant's deception, fraud, misrepresentation, concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

707.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

708.   Defendant knew or should have known that its conduct violated the Idaho CFA.

709.   Defendant owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because Defendant:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the CP4 into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

710.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

711.   GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

712.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

713.   Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

714.   Plaintiffs seeks the greater of $1,000 or actual ascertainable damages, including out-of-pocket and/or benefit-of-the-bargain damages, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

715.   Plaintiffs also seeks punitive damages against Defendant because Defendant's conduct evidences an extreme deviation from reasonable standards. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## UNJUST ENRICHMENT

716.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 290 -

717.    Plaintiffs bring this Count on behalf of the Idaho Class against GM.

718.    This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

719.    GM has received and retained a benefit from Plaintiffs and inequity has resulted.

720.    GM has benefitted from manufacturing, distributing, and selling the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

721.    Thus, all Plaintiffs conferred a benefit on GM.

722.    It is inequitable for GM to retain these benefits.

723.    Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from GM's conduct.

724.    GM knowingly accepted the benefits of its unjust conduct.

725.    As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

O.   **Claims Brought on Behalf of the Illinois Class.**

## COUNT I

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)

726.   Plaintiffs (for purposes of all Illinois Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

727.   Plaintiffs bring this Count on behalf of the Illinois Class members.

728.   Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

729.   Plaintiffs and the Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

730.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

731.   In the course of GM's business, it willfully failed to disclose and actively concealed, suppressed, and/or omitted that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not. GM acted with the intent that Plaintiffs and other Class members rely upon the deception, concealment, suppression, or omission of the material facts.

732.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 pumps and

disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure.

733.   Plaintiffs and Class members reasonably relied upon Defendant's misrepresentations and omissions, and had no way of knowing that GM's representations were false and gravely misleading. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part and Plaintiffs were not aware of the defective nature of the CP4 fuel pump in the Class Vehicles prior to purchase or lease.

734.   GM's actions as set forth above occurred in the conduct of trade or commerce.

735.   GM's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

736.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

737.   GM knew or should have known that its conduct violated the Illinois CFA.

738.   GM owed Plaintiffs and the Class a duty to disclose the truth about its heightened incompatibility of the Class Vehicles with U.S. diesel fuel because GM:

a.      Possessed exclusive knowledge of the design of the Class

Vehicles and the effect of low-lubricity diesel fuel on the high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the

introduction of the Bosch CP4 fuel pump into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the

Class; and/or

c.      Made incomplete representations regarding the quality and

durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully

withholding material facts from Plaintiffs and the Class that contradicted these

representations.

739.   Due to GM's specific and superior knowledge that the Bosch CP4 fuel

pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false

representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM

had a duty to disclose to Class members that their vehicles were particularly

incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in

Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the

expected durability over other diesel vehicles or of their namesake predecessor

engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle

engines and engine systems, and that Class members would be required to bear the

cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

740.   GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

741.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

742. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

743. Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Class members seek monetary relief against GM in the amount of actual damages, as well as punitive damages because GM acted with fraud and/or malice and/or was grossly negligent.

744. Plaintiffs also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

## COUNT II

## BREACH OF THE IMPLIED WARRANTY FOR MERCHANTABILITY (810 ILCS 5/2-314)

745. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

746. Plaintiffs bring this Count on behalf of the Illinois Class members.

747. GM was a merchant with respect to motor vehicles within the meaning of the 810 ILCS. 5/2-314.

748. Under 810 ILCS 5/2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased the Class Vehicles.

749.   The Class Vehicles, when sold and at all times thereafter, were not merchantable they were not in a safe condition nor substantially free from defects—in fact, they were quite the opposite.

750.   The Class Vehicles are inherently defective in that their high-pressure fuel injection systems are particularly incompatible with U.S. diesel fuel, such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

751.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

752.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

753.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

754.   Plaintiffs bring this Count on behalf of the Illinois Class.

755.    This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

756.    GM has received and retained a benefit from Plaintiffs and inequity has resulted.

757.    GM has benefitted from selling and leasing the Class Vehicles, for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

758.    Thus, all Plaintiffs conferred a benefit on GM.

759.    It is inequitable for GM to retain these benefits.

760.    Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from GM's conduct but were harmed by it.

761.    GM knowingly accepted the benefits of its unjust enrichment.

762.    As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

P.    **Claims Brought on Behalf of the Indiana Class.**

## COUNT I

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)

763.    Plaintiffs (for purposes of all Indiana Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

764.    Plaintiffs bring this Count on behalf of the Indiana Class members.

765.   GM is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

766.   Plaintiffs' purchases and leases of Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

767.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person or supplier from engaging in "an unfair, abusive or deceptive act, or omission, or practice in connection with a consumer transaction." "Deceptive acts" include: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits if does not have which the supplier knows or should reasonably know it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; . . . . . . . (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

768.   GM participated in unfair and deceptive trade practices that violated the Indiana DCSA as described herein. In the course of its business, GM knowingly

concealed and suppressed material facts concerning the defective CP4 fuel pumps in

the Class Vehicles. GM falsely represented the quality of the Class Vehicles and

omitted material facts regarding the heightened incompatibility of the Class Vehicles

with the fuel intended to be used with said vehicles (and the consequences of said

heightened incompatibility ), as well as the durability and overall value of the Class

Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase

Class Vehicles, and to increase GM's revenue and profits.

769.   Specifically, by misrepresenting the Class Vehicles as safe, durable,

reliable, and compatible with U.S. diesel, and by failing to disclose and actively

concealing the CP4 fuel pump defect, GM engaged in deceptive business practices

prohibited by the Indiana DCSA, including:

a.     Knowingly   making   a   false   representation   as   to   the

characteristics, uses, and benefits of the Class Vehicles;

b.     Knowingly making a false representation as to whether the Class

Vehicles are of a particular standard, quality, or grade;

c.     Advertising the Class Vehicles with the intent not to sell them as

advertised; and

d.     Otherwise engaging in conduct likely to deceive.

770.   GM's unfair or deceptive acts or practices, including the above-

mentioned concealments, omissions, and suppressions of material facts, had a

tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Indiana Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

771.   As alleged above, in the course of its business, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead the Indiana Class Members.

772.   GM knew or should have known that its conduct violated the Indiana DCSA.

773.   To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

774.   GM owed the Indiana Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM:

a.      Possessed exclusive knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles;

b.      Intentionally concealed the foregoing from the Indiana Class Members; and/or

c.     Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Indiana Class Members that contradicted these representations.

775.   Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and intentionally failed to disclose to the Indiana Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 which GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by the Indiana Class Members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

776.   The Indiana Class Members suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. The Indiana Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

777.   As a direct and proximate result of GM's violations of the Indiana DCSA, the Indiana Class Members have suffered injury-in-fact and/or actual damages.

778.   Pursuant to Ind. Code § 24-5-0.5-4, the Indiana Class Members are entitled to monetary relief from GM measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 for each Indiana Class Member, including treble damages up to $1,000 for GM's willfully deceptive acts.

779.   The Indiana Class Members also seek punitive damages based on the outrageousness and recklessness of GM's conduct and GM's high net worth.

780.   In accordance with Ind. Code § 24-5-0.5-5(a), on August 9, 2019, Plaintiffs' counsel, on behalf of Plaintiffs, sent a letter to GM with notice of their allegations regarding GM's violations of the Indiana DCSA relating to the Class Vehicles and the Indiana Class Members' demand that GM correct or agree to correct the actions described therein. GM has failed to do so. Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and Indiana Class Members are entitled.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (IND. CODE § 26-1-2-314)

781.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

782.   Plaintiffs bring this Count on behalf of the Indiana Class members.

783.   GM was a merchant with respect to motor vehicles within the meaning of the Ind. Code § 26-1-2-314.

784.   Under Ind. Code § 26-1-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles.

785.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

786.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pumps and disperse throughout the vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

787.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

788.    As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

789.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

790.    Plaintiffs bring this Count on behalf of the Indiana Class members.

791.    This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

792.    GM has received and retained a benefit from Plaintiffs and inequity has resulted.

793.    GM has benefitted from manufacturing, distributing, selling, and leasing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the cars and been forced to pay other costs.

794.    Thus, all Plaintiffs conferred a benefit on GM.

795.    It is inequitable for GM to retain these benefits.

796.   Plaintiffs were not aware of the true defective nature of the Class Vehicles at the time of acquisition, and did not benefit from GM's conduct.

797.   GM knowingly accepted the benefits of its unjust conduct.

798.   As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to the proof.

Q.   **Claims Brought on Behalf of the Iowa Class.**

## COUNT I

### CONSUMER FRAUDS ACTS IN VIOLATION OF IOWA LAW (IOWA CODE § 714H.1 *ET SEQ.*)

799.   Plaintiffs (for purposes of the Iowa Counts) incorporate by reference all paragraphs as though fully set forth herein.

800.   Plaintiffs bring this Count on behalf of the Iowa Class members.

801.   GM is a "person" under Iowa Code § 714H.2(7).

802.   Plaintiffs are "consumers," as defined by Iowa Code § 714H.2(3), who purchased or leased one or more Class Vehicles.

803.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection

with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. GM participated in misleading, false, or deceptive acts that violated the Iowa CFA with the intent that Plaintiffs and other Class members rely on it. By systematically concealing the defects in Class Vehicles, GM engaged in deceptive business practices prohibited by the Iowa CFA.

804.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

805.   In the course of GM's business, it willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, Defendant engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, false pretense, or false promise, or the misrepresentations, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles. GM's acts

- 308 -

had the capacity, tendency, or effect of deceiving or misleading consumers. GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

806.   In purchasing or leasing the Class Vehicles, Plaintiffs and other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

807.   Plaintiffs and other Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, Plaintiffs and Class members could not, and did not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part of the Class Vehicles and Plaintiffs were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

808.   GM's unfair or deceptive acts or practices, deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely to and did in fact deceive reasonable consumers.

809.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs.

810.   GM knew or should have known that its conduct violated the Iowa CFA.

811.   As alleged above, GM made material representations about the safety, performance, and reliability of the Class Vehicles that were either false or misleading.

812.   GM owed Plaintiffs a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with the U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge about the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in it vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pump into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.     Made incomplete representations about the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

813.   Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

814.   As a direct and proximate result of GM's conduct, Plaintiffs and other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and other

Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

815.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. In particular and as alleged herein, GM's unlawful acts and practices complained of herein affect the public interest.

816.   Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining GM's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

R.     **Claims Brought on Behalf of the Kansas Class.**

### COUNT I

### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*)

817.   Plaintiffs (for purposes of all Kansas Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

818.   Plaintiffs bring this Count on behalf of the Kansas Class members.

819.   GM is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

820.   Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

821.   The sale or lease of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

822.   The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

823.  In the course of GM's business, GM willfully failed to disclose and willfully concealed, suppressed, or omitted the fact that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles in light of representations of

fact made in a positive manner. GM actions were unconscionable in connection with the transaction involving the Class Vehicle. GM engaged in unfair and deceptive business practices in violation of the Kansas CPA.

824.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), as described above.

825.   GM acted with intent that others rely on the concealment or omission of material facts. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations were false and gravely misleading. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and Class members were not aware of the defective nature of the CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

826.   GM's actions as set forth above occurred in the conduct of trade or commerce.

827.    GM's unfair or deceptive acts or practices, willful misrepresentations, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

828.    GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

829.    GM knew or should have known that its conduct violated the Kansas CPA.

830.    GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

    a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it say upon the introduction of the Bosch CP4 fuel pump into the Class Vehicle;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

- 316 -

831.   Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

832.   GM's conduct directly and proximately caused injuries to Plaintiffs and the other Class members.

833.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

834.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

835.   Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs and the Kansas Class seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000

for Plaintiffs and each Kansas Class member. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

836.   Plaintiffs also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 *et seq.*

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (KAN. STAT. ANN. § 84-2-314)

837.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

838.   Plaintiffs bring this Count on behalf of the Kansas Class members.

839.   GM was a merchant with respect to motor vehicles within the meaning of the Kan. Stat. Ann. § 84-2-314.

840.   Under Kan. Stat. Ann. § 84-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

841.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles contain a latent, inherent defect because they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class

Vehicles causes metal shards to wear off of the CP4 pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

842. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

843. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

S. **Claims Brought on Behalf of the Kentucky Class.**

## COUNT I

## VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)

844. Plaintiffs (for purposes of all Kentucky Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

845. Plaintiffs bring this Count on behalf of the Kentucky Class members.

846. GM, Plaintiffs, and each member of the Kentucky Class are "person[s]" within the meaning of the Ky. Rev. Stat. Ann. § 367.110(1).

847. GM engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

848.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1). GM participated in misleading, false, or deceptive acts that violated the Kentucky CPA. Accordingly, Defendant engaged in deceptive business practices prohibited by the Kentucky CPA.

849.    In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. All of these defects would be material to a reasonable consumer. Accordingly, GM engaged in unfair, false, misleading, or deceptive acts or practices.

850.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential

catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

851.   Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, of which they had no way of knowing were false and gravely misleading. Indeed, Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

852.   GM's actions as set forth above occurred in the conduct of trade or commerce.

853.   GM's unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and other Class members, about the true safety and reliability of their vehicles.

854.   GM knew or should have known that its conduct violated the Kentucky CPA.

855.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

856.   GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pump into the Class Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

857.   Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

858.   GM's conduct and violation of the Kentucky CPA directly and proximately caused injury-in-fact and/or actual damages to Plaintiffs and the other Class members.

859.   Plaintiffs and Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

860.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

861.   Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs and the Class seek to recover actual damages in an amount to be determined at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

T.   **Claims Brought on Behalf of the Louisiana Class.**

## COUNT I

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. STAT. ANN. § 51:1401 *ET SEQ.*)

862.   Plaintiffs (for purposes of all Louisiana Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

863.   Plaintiffs bring this Count on behalf of the Louisiana Class members.

864.   GM, Plaintiffs, and Louisiana Class members are "persons" within the meaning of the La. Stat. Ann. § 51:1402(8).

865.   Plaintiffs and Louisiana Class members are "consumers" within the meaning of La. Stat. Ann. § 51:1402(1).

866.   GM engaged in "trade" or "commerce" within the meaning of La. Stat. Ann. § 51:1402(9).

867.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Stat. Ann. § 51:1405(A). GM participated in misleading, false, or deceptive acts that violated Louisiana CPL. By systematically concealing the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with the U.S. diesel fuel, GM engaged in deceptive business practices prohibited by the Louisiana CPL. These facts concealed would be material to a reasonable consumer.

868.   In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unlawful conduct of unfair or deceptive acts or practices in the conduct of any trade

or commerce with the intent that a consumer rely on the same in connection therewith.

869. In purchasing or leasing the Class Vehicles, Plaintiffs and the Sub-Class members were deceived by Defendant's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

870. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations in purchasing or leasing the Class Vehicles. They had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part of the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the CP4 fuel pump in the high-pressure fuel injection system prior to purchase or lease.

871. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

872.    GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

873.    GM knew or should have known that its conduct violated the Louisiana CPL.

874.    GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

        a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of the low-lubricity diesel fuel on high-pressure fuel injections systems in it vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

        b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

        c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

875.    Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

876.   GM's violations present a continuing risk to Plaintiffs and other Class members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest. GM's violations offend public policy

- 329 -

and are immoral, unethical, oppressive, unscrupulous and substantially injurious. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as a the Class Vehicles continue to be advertised and sold for use with American diesel fuel, the likelihood of continued injurious impact on other consumers is significant.

877. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. There injuries are the direct and natural consequence of GM's misrepresentations and omissions.

878. Pursuant to La. Stat. Ann. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for GM's knowing violations of the Louisiana CPL; an order enjoining GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Stat. Ann. § 51:1409.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)

879.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

880.   Plaintiffs bring this Count on behalf of the Louisiana Class members.

881.   GM was a merchant with respect to motor vehicles within the meaning of the La. Civ. Code Art. 2520, 2524.

882.   Under La. Civ. Code Art. 2520 and 2524, a warranty that the Class Vehicles did not have redhibitory defects was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

883.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used. The Class Vehicles had a redhibitory defect. In being inherently defective and particularly incompatible with U.S. diesel fuel, the Class Vehicles' use is so inconvenient that it must be presumed that a buyer would not have bought it had he known of the defect, or would have paid substantially less for it.

884.   The Bosch CP4 fuel pumps are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the

vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

885.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

886.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

U.   **Claims Brought on Behalf of the Maine Class.**

### COUNT I

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A *ET SEQ.*)

887.   Plaintiffs (for purposes of all Maine Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

888.   This claim is brought on behalf of the Maine Class members.

889.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207.

890.   GM, Plaintiffs, and Maine Class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

891. GM was and is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

892. GM participated in unfair and deceptive trade practices that violated the Maine UTPA as described herein. In the course of its business, GM knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

893. Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, GM engaged in deceptive business practices prohibited by the Maine UTPA, including:

a.     Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.     Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

       c.       Advertising the Class Vehicles with the intent not to sell them as advertised; and

       d.       Otherwise engaging in conduct likely to deceive.

894.   GM's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Maine Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

895.   As alleged above, in the course of its business, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead the Maine Class Members.

896.   GM knew or should have known that its conduct violated the Maine UTPA.

897.   To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

898.   GM owed the Maine Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM, by

virtue of designing, producing, and warranting the Class Vehicles, possessed exclusive, superior knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles, and Plaintiffs and Class Members could not reasonably be expected to learn of or discovery the CP4 fuel pump defect which is latent in nature and manifests in a deeply internal component part of the Class Vehicles' high-pressure fuel injection systems.

899.  Plaintiffs and Class Members relied on GM's representations and omissions regarding the safety, quality, and durability of the Class Vehicles, and specifically that said vehicles were compatible with U.S. diesel. GM, by the conduct, statements, and omissions described above, knowingly and intentionally concealed from Plaintiffs and the Class Members that the Class Vehicles suffer from an inherent defect (and the costs, safety risks, and diminished value of the vehicles as a result of this defect).

900.  GM's acts and practices have deceived Plaintiffs and Class Members and are likely to, and did, deceive the public. In misrepresenting the attributes and performance properties of Class Vehicles, and failing to disclose the CP4 fuel pump defect and suppressing material facts from Plaintiffs and Class Members, GM violated the MUTPA and substantially injured them. GM's misrepresentations, omissions, and acts of concealment pertained to information that was material to Plaintiffs and Class Members, as it would have been to all reasonable consumers.

901.   Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and intentionally failed to disclose to Plaintiffs and the Maine Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 which GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by Plaintiffs and the Maine Class Members at the time of purchase or lease. Indeed, GM's conduct proximately caused Plaintiffs' and Maine Class Members' injuries, as consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

902.   Plaintiffs and the Maine Class Members suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Plaintiffs and the Maine Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

903.   The injuries suffered by Plaintiffs and Maine Class Members are greatly outweighed by any potential countervailing benefit to consumers or to

competition, and are not injuries that Plaintiffs and Maine Class Members could or should have reasonably avoided.

904.   Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213(2), Plaintiffs and the Class seek costs, attorneys' fees, and any other just and proper relief under applicable law.

905.   On August 9, 2019, in accordance with Me. Rev. Stat. Ann. tit. 5, § 213(1-A), Plaintiffs' counsel, on behalf of Plaintiffs and Maine Class Members, sent a letter to GM with notice of their allegations regarding GM's violations of the MUTPA relating to the Class Vehicles and Plaintiffs' demand that GM correct or agree to correct the actions described therein. More than thirty days have passed since Plaintiffs' counsel sent that letter and GM has failed to correct or agree to correct the actions described therein. Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and Maine Class Members are entitled.

## COUNT II

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (ME. REV. STAT. ANN. TIT. § 2-314)

906.   Plaintiffs incorporate all paragraphs as though fully set forth herein.

907.   Plaintiffs bring this Count on behalf of the Maine Class members.

908.   GM is a merchant with respect to motor vehicles within the meaning of Me. Rev. Stat. Ann. tit. 11, § 2-104(1).

909.   Under Me. Rev. Stat. Ann. tit. § 2-314, a warranty that the Class Vehicles were in a merchantable condition was implied by law in the transactions

when Plaintiffs and other Class members purchased or leased the Class Vehicles from GM.

910.   The Class Vehicles, when first sold and at all times thereafter, were not merchantable an are not fit for the ordinary purpose for which cars are used.

911.   Specifically, the Class Vehicles contain a latent, inherent defect because they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

912.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

913.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

V.    **Claims Brought on Behalf of the Maryland Class.**

## COUNT I

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
(MD. CODE ANN., COM. LAW § 13-101 *ET SEQ.*)**

914.   Plaintiffs (for purposes of all Maryland Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

915.   Plaintiffs bring this Count on behalf of the Maryland Class members.

916.   Defendant, Plaintiffs, and the Maryland Class members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

917.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good. Md. Code Ann., Com. Law  § 13-303. These include "(1) false, falsely disparaging, or misleading oral or written statement, visual description, or other representations of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; (2) Representation that: (i) consumer goods . . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quality which they do not have; . . . (iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;" and "(3) failure to state a material fact if the failure deceives or tends to deceive;" and "(6) false or misleading representation of fact which concerns; (i) The reason for or the existence of a price reduction; or (ii) A

- 339 -

price comparison to a price of a competitor or to one's price at a past or future time;" and "(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods." GM participated in misleading, false, or deceptive acts that violated the Maryland CPA. By concealing the known defects in Plaintiffs' Class Vehicles, GM engaged in deceptive business practices prohibited by the Maryland CPA.

918.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

919.   In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices,

including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

920.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), as described above.

921.   Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel

GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

922.   GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

923.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

924.   GM knew or should have known that its conduct violated the Maryland CPA.

925.   GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

    a.   Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

    b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c. Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

926. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs

and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

927.   GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

928.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

929.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

930.   Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiffs and the Maryland Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MD. CODE COM. LAW § 2-314)

931.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

932.   Plaintiffs bring this Count on behalf of the Maryland Class against GM.

933.   GM was a merchant with respect to motor vehicles within the meaning of the Md. Code Com. Law § 2-314.

934.   Under Md. Code Com. Law § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

935.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

936.   The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

937.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

938.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

W.   **Claims Brought on Behalf of the Massachusetts Class.**

## COUNT I

## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT (MASS. GEN. LAWS CH. 93A)

939.   Plaintiffs (for purposes of all Massachusetts Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

940.   Plaintiffs bring this Count on behalf of the Massachusetts Class Members.

941.   Plaintiffs, Massachusetts Class Members, and GM are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

942.   GM was and is engaged in "trade" or "commerce" within the meaning of Mass. Gen Laws ch. 93A, § 1(b).

943.   The Massachusetts Consumer Protection Act ("MCPA") makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." Mass Gen. Laws ch. 93A, § 2(1).

944.    GM participated in misleading, false, and deceptive acts or practices in the conduct of trade or commerce as described herein. By failing to disclose and actively concealing the CP4 fuel pump defect and the dangers and issues stemming therefrom, GM engaged in deceptive business practices prohibited by the MCPA.

945.    GM knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

946.    Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, GM engaged in deceptive business practices prohibited by the MCPA, including:

a.    Knowingly    making    a    false    representation    as    to    the characteristics, uses, and benefits of the Class Vehicles;

b.    Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

        c.      Advertising the Class Vehicles with the intent not to sell them as advertised; and

        d.      Otherwise engaging in conduct likely to deceive.

947.  GM's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Massachusetts Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

948.  As alleged above, in the course of its business, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead the Massachusetts Class Members.

949.  GM knew or should have known that its conduct violated the MCPA.

950.  To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

951.    GM owed the Massachusetts Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM:

a.    Possessed exclusive knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles;

b.    Intentionally concealed the foregoing from the Massachusetts Class Members; and/or

c.    Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Massachusetts Class Members that contradicted these representations.

952.    Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and intentionally failed to disclose to the Massachusetts Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 which GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by the Massachusetts Class Members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not

have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

953.   Accordingly, the Massachusetts Class Members have suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. The Massachusetts Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

954.   As a direct and proximate result of GM's violations of the MCPA, the Massachusetts Class Members have suffered injury-in-fact and/or actual damages.

955.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Class Members are entitled to monetary relief from GM measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $25 for each Massachusetts Class Member. Because GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages.

956.   In accordance with Mass. Gen. Laws ch. 93A, § 9(3), Plaintiffs' counsel, on behalf of Plaintiffs, sent a letter to GM on August 9, 2019, providing GM with notice of the allegations regarding GM's violations of the MCPA relating to the Class Vehicles and the Massachusetts Class Members' demand that GM correct or agree to correct the actions described therein. The statutorily required time period has elapsed and GM has failed to do so. Plaintiffs therefore seek

compensatory and monetary damages to which Plaintiffs and Massachusetts Class Members are entitled.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MASS. GEN. LAWS CH. 106, § 2-314)

957.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

958.   Plaintiffs bring this Count on behalf of the Massachusetts Class members.

959.   GM was a merchant with respect to motor vehicles within the meaning of the Mass. Gen. Laws ch. 106, § 2-314.

960.   Under Mass. Gen. Laws ch. 106, § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

961.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

962.   The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and

subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

963.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

964.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

X.   **Claims Brought on Behalf of the Michigan Class.**

### COUNT I

### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

965.   Plaintiffs (for purposes of all Michigan Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

966.   Plaintiffs bring this Count on behalf of the Michigan Class members.

967.   Plaintiffs and the Michigan Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

968.   GM is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

969.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . .

characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). GM participated in unfair, unconscionable, or deceptive methods, acts, or practices that violated the Michigan CPA. By concealing the known defects in Plaintiffs' Class Vehicles, GM engaged in deceptive business practices prohibited by the Michigan CPA.

970.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

971.   In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a

moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

972.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure.

973.   Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of this defect prior to purchase or lease.

974.   GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

975.   GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

976.   GM knew or should have known that its conduct violated the Michigan CPA.

977.   GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.   Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

978.   Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

979.   GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

980.   Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

981.   GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

982.   Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 per each Plaintiff; and reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911. Plaintiffs also seek punitive damages against GM because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. GM's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MICH. COMP. LAWS § 440.2314)

983.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

984.   Plaintiffs bring this Count on behalf of the Michigan Class members.

985.   At all relevant times, GM was and is a merchant with respect to motor vehicles within the meaning of the Mich. Comp. Laws § 440.2314.

986.   Under Mich. Comp. Laws § 440-2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

987.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

988.   The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

989.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

990.   As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

991.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

992.   Plaintiffs bring this Count on behalf of the Michigan Class members.

993.   This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

994.   GM has received and retained a benefit from Plaintiffs and inequity has resulted.

995.   GM has benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

996.   Thus, all Plaintiffs conferred a benefit on GM.

997.   It is inequitable for GM to retain these benefits.

998.   Plaintiffs were not aware of the true facts about their Class Vehicles, and did not benefit from GM's conduct, but rather were harmed by it.

999.   GM knowingly accepted the benefits of its unjust conduct.

1000.  As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

Y.     **Claims Brought on Behalf of the Minnesota Class.**

## COUNT I

## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
## (MINN. STAT. § 325F.68 *ET SEQ.*)

1001.  Plaintiffs (for purposes of all Minnesota Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1002.  Plaintiffs bring this Count on behalf of the Minnesota Class members.

1003.  The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1004.  The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). GM participated in misleading, false, or deceptive acts that violated the Minnesota CFA. By concealing the known defects in Plaintiffs' Class Vehicles, GM engaged in deceptive business practices prohibited by the Minnesota CFA.

1005.  GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1006. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in fraud, misrepresentation, and deceptive practices. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that Plaintiffs and other Class members rely thereon in connection with the sale of the Class Vehicles.

1007. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1008. GM knew that Plaintiffs and other Class members would and did reasonably rely upon GM's false representations and omissions, and that they had no way of knowing that GM's representations and omissions were false and/or misleading, that the Class Vehicles were particularly incompatible with the fuel GM knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 fuel pumps to fail, or that GM would refuse to repair, replace, or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 fuel pumps and the known consequences of that failure to the Class Vehicles engines.

1009. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppressions and/or omissions of material facts were likely to and did in fact deceive reasonable consumers.

1010. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1011. GM knew or should have known that its conduct violated the Minnesota CFA.

1012. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1013. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be

required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1014. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1015. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1016. GM's violations present a continuing risk and impact to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of

herein impact the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

1017. Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1018. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights of others.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (MINN. STAT. § 336.2-314)

1019. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1020. Plaintiffs bring this Count on behalf of the Minnesota Class members.

1021. GM was and is a merchant with respect to motor vehicles within the meaning of the Minn. Stat. § 336.2-314.

- 366 -

1022. Under Minn. Stat. § 336.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1023. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1024. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1025. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1026. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

Z.    **Claims Brought on Behalf of the Mississippi Class.**

## COUNT I

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MISS. CODE ANN. § 75-2-314)

1027. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1028. Plaintiffs bring this Count on behalf of the Mississippi Class against GM.

1029. GM was and is a merchant with respect to motor vehicles within the meaning of the Miss. Code Ann. § 75-2-314.

1030. Under Miss. Code Ann. § 75-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1031. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1032. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a

moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1033. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1034. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

AA.   **Claims Brought on Behalf of the Missouri Class.**

## COUNT I

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*)

1035. Plaintiffs (for purposes of all Missouri Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1036. Plaintiffs bring this Count on behalf of the Missouri Class against GM.

1037. GM, Plaintiffs, and the Missouri Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1038. GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1039. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or

omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. GM used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA.

1040. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Bosch CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1041. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1042. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. Indeed, Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1043. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1044. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1045. GM knew or should have known that its conduct violated the Missouri CPA.

1046. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1047. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were

particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1048. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1049. Plaintiffs and the other Class members purchased Class Vehicles for personal, family, or household use and were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that

Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1050. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1051. GM is liable to Plaintiffs and the Missouri Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining GM's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MO. REV. STAT. § 400.2-314)

1052. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1053. Plaintiffs bring this Count on behalf of the Missouri Class members.

1054. GM is a merchant with respect to motor vehicles within the meaning of the Mo. Rev. Stat. § 400.2-314.

1055. Under Mo. Rev. Stat. § 400.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1056. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1057. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death.

1058. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1059. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

1060. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1061. Plaintiffs bring this Count on behalf of the Missouri Class members.

1062. This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1063. GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1064. GM has benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

1065. Thus, all Plaintiffs conferred a benefit on GM.

1066. It is inequitable for GM to retain these benefits.

1067. Plaintiffs were not aware of the true facts about their Class Vehicles prior to spending their money on said Vehicles, and did not benefit from GM's conduct.

1068. GM knowingly accepted the benefits of its unjust conduct.

1069. As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

1070. Accordingly, GM is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

BB.  **Claims Brought on Behalf of the Montana Class.**

**COUNT I**

**VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)**

1071. Plaintiffs (for purposes of all Montana Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1072. Plaintiffs bring this Count on behalf of the Montana Class members.

1073. GM, Plaintiffs, and the Montana Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

1074. Plaintiffs and Montana Class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

1075. The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103. GM participated in false, misleading, or deceptive acts or practices that violated the Montana CPA. By concealing known defects in the Class Vehicles, GM's conduct, actions, and inactions offend established public policy and

- 377 -

are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

1076. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1077. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Bosch CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1078. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose the aforementioned material facts.

- 378 -

1079. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. Indeed, Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1080. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1081. GM knew or should have known that its conduct violated the Montana CPA.

1082. GM owed Plaintiffs and the Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

        a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1083. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or

leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1084. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1085. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest and offends public policy and is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Specifically: (1) the number of consumers affected by GM's unfair and deceptive acts or practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the

Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

1086. Because Defendant's unlawful methods, acts, and practices have caused Plaintiffs and Montana Class members to suffer an ascertainable loss of money and property, Plaintiffs and the Class seek from Defendant actual damages, discretionary treble damages, reasonable attorneys' fees, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MONT. CODE ANN. § 30-2-314)

1087. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1088. Plaintiffs bring this Count on behalf of the Montana Class members.

1089. GM is a merchant with respect to motor vehicles within the meaning of the Mont. Code Ann. § 30-2-314.

1090. Under Mont. Code Ann. § 30-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1091. The Class Vehicles, when first sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1092. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1093. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1094. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

CC.  **Claims Brought on Behalf of the Nebraska Class.**

### COUNT I

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*)

1095. Plaintiffs (for purposes of all Nebraska Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1096. Plaintiffs bring this Count on behalf of the Nebraska Class members against GM.

1097. GM, Plaintiffs, and Nebraska Class members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

1098. GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

1099. The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. GM's conduct as set forth herein constitutes unfair or deceptive acts or practices prohibited by the Nebraska CPA.

1100. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression,

or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1101. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1102. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. Indeed, Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1103. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1104. GM knew or should have known that its conduct violated the Nebraska CPA.

1105. GM owed Plaintiffs and the Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1106. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1107. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1108. GM's violations present a continuing risk to Plaintiffs as well as to the general public, and thus GM's unlawful acts and practices complained of herein impact the public interest. Specifically: (1) the number of consumers affected by GM's unfair or deceptive acts or practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers in significant.

1109. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1110. Because GM's conduct caused injury to Nebraska Class members' through violations of the Nebraska CPA, Plaintiffs and the Nebraska Class seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendant's unfair or deceptive acts and practices, court costs, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (NEB. REV. STAT. § 30-2-314)

1111. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1112. Plaintiffs bring this Count on behalf of the Nebraska Class members.

1113. GM is a merchant with respect to motor vehicles within the meaning of the Neb. Rev. Stat. § 30-2-314.

1114. Under Neb. Rev. Stat. § 30-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1115. The Class Vehicles, when first sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1116. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' CP4 high-pressure fuel injection pumps and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death.

1117. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1118. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

DD.   **Claims Brought on Behalf of the Nevada Class.**

## COUNT I

### VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*)

1119. Plaintiffs (for purposes of the Nevada Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1120. Plaintiffs bring this Count on behalf of the Nevada Class members.

1121. The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903 *et seq.*, prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or

should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction." Accordingly, GM has violated the Nevada DTPA by knowingly representing that the Class Vehicles have uses and benefits which they do not have; representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

1122. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1123. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Bosch CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer

would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1124. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1125. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. Indeed, Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1126. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1127. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1128. GM knew or should have known that its conduct violated the Nevada DTPA.

1129. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1130. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1131. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1132. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1133. Accordingly, Plaintiffs and the Nevada Class members seek their actual damages, punitive damages, court costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEV. REV. STAT. § 104.2314)

1134. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1135. Plaintiffs bring this Count on behalf of the Nevada Class members against GM.

1136. GM is a merchant with respect to motor vehicles within the meaning of the Nev. Rev. Stat. § 104.2314.

1137. Under Nev. Rev. Stat. § 104.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1138. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1139. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1140. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1141. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

EE.    **Claims Brought on Behalf of the New Hampshire Class.**

## COUNT I

## VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
## (N.H. REV. STAT. ANN. § 358-A:1 *ET SEQ.*)

1142. Plaintiffs (for purposes of all New Hampshire Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1143. Plaintiffs bring this Count on behalf of the New Hampshire Class members.

1144. Plaintiffs, other Class Members, and GM are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"). N.H. Rev. Stat. § 358-A:1.

1145. GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

1146. The New Hampshire CPA prohibits a person in the conduct of any trade or commerce from using "any unfair or deceptive act or practice," including "but . . . not limited to the following: . . . (V) Representing that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have," "(VII) Representing that goods or services are of a particular standard, quality, or grade, . . . if they are of another," and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2. GM participated in unfair methods of competition or unfair or deceptive acts or practices that violated the New

Hampshire CPA. By representing that the Class Vehicles were compatible with U.S. diesel fuel when they were not, and by touting these diesel trucks' superior durability and longevity, all the while concealing its knowledge of those false representations, GM engaged in deceptive business practices prohibited by the New Hampshire CPA. The facts concerning the inherently defective nature of the Class Vehicles would be material to a reasonable consumer.

1147. In the course of GM's business, it willingly, knowingly, and intentionally failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving a stall and subsequent inability to restart the vehicle). Particularly in light of GM's nationwide advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM willfully and knowingly engaged in unfair and deceptive trade practices, in unfair methods of competition, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead

or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transactions in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentations, or knowingly concealment, suppression, or omission of any material fact with intent that Plaintiffs and other Class Members rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

1148. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion causing a moving stall and subsequent inability to restart the vehicle).

1149. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations and omissions were false and gravely misleading; indeed, they did not, and could not,

unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component in the Class Vehicles and Plaintiffs and Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

1150. The facts concealed and omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs and other Class members known of the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. But GM's unfair and deceptive acts of fraud, misrepresentation, concealment, suppression, and/or omission of material facts were likely to and did in fact deceive reasonable consumers.

1151. GM knew or should have known that its conduct violated the New Hampshire CPA.

1152. GM owed Plaintiffs and the other Class members a duty to disclose the truth about the heightened incompatibility of the CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1153. Due to GM's specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, and due to its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and the Class members that their Class Vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that catastrophic failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engine and engine systems, and that Class members would be required to bear the

cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1154. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles, did not get the benefit of their bargain, their Class Vehicles have suffered a diminution in value, and their vehicles are equipped with a defective and destructive CP4 fuel pump. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1155. GM's violations present a continuing risk to Plaintiffs as well as the other Class members and the general public. GM's unlawful acts and practices

complained of herein affect the public interest, and its practices are immoral, unethical, oppressive, and/or unscrupulous.

1156. Pursuant to N.H. Rev. Stat. § 358-A:10, Plaintiffs and Class members seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and proper relief available under N.H. Rev. Stat. § 358-A:10.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. REV. STAT. ANN. § 382-A:2-314)

1157. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1158. Plaintiffs bring this Count on behalf of the New Hampshire Class members.

1159. GM was at all times a merchant with respect to motor vehicles within the meaning of N.H. Rev. Stat. Ann. § 382-A:2-314.

1160. Under N.H. Rev. Stat. Ann. § 382-A:2-314, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used was implied by law in the transactions when Plaintiffs and other Class members purchased or leased their Class Vehicles from GM.

1161. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which

vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicles.

1162. The normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1163. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1164. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

1165. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1166. Plaintiffs bring this Count on behalf of the New Hampshire Class members.

1167. This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and other Class members.

1168. As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects the Class Vehicles' high-pressure fuel injection systems and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

1169. GM has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by GM's concealment of the defective nature of the CP4 fuel pump in the Class Vehicles, and false representations related thereto.

1170. GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

1171. GM has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

1172. It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

1173. Because GM concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

1174. GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

1175. As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial.

FF.   **Claims Brought on Behalf of the New Jersey Class.**

## COUNT I

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)

1176. Plaintiffs (for purposes of all New Jersey Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1177. Plaintiffs bring this Count on behalf of the New Jersey Class members.

1178. GM and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1179. GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

1180. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.* ("N.J. CFA"), makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ." N.J. Stat. Ann. § 56:8-2. GM engaged in unconscionable commercial practice or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Plaintiffs rely upon their acts of concealment, suppression and/or omission.

1181. In the course of GM's business, GM willfully failed to disclose and actively concealed or omitted that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of

- 407 -

GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel, but they are not. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; knowingly failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

1182. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1183. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations and omissions were false and gravely misleading; indeed, they did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel

injection systems are a deeply internal component in the Class Vehicles and Plaintiffs and Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

1184. The facts concealed and omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs and other Class members known of the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. But GM's unfair and deceptive acts of fraud, misrepresentation, concealment, suppression, and/or omission of material facts were likely to and did in fact deceive reasonable consumers.

1185. GM intentionally, affirmatively, and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1186. GM knew or should have known that its conduct violated the New Jersey CFA.

1187. GM owed Plaintiffs and the Class a duty to disclose the truth about the

heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with

U.S. diesel fuel because GM:

      a.     Possessed exclusive knowledge of the design of the Class

Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the

introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

      b.     Intentionally concealed the foregoing from Plaintiffs and the

Class; and

      c.     Made incomplete representations regarding the quality and

durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully

withholding material facts from Plaintiffs and the Class that contradicted these

representations.

1188. Due to GM's specific and superior knowledge that the Bosch CP4 fuel

pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false

representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM

had a duty to disclose to Plaintiffs and other Class members that their vehicles were

particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps

will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1189. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1190. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1191. Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs and the New Jersey Class members seek an order enjoining GM's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CPA.

**COUNT II**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.J. STAT. ANN. § 12A:2-314)**

1192. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1193. Plaintiffs bring this Count on behalf of the New Jersey Class members.

1194. GM is a merchant with respect to motor vehicles within the meaning of the N.J. Stat. Ann. § 12A:2-314.

1195. Under N.J. Stat. Ann. § 12A:2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1196. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1197. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

1198. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1199. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

GG. **Claims Brought on Behalf of the New Mexico Class.**

## COUNT I

### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*)

1200. Plaintiffs (for purposes of all New Mexico Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1201. Plaintiffs bring this Count on behalf of the New Mexico Class members.

1202. Defendant, Plaintiffs, and New Mexico Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

1203. Defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

1204. The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Defendant's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D). In addition, Defendant's actions constitute unconscionable actions under N.M. Stat. Ann. § 57-12-2(E), since it took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

1205. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Bosch CP4 fuel pump in Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse

throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with American diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1206. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1207. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations and omissions were false and gravely misleading; indeed, they did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel

injection systems are a deeply internal component in the Class Vehicles and Plaintiffs and Class members were not aware of the defective nature of that high-pressure fuel injection system prior to purchase or lease.

1208. The facts concealed and omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs and other Class members known of the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. But GM's unfair and deceptive acts of fraud, misrepresentation, concealment, suppression, and/or omission of material facts were likely to and did in fact deceive reasonable consumers.

1209. GM intentionally, affirmatively, and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1210. GM knew or should have known that its conduct violated the New Mexico UTPA.

1211. GM owed Plaintiffs and the other Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a. Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b. Intentionally concealed the foregoing from Plaintiffs and the Class; and

c. Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1212. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1213. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1214. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

1215. Because GM's unconscionable, willful conduct caused actual harm to Plaintiffs and New Mexico Class members, Plaintiffs and the New Mexico Class members seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. STAT. ANN. § 55-2-314)

1216. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1217. Plaintiffs bring this Count on behalf of the New Mexico Class members.

1218. GM is a merchant with respect to motor vehicles within the meaning of the N.M. Stat. Ann. § 55-2-314.

1219. Under N.M. Stat. Ann. § 55-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1220. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1221. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1222. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1223. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

HH.    **Claims Brought on Behalf of the New York Class.**

## COUNT I

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. GEN. BUS. LAW § 349)

1224. Plaintiffs (for purposes of all New York Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1225. Plaintiffs bring this Count on behalf of the New York Class members.

1226. Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

1227. GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

1228. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. GM's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of GM's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, Plaintiffs and other Class members suffered injury as a result of the deceptive acts or practice.

1229. GM's actions, as set forth above, occurred in the conduct of business, trade or commerce.

1230. In the course of GM's business, GM willfully failed to disclose and systematically and actively concealed that the Bosch CP4 fuel pumps in Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1231. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1232. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1233. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression and omission of material facts were likely to and did in fact deceive reasonable consumers.

1234. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1235. GM knew or should have known that its conduct violated the New York GBL.

1236. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

    a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

        b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

        c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1237. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not

just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1238. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1239. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful and deceptive acts and practices complained of herein impact the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class

members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

1240. Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and each Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining GM's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT II

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

1241. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1242. Plaintiffs bring this Count on behalf of the New York Class members.

1243. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

1244. GM caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

1245. GM has violated N.Y. Gen. Bus. Law § 350 because of the misrepresentations and omissions alleged herein, including, but not limited to, GM's failure to disclose the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle).

1246. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure.

1247. Plaintiffs and other Class members had no way of knowing that GM's representations and omissions were false and misleading, that an internal component

part of the Class Vehicles is devastatingly defective to the entire fuel and engine system, that the Class Vehicles were particularly incompatible with the fuel GM knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that GM would refuse to repair, replace, or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

1248. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1249. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1250. GM knew or should have known that its conduct violated the New York GBL § 350.

1251. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

      a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1252. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not

just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1253. GM's actions as set forth above occurred in the conduct of trade or commerce.

1254. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1255. Plaintiffs and the other Class members are entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully or knowingly, Plaintiffs and the other Class members are entitled to recover three times actual damages, up to $10,000.

# COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (N.Y. U.C.C. § 2-314)

1256. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1257. Plaintiffs bring this Count on behalf of the New York Class members.

1258. GM is a merchant with respect to motor vehicles within the meaning of the N.Y. U.C.C. § 2-314.

1259. Under N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1260. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1261. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This

defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1262. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1263. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IV

## UNJUST ENRICHMENT

1264. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1265. Plaintiffs bring this Count on behalf of the New York Class members.

1266. This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1267. GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1268. GM has benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

1269. Thus, all Plaintiffs conferred a benefit on GM.

1270. It is against equity and good conscience for GM to retain these benefits.

1271. Plaintiffs were not aware of the true facts about their Class Vehicles, and did not benefit from GM's conduct.

1272. GM knowingly accepted the benefits of its unjust conduct.

1273. As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

II. **Claims Brought on Behalf of the North Carolina Class.**

## COUNT I

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *ET SEQ.*)

1274. Plaintiffs (for purposes of all North Carolina Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1275. Plaintiffs bring this Count on behalf of the North Carolina Class members.

1276. GM engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

1277. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). GM willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

1278. GM's actions occurred in the conduct of trade or commerce.

1279. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers;

failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive acts or practices in violation of the North Carolina UDPTA.

1280. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1281. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1282. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression and omission of material facts were likely to and did in fact deceive reasonable consumers.

1283. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1284. GM knew or should have known that its conduct violated the North Carolina UDTPA.

1285. GM owed Plaintiffs and the Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

   a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

   b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

   c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1286. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1287. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1288. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1289. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1290. Because GM's actions and conduct were willful, Plaintiffs seek an order for treble their actual damages, an order enjoining GM's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (N.C. GEN. STAT. § 25-2-314)

1291. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1292. Plaintiffs bring this Count on behalf of the New Carolina Class members.

1293. GM is a merchant with respect to motor vehicles within the meaning of the N.C. Gen. Ann. § 25-2-314.

1294. Under N.C. Gen. Ann. § 25-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1295. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1296. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1297. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1298. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

JJ.   **Claims Brought on Behalf of the North Dakota Class.**

## COUNT I

## VIOLATIONS OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02)

1299. Plaintiffs (for purposes of all North Dakota Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1300. Plaintiffs bring this Count on behalf of the North Dakota Class members.

1301. Plaintiffs, North Dakota Class members, and GM are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

1302. Defendant engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

1303. The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any

merchandise. . . . The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition." N.D. Cent. Code § 51-15-02. As set forth above and below, Defendant committed deceptive acts or practices, with the intent that Plaintiffs and other Class members rely thereon in connection with their purchase or lease of the Class Vehicles.

1304. GM's actions, as set forth herein, occurred in the conduct of trade or commerce.

1305. In the course of GM's business, GM willfully and knowingly failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unlawful, unfair and deceptive trade practices, in unfair methods of

competition, unconscionable acts or practices, including representing that the Class

Vehicles have characteristics, uses, benefits, and qualities which they do not have;

representing that the Class Vehicles are of a particular standard and quality when

they are not; failing to reveal a material fact, the omission of which tends to mislead

or deceive the consumer, and which fact could not reasonably be known by the

consumer; making a representation of fact or statement of fact material to the

transaction such that person reasonably believes the represented and suggested state

of affairs to be other than it actually is; and failing to reveal facts that are material to

the transaction in light of the representations of fact made in a positive manner. GM's

acts had the capacity, tendency or effect of deceiving or misleading consumers;

failed to state a material fact that deceives or tends to deceive; and constitute

deception, fraud, false pretense, false promise, misrepresentation, or knowing

concealment, suppression, or omission of any material fact with the intent that a

consumer rely on the same in connection with the Class Vehicles. GM engaged in

unlawful and deceptive acts and practices in violation of the North Dakota CFA.

1306. In purchasing or leasing the Class Vehicles, Plaintiffs and the other

Class members were deceived by GM's failure to disclose that the normal use of the

Class Vehicles causes metal shards to wear off of the fuel pump and disperse

throughout the vehicle's fuel injection system, leading to certain component wear

and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1307. Plaintiffs and Class members reasonably relied upon GM's false and misleading misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injection system prior to purchase or lease.

1308. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1309. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class members.

1310. GM knew or should have known that its conduct violated the North Dakota CFA.

1311. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1312. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1313. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1314. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1315. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

1316. Further, GM knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, GM is liable to Plaintiffs and the North Dakota Class for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining GM's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (N.D. CENT. CODE § 41-02-31)

1317. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1318. Plaintiffs bring this Count on behalf of the North Dakota Class members.

1319. GM is a merchant with respect to motor vehicles within the meaning of the N.D. Cent. Code § 41-02-31.

1320. Under N.D. Cent. Code § 41-02-31, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1321. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1322. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1323. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1324. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

- 447 -

KK.   **Claims Brought on Behalf of the Ohio Class.**

### COUNT I

### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE § 1345.01 *ET SEQ.*)

1325. Plaintiffs (for purposes of all Ohio Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1326. Plaintiffs bring this Count behalf of the Ohio Class members.

1327. Plaintiffs and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("Ohio CSPA").

1328. GM is a "supplier" as defined by the Ohio CSPA.

1329. Plaintiffs' and the other Ohio Class members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

1330. The Ohio CSPA, Ohio Rev. Code § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code § 1345.02. Defendant's conduct as alleged above and below constitutes

unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code § 1345.02. By concealing the known defects in the Class Vehicles, GM participated in unconscionable acts and practices that violated the Ohio CSPA.

1331. In the course of GM's business, GM willfully and knowingly failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unlawful, unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the

transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unlawful and deceptive acts and practices in violation of the Ohio CSPA.

1332. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1333. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle), and directly affecting the operability of the Class Vehicles.

1334. GM knew at the time of the consumer transactions that the Plaintiffs and other Class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

1335. GM knowingly made misleading representations on which the Plaintiffs and other Class members were likely to rely to their detriment. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1336. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1337. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1338. GM knew or should have known that its conduct violated the Ohio CSPA.

1339. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

       a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

       b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and

       c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1340. Due to GM's specific and superior knowledge that the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the

use of U.S. fuel, that the Class Vehicles will fail when used with U.S. diesel fuel, that the Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1341. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1342. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class

Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1343. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

1344. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining GM's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code § 1345.09.

## COUNT II

## BREACH OF IMPLIED WARRANTY IN TORT

1345. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1346. Plaintiffs bring this Count on behalf of the Ohio Class members.

1347. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1348. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and

disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes. GM thus failed to meet the expectations of a reasonable consumer, as the Class Vehicles fail in their ordinary, intended use because they do not function as a reasonable consumer would expect.

1349. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1350. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

LL.    **Claims Brought on Behalf of the Oklahoma Class.**

## COUNT I

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
### (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*)

1351. Plaintiffs (for purposes of all Oklahoma Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1352. Plaintiffs bring this Count on behalf of the Oklahoma Class members.

1353. Plaintiffs and the Oklahoma Class members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15, § 752.

1354. Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

1355. The sale or lease of the Class Vehicles to the Oklahoma Class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and GM's actions as set forth herein occurred in the conduct of trade or commerce.

1356. The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: (1) "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, . . . uses, [or] benefits, of the subject of a consumer transaction;" (2) making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;" (3) "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and (4) otherwise committing "an unfair or deceptive trade practice." Okla. Stat. tit. 15, § 753. GM participated in misleading, false, or deceptive acts that violated the Oklahoma CPA.

1357. GM's actions, as set forth herein, occurred in the conduct of trade or commerce.

1358. In the course of GM's business, GM willfully and knowingly failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unlawful, unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers;

failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unlawful and deceptive acts and practices in violation of the Oklahoma CPA.

1359. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle), and directly affecting the operability of the Class Vehicles.

1360. GM knew at the time of the consumer transactions that the Plaintiffs and other Class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

1361. GM knowingly made misleading representations on which the Plaintiffs and other Class members were likely to rely to their detriment. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely

sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1362. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1363. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1364. GM knew or should have known that its conduct violated the Oklahoma CPA.

1365. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1366. Due to GM's specific and superior knowledge that the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Class Vehicles will fail when used with U.S. diesel fuel, that the Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity,

durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1367. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1368. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1369. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

1370. GM's conduct as alleged herein was unconscionable because (1) Defendant, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity,

ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transactions were entered into, Defendant knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) Defendant knew or had reason to know that the transaction Defendant induced the consumers to enter into were excessively one-sided in favor of Defendant.

1371. Because GM's unconscionable conduct caused injury to Oklahoma Class members, Plaintiffs and the Oklahoma Class seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1. Plaintiffs and other Class members further seek an order enjoining GM's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OKLA. STAT. ANN. § 12A-2-314)

1372. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1373. Plaintiffs bring this Count on behalf of the Oklahoma Class members.

1374. GM is a merchant with respect to motor vehicles within the meaning of the Okla. Stat. Ann. § 12A-2-314.

1375. Under Okla. Stat. Ann. § 12A-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1376. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1377. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1378. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1379. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

MM.  **Claims Brought on Behalf of the Oregon Class.**

## COUNT I

## VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. § 646.605, *ET SEQ.*)

1380. Plaintiffs (for purposes of all Oregon Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1381. Plaintiffs bring this Count on behalf of the Oregon Class members.

1382. GM is a "person" within the meaning of Or. Rev. State § 646.605(4).

1383. The Class Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

1384. Pursuant to the Oregon Unfair Trade Practices Act ("Oregon UTPA"), a person engages in an unlawful trade practice if in the course of the person's business the person "(1) employs any unconscionable tactic in connection with selling, renting or disposing of . . . goods or services." Or. Rev. Stat.  § 646.607(1). The Oregon UTPA prohibits a person from, in the course of the person's business, doing any of the following: "(e) representing that . . . goods . . . have . . . characteristics . . . uses, benefits . . . or qualities that they do not have; (g) representing that . . . goods . . . are of a particular standard [or] quality . . . if they are of another; (i) advertising . . . goods or services with intent not to provide then as advertised;" and "(u) engaging in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1). GM participated in misleading, false, or

deceptive acts that violated the Oregon UTPA. By concealing the known defects in Plaintiffs' Class Vehicles, GM engaged in deceptive business practices prohibited by the Oregon UTPA.

1385. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1386. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the

consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

1387. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' high-pressure fuel injection pump and disperse throughout the fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1388. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM

engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1389. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1390. GM knew or should have known that its conduct violated the Oregon UTPA.

1391. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.      Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1392. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or

leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1393. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1394. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1395. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1396. Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs and other Class members also seek to recover attorneys' fees, and any other just and proper relief available under the

Oregon UTPA. Due to the significant level of reprehensibility, malice, reckless and outrageous indifference of GM's conduct, Plaintiffs and other Class members seek punitive damages.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OR. REV. STAT. § 72-3140)

1397. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1398. Plaintiffs bring this Count on behalf of the Oregon Class members.

1399. GM is a merchant with respect to motor vehicles within the meaning of the Or. Stat. Ann. § 72-3140.

1400. Under Or. Stat. Ann. § 72-3140, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1401. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1402. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and

subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1403. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1404. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

NN.   **Claims Brought on Behalf of the Pennsylvania Class.**

## COUNT I

**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*)**

1405. Plaintiffs (for purposes of all Pennsylvania Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1406. Plaintiffs bring this Count on behalf of the Pennsylvania Class members.

1407. Plaintiffs purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

1408. All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

1409. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

1410. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class

Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

1411. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the Vehicles' high-pressure fuel injection pump and disperse throughout the fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the

vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1412. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1413. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1414. GM knew or should have known that its conduct violated the Pennsylvania CPL.

1415. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge of the design of the Class

Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection

systems in its vehicles, including the uptick in warranty claims it saw upon the

introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the

Class; and

c.     Made incomplete representations regarding the quality and

durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully

withholding material facts from Plaintiffs and the Class that contradicted these

representations.

1416. Due to GM's specific and superior knowledge that the Bosch CP4 fuel

pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false

representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM

had a duty to disclose to Plaintiffs and other Class members that their vehicles were

particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps

will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake

predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to

the Class Vehicle engines and engine systems, and that Class members would be

required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1417. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1418. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1419. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1420. GM is liable to Plaintiffs and the Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. ANN. § 2314)

1421. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1422. Plaintiffs bring this Count on behalf of the Pennsylvania Class members.

1423. GM is a merchant with respect to motor vehicles within the meaning of the 13 Pa. Cons. Stat. Ann. § 2314.

1424. Under 13 Pa. Cons. Stat. Ann. § 2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

- 477 -

1425. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1426. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death. This defect directly impacts the operability of the Class Vehicles and renders them unfit for their ordinary purposes.

1427. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1428. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

1429. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1430. Plaintiffs bring this Count on behalf of the Pennsylvania Class members.

1431. This claim is pleaded in the alternative to any contract-based claims brought on behalf of Plaintiffs.

1432. GM has received and retained a benefit from Plaintiffs and inequity has resulted.

1433. GM has benefitted from selling and leasing the Class Vehicles for more than they were worth as a result of GM's conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

1434. Thus, all Plaintiffs conferred a benefit on GM.

1435. It is inequitable for GM to retain these benefits.

1436. Plaintiffs were not aware of the true facts about their Class Vehicles, and did not benefit from GM's conduct but rather relied on it to their detriment.

1437. GM knowingly accepted the benefits of its unjust conduct.

1438. As a result of GM's conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

OO.   **Claims Brought on Behalf of the Rhode Island Class.**

### COUNT I

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1 *ET SEQ.*)

1439. Plaintiffs (for purposes of all Rhode Island Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1440. Plaintiffs bring this Count on behalf of the Rhode Island Class members.

1441. Plaintiffs and other Class members are persons who purchased or leased Class Vehicles primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

1442. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are unlawful. R.I. Gen. Laws § 6-13.1-2.

1443. Rhode Island's Unfair Trade Practices and Consumer Protections Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;" "(vii) Representing that goods or services are of a particular standard, quality, or grade, . . . if they are of another;" "(ix) Advertising goods or services with intent not to sell them as advertised;" "(xii) Engaging in any other

conduct that similarly creates a likelihood of confusion or of misunderstanding;" "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;" and "(xiv) Using other methods, acts or practices which mislead or deceive Members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

1444. GM engaged in unlawful trade practices, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive. Plaintiffs and other Class Members purchased or leased the Class Vehicles for personal, family, or household purposes. GM's conduct violated the Rhode Island CPA, and GM knew or should have known that its conduct would be in violation thereof.

1445. In the course of GM's business, it willingly failed to disclose and actively concealed that the CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving a stall and subsequent inability to restart the vehicle). Particularly in light of GM's national

advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. GM's acts had the capacity, tendency and effect of deceiving or misleading consumers, including Plaintiffs and other Class members.

1446. The facts concealed and omitted by GM were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiffs and other Class Members known of the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), and the defective nature of the CP4 fuel pump at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

1447. Plaintiffs and Class members are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs and the Class also seek punitive damages in the discretion of the Court.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (R.I. GEN. LAWS § 6A-2-314)

1448. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1449. Plaintiffs bring this Count on behalf of Rhode Island Class members against GM.

1450. Pursuant to R.I. Gen. Laws § 6A-2-314A, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions where Plaintiffs and other Class members purchased or leased the Class Vehicles from GM.

1451. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which automobiles are used.

1452. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death, and further rendering them fundamentally useless.

1453. GM has been provided notice of these issues by the numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1454. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

1455. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1456. Plaintiffs bring this Count on behalf of the Rhode Island Class members.

1457. This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiffs and other Class members.

1458. As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defective nature of the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Class Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

1459. GM has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by GM's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false representations related thereto.

1460. GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

1461. GM has knowingly received and retained unjust benefits from Plaintiffs and other Class Members, and inequity has resulted.

1462. It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

1463. Because GM concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

1464. As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class Members, in an amount to be proven at trial.

PP.   **Claims Brought on Behalf of the South Carolina Class.**

## COUNT I

### VIOLATIONS OF THE SOUTH CAROLINA
### UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 *ET SEQ.*)

1465. Plaintiffs (for purposes of all South Carolina Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1466. Plaintiffs bring this Count on behalf of the South Carolina Class members.

1467. GM is a "person" under S.C. Code Ann. § 39-5-10.

1468. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a). GM's conduct and acts were offensive to public policy or immoral, unethical, or oppressive, thus unfair; indeed, to manufacture, distribute, and promote large-engined diesel vehicles with a known susceptibility to catastrophic failure while the vehicle is in motion is surely detrimental to the public at large. GM's unfair or deceptive acts or practices were prohibited by the South Carolina UTPA.

1469. GM's actions, as set forth herein, occurred in the conduct of trade or commerce.

1470. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's advertising

campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the South Carolina UTPA.

1471. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1472. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class

Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1473. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1474. GM knew or should have known that its conduct violated the South Carolina UTPA.

1475. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and

c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1476. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs

and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1477. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1478. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1479. GM's violations set forth herein present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein had an adverse impact on the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact

on other consumers is significant. Additionally, GM's conduct was offensive to public interest because the unfair acts and practices have the potential for repetition.

1480. Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief against Defendant to recover for economic losses, reasonable attorney's fees and costs. Because Defendant's actions were willful and knowing, Plaintiffs' damages should be trebled.

1481. Plaintiffs further allege that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to cruel and unjust hardship as a result.

## COUNT II

### VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET SEQ.*)

1482. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1483. Plaintiffs bring this Count on behalf of the South Carolina Class members.

1484. GM is a "manufacturer" as set forth in S.C. Code Ann. § 56-15-10, as at all relevant times it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

1485. GM committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

1486. GM engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina Class members, and to the public.

1487. GM's bad faith and unconscionable actions include, but are not limited to: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Class Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving the Class Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving the Class Vehicles has been supplied in accordance with a previous representation when it has not.

1488. GM resorted to and used false and misleading advertisements in connection with its business. As alleged above, GM made numerous material statements about the safety, reliability, and functionality of the Class Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

1489. Plaintiffs and other Class members bring this action pursuant to S.C. Code Ann. § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the Court.

1490. Plaintiffs are entitled to double their actual damages injunctive relief, the cost of the suit and attorney's fees pursuant to S. C. Code Ann. § 56-15-110. Plaintiffs also seeks treble damages because GM acted maliciously.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE ANN. § 36-2-314)

1491. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1492. Plaintiffs bring this Count on behalf of the South Carolina Class members.

1493. GM is a merchant with respect to motor vehicles within the meaning of the S.C. Code Ann.§ 36-2-314.

1494. Under S.C. Code Ann. § 36-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1495. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1496. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death, and further rendering them fundamentally useless.

1497. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1498. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

QQ.   **Claims Brought on Behalf of the South Dakota Class.**

### COUNT I

### VIOLATIONS OF SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. CODIFIED LAWS § 37-24-1 *ET SEQ.*)

1499. Plaintiffs (for purposes of all South Dakota Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1500. Plaintiffs bring this Count on behalf of the South Dakota Class members.

1501. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1). GM's conduct as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of the South Dakota CPL, including but not limited to, GM's misrepresentations and omissions regarding the safety and reliability of the Class Vehicles, and their heightened incompatibility with U.S. diesel fuel.

1502. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1503. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's

fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices. GM's unfair and deceptive acts or practices constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the South Dakota CPL.

1504. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1505. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM

engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1506. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1507. GM knew or should have known that its conduct violated the South Dakota CPL.

1508. GM owed Plaintiffs and Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the Class; and

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1509. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or

leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1510. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1511. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1512. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1513. Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and the other Class members seek actual damages, attorneys' fees, and any other just and proper relief available under the South Dakota CPL.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (S.D. CODIFIED LAWS § 57A-2-314)

1514. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1515. Plaintiffs bring this Count on behalf of the South Dakota Class members.

1516. GM is a merchant with respect to motor vehicles within the meaning of the S.D. Codified Laws § 57A-2-314.

1517. Under S.D. Codified Laws § 57A-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1518. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1519. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle),

thereby causing an increased likelihood of serious injury or death, and further rendering them fundamentally useless.

1520. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1521. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

RR.  **Claims Brought on Behalf of the Tennessee Class.**

## COUNT I

## VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT
### (TENN. CODE ANN. § 47-18-101 *ET SEQ.*)

1522. Plaintiffs (for purposes of all Tennessee Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1523. Plaintiffs bring this Count on behalf of the Tennessee Class members.

1524. Plaintiffs and Tennessee Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

1525. GM is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

1526. GM's conduct complained of herein affected "trade," "commerce" and/or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

- 501 -

1527. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "(5) Representing that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have;" "(7) Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" "(9) Advertising goods or services with intent not to sell them as advertised;" and "(27) Engaging in any other act or practice which is deceptive to the consumer or any other person." Tenn. Code Ann. § 47-18-104. GM violated Tennessee CPA by engaging in unfair or deceptive acts.

1528. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have

characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

1529. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure and an exorbitant repair bill that GM refuses to cover by blaming the consumer for "fuel contamination."

1530. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, omissions, and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles, and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1531. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1532. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class. In the alternative (or in addition), GM failed to disclose material facts to Plaintiffs and the Class, including but not limited to the fact that the Class Vehicles are inherently particularly incompatible with U.S. diesel fuel because of the defective CP4 pump.

1533. GM knew or should have known that its conduct violated the Tennessee CPA.

1534. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

  a. Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

  b. Intentionally concealed the foregoing from Plaintiffs and the Class; and

  c. Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1535. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were

particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1536. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1537. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class

Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1538. GM's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1539. Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Tennessee Class members seek monetary relief against GM measured as actual damages in an amount to be determined at trial, treble damages as a result of GM's willful or knowing violations, attorney's fees, and any other just and proper relief available under the Tennessee CPA.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TENN. CODE ANN. § 47-2-314)

1540. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1541. Plaintiffs bring this Count on behalf of the Tennessee Class members.

1542. GM is a merchant with respect to motor vehicles within the meaning of the Tenn. Code Ann. § 47-2-314.

1543. Under Tenn. Code Ann. § 47-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1544. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1545. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death, and further rendering them fundamentally useless. To be sure, the Class Vehicles are dangerously defective in this regard, and are imminently dangerous to human life for from their use for the purpose for which Plaintiffs and Class members purchased said Vehicles.

1546. The defective nature of the Class Vehicles was not apparent so that Plaintiffs and Class members could have ascertained the defect on their own.

1547. GM has been provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1548. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

SS. **Claims Brought on Behalf of the Utah Class.**

## COUNT I

### VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

1549. Plaintiffs (for purposes of all Utah Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1550. Plaintiffs bring this Count on behalf of the Utah Class members against GM.

1551. GM qualifies as a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"). Utah Code Ann. § 13-11-3.

1552. Plaintiffs and the Class members are "persons" under Utah Code Ann. § 13-11-3.

1553. Sales and leases of the Class Vehicles to Plaintiffs and the other Class members are "consumer transactions" within the meaning of Utah Code Ann. § 13-11-3(2).

1554. The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under Utah Code Ann. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." Utah Code Ann. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-11-5. GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things: (a) engaging in unconscionable acts; (b) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; and (c) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not.

1555. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1556. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the

Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the

Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

1557. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1558. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, omissions, and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles, and Plaintiffs and other Class members were not aware of the defective nature of these systems prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1559. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1560. GM committed deceptive acts and practices intentionally and knowingly through misrepresentation of material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Class members.

1561. GM knew or should have known that its conduct violated the Utah CSPA.

1562. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

        a.      Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

        b.      Intentionally concealed the foregoing from Plaintiffs and the Class; and

        c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully

withholding material facts from Plaintiffs and the Class that contradicted these representations.

1563. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel

with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1564. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1565. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1566. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1567. Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs and the Class seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for Plaintiffs and each Utah Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (UTAH CODE ANN. § 70A-2-314)

1568. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1569. Plaintiffs bring this Count on behalf of the Utah Class members.

1570. GM is a merchant with respect to motor vehicles within the meaning of the Utah Code Ann. § 70A-2-314.

1571. Under Utah Code Ann. § 70A-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1572. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1573. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death, and further rendering them fundamentally useless.

- 516 -

1574. The defective nature of the Class Vehicles was not apparent so that Plaintiffs and Class members could have ascertained the defect on their own.

1575. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and other Class members.

1576. As a direct and proximate result of GM's breach of implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

TT.    **Claims Brought on Behalf of the Vermont Class.**

### COUNT I

### VIOLATIONS OF THE VERMONT CONSUMER FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

1577. Plaintiffs (for purposes of all Vermont Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1578. Plaintiffs bring this Count on behalf of the Vermont Class members.

1579. The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453(a).

1580. GM was and is a seller within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

1581. GM's acts and omissions, as defined throughout this Complaint, were unfair and deceptive acts or practices in commerce which violated the Vermont CFA, and GM knew or should have known that its conduct violated this Statute.

1582. Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY
(VT. STAT. ANN. TIT. 9A, § 2-314)

1583. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1584. Plaintiffs bring this Count on behalf of the Vermont Class members.

1585. GM is a merchant with respect to motor vehicles under Vt. Stat. Ann. tit. 9A, § 2-104.

1586. Under Vt. Stat. Ann. tit. 9A, § 2-314, a warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used was implied by law in the transactions when Plaintiffs and the Class purchased or leased their Class Vehicles from GM.

1587.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery and engine systems.

1588.  It was reasonable to expect that Plaintiffs and other Class members may use, consume or be affected by the manifest defect in the Class Vehicles.

1589.  The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death).

1590. GM has been provided notice of this defect via, *inter alia*, complaints by Plaintiffs and Class Members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

1591. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

UU.   **Claims Brought on Behalf of the Virginia Class.**

## COUNT I

## VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*)

1592. Plaintiffs (for purposes of all Virginia Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1593. Plaintiffs bring this Count on behalf of the Virginia Class members.

1594. GM is a "supplier" as defined by Va. Code Ann. § 59.1-198. The transactions between Plaintiffs and the other Class members on the one hand and GM on the other, leading to the purchase or lease of the Class Vehicles by Plaintiffs and the other Class members, are "consumer transactions" as defined by Va. Code

Ann. § 59.1-198, because the Class Vehicles were purchased or leased primarily for personal, family or household purposes.

1595. The Virginia Consumer Protection Act ("Virginia CPA") prohibits the following fraudulent acts or practices committed by a supplier in a consumer transaction: "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; . . . (8) advertising goods or services with intent not to sell them as advertised; . . . [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" Va. Code Ann. § 59.1-200(A).

1596. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1597. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a

reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Virginia CPA.

1598. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the

Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1599. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, omissions, and misleading statements, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles, and Plaintiffs and other Class members were not aware of the defective nature of these systems prior to purchase or lease. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1600. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1601. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

- 523 -

1602. GM knew or should have known that its conduct violated the Virginia CPA.

1603. GM owed Plaintiffs and the other Class members a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

    a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1604. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were

particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1605. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1606. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class

Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1607. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, GM's unlawful acts and practices complained of herein affect the public interest.

1608. Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Class members seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiffs and each Class member. Because GM's conduct was committed willfully and knowingly, Plaintiffs and each Class member are each entitled to recover the greater of (a) three times actual damages or (b) $1,000.

1609. Plaintiffs also seek an order enjoining GM's fraudulent, unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Virginia General Business Law § 59.1-204 *et seq.*

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (VA. CODE ANN. § 8.2-314)

1610. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1611. Plaintiffs bring this Count on behalf of the Virginia Class members.

1612. GM is a merchant with respect to motor vehicles within the meaning of the Va. Code Ann. § 8.2-314.

1613. Under Va. Code Ann. § 8.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1614. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery and engine systems.

1615. It was reasonable to expect that Plaintiffs and other Class members may use, consume or be affected by the manifest defect in the Class Vehicles.

1616. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the

vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death).

1617. GM has been provided notice of this defect via, *inter alia*, complaints by Plaintiffs and Class Members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

1618. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

VV. **Claims Brought on Behalf of the** Washington **Class.**

### COUNT I

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*)

1619. Plaintiffs (for purposes of all Washington Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1620. Plaintiffs bring this Count on behalf of the Washington Class members.

- 528 -

1621. GM, Plaintiffs, and each member of the Washington Class are "person[s]" under Wash. Rev. Code Ann. § 19.86.010(1) ("Washington CPA").

1622. At all relevant times, GM was and is engaged in "trade" or "commerce" under Wash. Rev. Code Ann. § 19.86.010(2).

1623. The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. GM's conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. In short, GM's conduct has been deceptive because it has the capacity or tendency to deceive.

1624. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Class Vehicles are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 high-pressure fuel injection pump and disperse throughout the Vehicles' fuel injection systems, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). Particularly in light of GM's national advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in unfair and deceptive trade

practices, in unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. GM's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles. GM engaged in unfair and deceptive business practices in violation of the Washington CPA.

1625. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear

and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing moving stall and subsequent inability to restart the vehicle).

1626. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations. They had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1627. GM's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1628. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

1629. GM knew or should have known that its conduct violated the Washington CPA.

1630. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.     Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.     Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1631. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1632. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1633. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1634. GM's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein impact the public interest. Specifically: (1) the number of consumers affected by GM's deceptive practices are in the hundreds of thousands nation-wide; (2) GM has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed for use with American diesel fuel, the likelihood of continued impact on other consumers is significant.

1635. GM is liable to Plaintiffs and the Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages up to $25,000, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WASH. REV. CODE ANN. § 62A.2-314)

1636. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1637. Plaintiffs bring this Count on behalf of the Washington Class members.

1638. Under Wash. Rev. Code Ann. § 62A.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1639. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1640. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery and engine systems.

1641. It was reasonable to expect that Plaintiffs and other Class members may use, consume or be affected by the manifest defect in the Class Vehicles.

1642. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the

vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death).

1643. GM has been provided notice of this defect via, *inter alia*, complaints by Plaintiffs and Class Members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

1644. Plaintiffs and other Class members were the intended third-party beneficiaries of GM's contracts with its authorized dealerships and therefore direct privity is not required for this Count.

1645. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

WW.  **Claims Brought on Behalf of the West Virginia Class.**

## COUNT I

### VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101 *ET SEQ.*)

1646. Plaintiffs (for purposes of all West Virginia Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1647. Plaintiffs state this Count on behalf of the West Virginia Class members.

1648. Plaintiffs and West Virginia Class Members are "consumers" as defined by W. Va. Code §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more of the Class Vehicles.

1649. GM was and is engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

1650. The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

> (I) Advertising goods or services with intent not to sell them as advertised; . . .
>
> (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.

W. Va. Code § 46A-6-102(7).

1651. GM participated in unfair and deceptive trade practices that violated the West Virginia CCPA as described herein. In the course of its business, GM knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. GM falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said heightened incompatibility ), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase GM's revenue and profits.

1652. Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, GM engaged in deceptive business practices prohibited by the West Virginia CCPA, including:

a.    Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.    Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

c.    Advertising the Class Vehicles with the intent not to sell them as advertised; and

d.    Otherwise engaging in conduct likely to deceive.

1653. GM's unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the West Virginia Class Members about the true safety and reliability of Class Vehicles, the quality of GM's Duramax diesel-engine vehicles, and the true value of the Class Vehicles.

1654. As alleged above, in the course of its business, GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles and the

defective high-pressure fuel pumps installed therein with an intent to mislead the West Virginia Class Members.

1655. GM knew or should have known that its conduct violated the West Virginia CCPA.

1656. To protect its profits, GM concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive the inherently defective Class Vehicles.

1657. GM owed the West Virginia Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because GM, by virtue of designing, producing, and warranting the Class Vehicles, possessed exclusive, superior knowledge of the CP4 fuel pump defect in its Duramax diesel-engine vehicles, and Plaintiffs and West Virginia Class Members could not reasonably be expected to learn of or discovery the CP4 fuel pump defect which is latent in nature and manifests in a deeply internal component part of the Class Vehicles' high-pressure fuel injection systems.

1658. Plaintiffs and West Virginia Class Members relied on GM's representations and omissions regarding the safety, quality, and durability of the Class Vehicles, and specifically that said vehicles were compatible with U.S. diesel. GM, by the conduct, statements, and omissions described above, knowingly and intentionally concealed from Plaintiffs and the West Virginia Class Members that

the Class Vehicles suffer from an inherent defect (and the costs, safety risks, and diminished value of the vehicles as a result of this defect).

1659. GM's acts and practices have deceived Plaintiffs and West Virginia Class Members and are likely to, and did, deceive the public. In misrepresenting the attributes and performance properties of Class Vehicles, and failing to disclose the CP4 fuel pump defect and suppressing material facts from Plaintiffs and West Virginia Class Members, GM violated the West Virginia CCPA and substantially injured them. GM's misrepresentations, omissions, and acts of concealment pertained to information that was material to Plaintiffs and West Virginia Class Members, as it would have been to all reasonable consumers.

1660. Because GM fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and intentionally failed to disclose to Plaintiffs and the West Virginia Class Members at the time of purchase or lease that said vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000 - $20,000 which GM will not cover, the Class Vehicles are worth significantly less than the amounts paid by Plaintiffs and the West Virginia Class Members at the time of purchase or lease. Indeed, GM's conduct proximately caused Plaintiffs' and West Virginia Class Members' injuries, as consumers who purchased

or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

1661. Plaintiffs and the West Virginia Class Members suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Plaintiffs and the West Virginia Class Members did not receive the benefit of their bargains as a result of GM's misconduct.

1662. Pursuant to W. Va. Code § 46A-6-106, Plaintiffs seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1663. Plaintiffs also seek punitive damages against GM because it carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs of West Virginia Class Members to cruel and unjust hardship as a result.

1664. Plaintiffs further seek restitution, costs of Court, and attorney's fees under W. Va. Code § 46A-5-101 *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1665. On August 9, 2019, Plaintiffs' counsel, on behalf of the West Virginia Class Members, sent GM a letter with notice of its alleged violations of the West

Virginia CCPA relating to the Class Vehicles and demanded that GM correct or agree to correct the actions described therein, pursuant to W. Va. Code § 46A-6-106(b). As GM has failed to do so within the required 20 days, Plaintiffs seek all damages and relief to which Plaintiffs and the West Virginia Class Members are entitled.

## COUNT II

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. VA. CODE § 46-2-314)

1666. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1667. Plaintiffs bring this Count on behalf of the West Virginia Class members.

1668. At all relevant times, GM was and is a merchant with respect to motor vehicles within the meaning of the W. Va. Code § 46-2-314.

1669. Under W. Va. Code § 46-2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Class Vehicles from GM.

1670. The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

1671. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which

vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery and engine systems.

1672. It was reasonable to expect that Plaintiffs and other Class members may use, consume or be affected by the manifest defect in the Class Vehicles.

1673. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death).

1674. GM has been provided notice of this defect via, *inter alia*, complaints by Plaintiffs and Class Members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing,

presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

1675. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

XX. **Claims Brought on Behalf of the Wisconsin Class.**

## COUNT I

## VIOLATIONS OF THE WISCONSIN
## DECEPTIVE TRADE PRACTICES ACT
## (WIS. STAT. § 110.18)

1676. Plaintiffs (for purposes of all Wisconsin Class Counts) incorporate by reference all paragraphs as though fully set forth herein.

1677. Plaintiffs bring this Count on behalf of the Wisconsin Class members.

1678. GM is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1679. Plaintiffs and Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiffs and Wisconsin Class members purchased or leased one or more Class Vehicles in Wisconsin.

1680. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). By systematically concealing the defects in the Class Vehicles, GM's conduct, acts, and practices violated the Wisconsin DTPA.

1681. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1682. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). GM affirmatively asserted, represented, and stated that the Class vehicles have increased durability, performance, and longevity and were fuel-efficient. Particularly in light of GM's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in prohibited acts with the affirmative assertions, representations, or statement of facts that are false, deceptive, or misleading with the intent to induce an obligation. GM engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

1683. In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure.

1684. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1685. GM's unfair and deceptive acts or practices, involving fraud, misrepresentation, and the suppression or omission of material facts, were likely to and did in fact deceive reasonable consumers.

1686. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class members.

1687. GM knew or should have known that its conduct violated the Wisconsin DTPA.

1688. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

      a.    Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

      c.    Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1689. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do

not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1690. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1691. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles

have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1692. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, GM's widespread, unlawful acts and practices complained of herein affect the public interest.

1693. Plaintiffs and Wisconsin Class members seek actual damages, court costs, attorneys' fees, and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because GM's conduct was committed knowingly and/or intentionally, Plaintiffs and Wisconsin Class members are entitled to treble damages and any other such relief necessary to deter GM's unlawful conduct in the future.

YY.   **Claims Brought on Behalf of the Wyoming Class.**

### COUNT I

### VIOLATIONS OF THE WYOMING CONSUMER PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*)

1694. Plaintiffs (for purposes of all Wyoming Class Counts) restate and incorporate by reference all paragraphs as though fully set forth herein.

1695. This Count is stated on behalf of the Wyoming Class members.

1696. GM, Plaintiffs, and Wyoming Class members are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1697. Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and

in connection with a consumer transaction, it knowingly: "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not . . . ;" "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false;" "(x) Advertises merchandise with intent not to sell it as advertised;" or "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. § 45-12-105.

1698. In the course of GM's business, GM willfully failed to disclose and actively concealed that the Bosch CP4 fuel pump in the Class Vehicles is particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the Vehicles' fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle). GM affirmatively asserted, represented, and stated that the Class vehicles have increased durability, performance, and longevity and were fuel-efficient. Particularly in light of GM's advertising campaign, a reasonable American consumer would expect the Class Vehicles to be compatible with *American* diesel fuel. Accordingly, GM engaged in prohibited acts with the affirmative assertions, representations, or statement of facts that are false,

deceptive, or misleading with the intent to induce an obligation. GM engaged in unfair and deceptive business practices in violation of the Wyoming CPA.

1699.  In purchasing or leasing the Class Vehicles, Plaintiffs and the Wyoming Class members were deceived by GM's failure to disclose that the normal use of the Class Vehicles causes metal shards to wear off of the fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure.

1700. Plaintiffs and Class members reasonably relied upon GM's false misrepresentations, and had no way of knowing that GM's representations were false and gravely misleading. As alleged herein, GM engaged in extremely sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel GM's deception on their own, as the Class Vehicles' high-pressure fuel injection systems are a deeply internal component part in the Class Vehicles and Plaintiffs and other Class members were not aware of the defective nature of the Bosch CP4 fuel pump in that high-pressure fuel injections system prior to purchase or lease.

1701. GM's unfair and deceptive acts or practices, involving fraud, misrepresentation, and the suppression or omission of material facts, were likely to and did in fact deceive reasonable consumers.

1702. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class members.

1703. GM knew or should have known that its conduct violated the Wyoming CPA.

1704. GM owed Plaintiffs and the Class a duty to disclose the truth about the heightened incompatibility of the Bosch CP4 fuel pump in the Class Vehicles with U.S. diesel fuel because GM:

a.      Possessed exclusive knowledge of the design of the Class Vehicles and the effect of low-lubricity diesel fuel on high-pressure fuel injection systems in its vehicles, including the uptick in warranty claims it saw upon the introduction of the Bosch CP4 fuel pumps into the Class Vehicles;

b.      Intentionally concealed the foregoing from Plaintiffs and the Class;

c.      Made incomplete representations regarding the quality and durability of the Class Vehicles when used with U.S. diesel fuel, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and

d.      Had duties under the TREAD Act and related regulations to disclose and remedy this inherent safety defect.

1705. Due to GM's specific and superior knowledge that the Bosch CP4 fuel pumps in the Class Vehicles will fail when combined with U.S. diesel fuel, its false representations regarding the increased durability of the Class Vehicles, and

Plaintiffs' and other Class members' reliance on these material representations, GM had a duty to disclose to Plaintiffs and other Class members that their vehicles were particularly incompatible with the use of U.S. fuel, that the Bosch CP4 fuel pumps will fail in Class Vehicles when used with U.S. diesel fuel, that Class Vehicles do not have the expected durability over the other diesel vehicles or their namesake predecessor engines, that failure of the Bosch CP4 fuel pumps will cause damage to the Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiffs and Class members, GM had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Longevity, durability, performance, and safety are material concerns to diesel truck consumers. GM represented to Plaintiffs and other Class members that they were purchasing or leasing vehicles that were compatible with U.S. diesel fuel, when in fact the combination of U.S. diesel fuel with the CP4 fuel pump in the Class Vehicles creates a ticking time bomb, wherein pump disintegration and component wear begin at the first fill of the tank.

1706. GM's conduct proximately caused injuries to Plaintiffs and the other Class members.

1707. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations, fraud, deceptive practices, and omissions.

1708. GM's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, GM's widespread, unlawful acts and practices complained of herein affect the public interest.

1709. Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs seek monetary relief against GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

1710. In accordance with Wyo. Stat. § 45-12-109, Plaintiffs will send a notice letter to Defendant GM and will amend their allegations herein accordingly once the applicable statutorily required notice period has elapsed if GM has failed to remedy the defects and damages complained of herein.

1711. On August 9, 2019, Plaintiffs sent a letter to GM complying with Wyo. Stat. § 45-12-109. Because GM has failed to remedy its unlawful conduct within the statutorily required time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Wyoming Class are entitled.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (WYO. STAT. §§ 34.1-2-314)

1712. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1713. This claim is brought on behalf of the Wyoming Class members.

1714. GM is and was at all relevant times a merchant with respect to motor vehicles.

1715. Under Wyoming law, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs and the other Class members purchased or leased the Class Vehicles from GM.

1716. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are particularly incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and inevitable catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery and engine systems.

- 556 -

1717. It was reasonable to expect that Plaintiffs and other Class members may use, consume or be affected by the manifest defect in the Class Vehicles.

1718. The Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the CP4 fuel pump and disperse throughout the vehicle's fuel injection system, leading to certain component wear and potential catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle, thereby causing an increased likelihood of serious injury or death).

1719. GM has been provided notice of this defect via, *inter alia*, complaints by Plaintiffs and Class Members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

1720. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members who have purchased or leased the defective Class Vehicles, respectfully request that the Court enter judgment in Plaintiffs' favor and against GM, as follows:

A.    Certification of the proposed State Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining GM continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Restitution, including at the election of Class members, recovery of the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles;

E.    Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

F.    An order requiring GM to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.     Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.


DATED: May 22, 2020                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                        *s/ Steve W. Berman*
                                        Steve W. Berman
                                        Jerrod C. Patterson
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Telephone: (206) 623-7292
                                        Facsimile: (206) 623-0594
                                        steve@hbsslaw.com
                                        jerrodp@hbsslaw.com

                                        Robert C. Hilliard
                                        Lauren Akers
                                        HILLIARD MARTINEZ GONZALES LLP
                                        719 S. Shoreline Blvd.
                                        Corpus Christi, TX 78401
                                        Telephone: (361) 882-1612
                                        bobh@hmglawfirm.com
                                        lakers@hmglawfirm.com

                                        E. Powell Miller (P39487)
                                        THE MILLER LAW FIRM, P.C.
                                        950 W. University Drive, Suite 300
                                        Rochester, MI 48307
                                        Telephone: (248) 841-2200
                                        Facsimile: (248) 652-2852
                                        epm@millerlawpc.com

Andrew Parker Felix, Esq.
MORGAN & MORGAN, P.A.
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Telephone: (407) 244-3204
Facsimile: (407) 245-3334
andrew@forthepeople.com

Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
BERGER MONTAGUE PC
1818 Market Street Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
rpaul@bm.net
josterwise@bm.net
apark@bm.net
agertner@bm.net

Sidney D. Torres, III
Roberta L. Burns
Beau F. Camel
Valerie L. Rodrigue
LAW OFFICES OF SIDNEY D. TORRES, III,
A PROFESSIONAL LAW CORPORATION
8301 West Judge Perez Drive, Suite 303
Chalmette, LA 70043
Telephone: (504) 271-8422
Facsimile: (504) 271-1961
storres@torres-law.com
rburns@torres-law.com
bcamel@torres-law.com
vrodrigue@torres-law.com

Eric H. Gibbs
David Stein
Steven Lopez
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, California 94612
ehg@classlawgroup.com
sal@classlawgroup.com
ds@classlawgroup.com