## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MARK D. CHAPMAN, *et al.*,

               Plaintiffs,

v.

GENERAL MOTORS LLC,

               Defendant.

Case No. 2:19-cv-12333-TGB-DRG

Hon. Terrence G. Berg
Magistrate Judge David R. Grand

## PLAINTIFFS' OPPOSITION TO GENERAL MOTORS, LLC'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF <u>PLAINTIFFS' EXPERT EDWARD M. STOCKTON</u>

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED.................................................................iv

STATEMENT OF CONTROLLING OR MOST IMPORTANT
    AUTHORITY ........................................................................................v

I.    INTRODUCTION .........................................................................1

II.    SUMMARY OF MATERIAL FACTS ........................................2

    A.    Stockton Is Indisputably Qualified to Render His Opinion .................2

    B.    Plaintiffs' Theory of Liability ....................................................3

    C.    Stockton's Cost of Repair Calculation Is Reliable and
        Robust........................................................................................4

    D.    GM's Corrected Data ................................................................6

III.    ARGUMENT...................................................................................7

    A.    All of GM's Criticisms Go to Weight, Not Admissibility.................7

    B.    Stockton's Calculation of Typical Repair Costs Is Based
        on Relevant Data ......................................................................8

        1.    Stockton's data preparation is appropriate.................................8

        2.    Stockton's cost of repair calculation is reliable.......................12

    C.    Stockton's Analysis Fits With Plaintiffs' Theory of
        Liability ...................................................................................18

    D.    Stockton Is Not Required to Allocate Damages .................................18

    E.    Stockton's Opinion on Overpayments to Multiple
        Owners Is Valid.......................................................................21

    F.    GM Is Not Unfairly Prejudiced by Stockton's Opinions
        and Testimony ..........................................................................23

IV.    CONCLUSION.............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ask Chems., LP v. Comput. Packages, Inc.*,
  593 F. App'x 506 (6th Cir. 2014) ........................................................15

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) .............................................2, 7, 8

*Cason-Merenda v. Detroit Med. Ctr.*,
  862 F. Supp. 2d 603 (E.D. Mich. 2012) .............................................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2013 WL 5429718 (N.D. Cal. June 20, 2013)....................................19

*Counts v. Gen. Motors, LLC*,
  2022 WL 2078023 (E.D. Mich. June 9, 2022) ...........................*passim*

*Daubert v. Merrell Dow Pharms, Inc.*,
  509 U.S. 579 (1993).............................................................................8

*Desai v. Geico Casualty Co.*,
  2021 WL 5762999 (N.D. Ohio Dec. 6, 2021) .............................16, 17

*Hurt v. Com. Energy, Inc.*,
  2015 WL 410703 (N.D. Ohio Jan. 29, 2015) .....................................14

*Lahar v. Oakland Cty.*,
  2006 WL 2269340 (E.D. Mich. Aug. 8, 2006)....................................18

*McLean v. 988011 Ontario, Ltd.*,
  224 F.3d 797 (6th Cir. 2000) .............................................................10

*In re Nw. Airlines Corp.*,
  208 F.R.D. 174 (E.D. Mich. 2002) ....................................................21

*In re Polyurethane Foam Antitrust Litig.*,
  314 F.R.D. 226 (N.D. Ohio 2014) .........................................19, 20, 21

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..................................................................19

*Sheehan v. Daily Racing Form, Inc.*,
    104 F. 3d 940 (7th Cir. 1997) (*see* Mot. )............................................16

*Sloan v. General Motors LLC*,
    2020 WL 1955643 (N.D. Cal. Apr. 23, 2020)......................................22

*Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*,
    2008 WL 3819752 (M.D. Fla. Aug. 12, 2008)........................................9

*Teenier v. Charter Communications, LLC*,
    2017 WL 3141051 (E.D. Mich. July 25, 2017)....................................17

*Tershakovec v. Ford Motor Co.*,
    546 F. Supp. 3d 1348 (S.D. Fla. 2021) ..................................................1

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
    2008 WL 4382141 (D. Kan. Sept. 28, 2008).........................................13

010784-21/1935461 V1

## STATEMENT OF ISSUES PRESENTED

1. When Plaintiffs' expert Ted Stockton has offered a robust model calculating cost-of-repair damages on a classwide basis using GM's own data and documents in order to assist the trier of fact in assessing damages in this case, should the Court exclude his opinion?

   Plaintiffs answer: No.

010784-21/1935461 V1

## STATEMENT OF CONTROLLING OR
## MOST IMPORTANT AUTHORITY

1.   *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993)

2.   *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001)

3.   *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797 (6th Cir. 2000)

4.   *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226 (N.D. Ohio 2014)

5.   *Counts v. Gen. Motors, LLC*, 2022 WL 2078023 (E.D. Mich. June 9, 2022)

010784-21/1935461 V1

## I.    INTRODUCTION

GM's motion to strike Plaintiffs' damages expert, Edward Stockton, is frivolous and lacks any basis in fact. GM identifies no substantive fault with his opinion, and offers no substantive analysis from any expert that undermines his conclusions. Nor does GM acknowledge that Stockton's cost of repair model in a different case using a similar methodology has recently been upheld by another federal court. *See Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348, 1379 (S.D. Fla. 2021).

In its motion, GM tries to suggest that Stockton's opinion is speculative and arbitrary, but in making this pitch GM misconstrues Stockton's damages model and serially misstates the underlying case law. In truth, Stockton's analysis is straightforward and soundly grounded in GM's own data. He calculates an estimate of the typical and aggregate cost of repair for Class Vehicle truck owners who paid out-of-pocket when their CP4 pumps failed. The data sources used for his calculations include GM's own business records that document the cost of repairs *that have already occurred*. This data, comprised of thousands of records, document actual prices paid for the subject repairs, including labor rates, labor hours necessary to complete the repairs, parts needed to complete the repairs, parts prices, diagnostic charges, and shop charges. *See* Mar. 2, 2022 Report of E. Stockton ("Stockton Rep."), ECF No. 112-22, ¶¶ 8-9, 23-24. He then uses verifiable math to multiply the

typical cost of repair by the number of trucks that were repaired, although he adjusted his calculations to account for repairs that were covered under warranty. *Id.* ¶ 12.

In response to Stockton's well-reasoned opinion, GM resorts to distorting the facts of Stockton's analysis and datasets, and cites to vague conclusory statements by Lorin Hitt, a hired gun friendly to the automotive industry, to offer a string of rote criticisms of Stockton's report. *See* Hitt Rep., ECF No. 117-53. Hitt's criticisms are "neither surprising nor relevant,"[1] and he hastily retreated from many of them during his deposition. Stockton's robust model is based on a reliable methodology, using GM's own data, to calculate classwide damages. Nothing in GM's motion to strike undermines the integrity of Stockton's report, and the motion should be denied.

## II.    SUMMARY OF MATERIAL FACTS

### A.    Stockton Is Indisputably Qualified to Render His Opinion

Stockton's experience and qualifications are detailed in his report, including a 24-year career at the Fontana Group providing over 30,000 hours of professional services to the retail automotive industry. Stockton Rep. ¶¶ 6-7. Mr. Stockton has experience with "well over 100 studies" that he has directed regarding "economic problems within the automotive industry." *Id.* A court in this District recently concluded that "Edward Stockton is well qualified to opine on economic-damages models. . . . He has more than a quarter of a century of experience in economic

---

[1] *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 311 (E.D. Mich. 2001).

analysis." *Counts v. Gen. Motors, LLC*, 2022 WL 2078023, at *15 (E.D. Mich. June 9, 2022). GM accordingly does not challenge Stockton's credentials.

## B.   Plaintiffs' Theory of Liability

Plaintiffs allege that GM designed, manufactured, and sold automobiles equipped with defective CP4 high-pressure fuel pumps, and knew that the CP4 fuel pumps were defective and particularly incompatible with American diesel fuel. Mot. for Class Cert., ECF No. 112, at 4-5, 11. As a result, customers who purchased these automobiles overpaid at the point of sale because the trucks contained an undisclosed defect and, in some cases, incurred substantial repair costs associated with catastrophic fuel system failure. *Id.* at 14; *see also* Second Amended Complaint, ECF No. 40 ("SAC"), ¶¶ 12, 169. All but three of the named plaintiffs experienced a catastrophic failure. The majority of these CP4 pump failures occurred with less than 100,000 miles driven.[2]

Consistent with Plaintiffs' theory of liability, Plaintiffs have offered two damages models: a cost of repair model and an overpayment model. Mot. for Class Cert., ECF No. 112, at 3. Class members who paid for repairs not covered under warranty will be compensated for those costs and the remaining class members will be compensated for overpaying for the defective truck. *Id.*

---

[2] *See, e.g.*, First Amended Complaint in *Click v. General Motors LLC* ¶ 11 (Bowen); SAC ¶¶ 14, 30, 33-34, 81, 89 (Chapman, Joyce, Taylor, Egleberry, and Sizelove); Ex. 1, Homero Medina Dep. 37:10-13.

010784-21/1935461 V1

C.    **Stockton's Cost of Repair Calculation Is Reliable and Robust**

Stockton's cost of repair model calculates damages incurred by putative class members in relation to repair work associated with CP4 fuel pump failures that have already occurred. *See* Stockton Rep. ¶¶ 17-18. The data sources that Mr. Stockton incorporated into his analysis "are of the type relied upon by decision-makers, i.e., those who analyze, plan, act, and evaluate based on data like those referenced herein, in the retail automotive field in the ordinary course of business." *See id.* ¶ 8. To perform this calculation, Mr. Stockton used data reflecting the costs of parts, labor, diagnostics, and miscellaneous shop charges from various GM sources. The sources include "GM's warranty records, GM's internal estimates of CP4 repair costs, dealer records of CP4 Customer Pay repairs, GM's records of dealerships' customer pay and warranty labor rates, and GM's internal bulletins specific to CP4 repairs." *Id.* ¶ 23. Mr. Stockton also considered dealer composite financial statements provided by GM in determining the typical repair cost. *Id.* ¶ 49.

The warranty records maintained by GM show the amount that GM has paid to dealerships for CP4-related repairs that were covered under warranty, broken down by the number of labor hours for the repairs, the parts reimbursement paid by GM, the labor reimbursement paid by GM, and a list of parts used for the repairs. *Id.* ¶¶ 43-47. Technical service bulletins list the parts needed to perform the subject repairs, as well as GM's deemed "standard repair time" for completion of the repairs.

*Id.* ¶¶ 53-54. The Customer Pay Data considered by Mr. Stockton included "records responsive to a request for service encounters where customers paid out of pocket for CP4 repairs from GM dealers in approximately 41 states." *See* Ex. 2, Stockton Dep. 175:13-16; Stockton Rep. ¶ 48. Notably, "[b]etween ███ and ███ of VINS in the Customer Pay Data file were within the five-year/100,000 mile threshold at the time of their repairs." Ex. 3, Stockton Declaration ¶ 26. Composite financial statements from dealerships show dealership labor rates and information regarding prices charged for warranty repairs and customer pay repairs. Stockton Rep. ¶¶ 49-51, 71, 79. Mr. Stockton also considered a comprehensive analysis prepared by GM with its own internal determination of the cost necessary for GM to repair vehicles that have experienced CP4 failure. *Id.* ¶¶ 65-67.[3] GM estimated this cost to be ███ *Id.* He used this cost data from these sources and analyzed it to determine a "typical" repair cost. *Id.* ¶¶ 27-30.[4]

---

[3] *See also* Ex. 4, GM Engineer Chinnusamy Dep. Ex. 20, GM_CP4_000198864, GM_CP4_000199765.

[4] GM criticizes Mr. Stockton for not looking at "actual repair records from dealership service departments or other independent repair facilities." Mot. at 6. But, as GM's counsel knows, this is because of an agreement reached between GM and Plaintiffs. Plaintiffs' counsel served subpoenas on over 20 GM dealerships across the country to request invoices for the CP4 repairs. GM's counsel contacted Plaintiffs' counsel and requested withdrawal of the subpoenas (so as not to upset the dealerships) if GM would produce the requested data. This data was produced in the form of the customer pay data relied upon by Mr. Stockton.

Mr. Stockton then took the "typical" repair cost and Dr. Edgar's estimate of the number of aggregate repairs and calculated the aggregate out-of-pocket repair cost. *Id.* ¶¶ 76-86; Ex. 2, Stockton Dep. 50:1-10. Once the aggregate damages were calculated, he made appropriate adjustments for repairs covered by third party extended warranty plans and for CP4 sales that remain in the dealer inventory. *See* Stockton Rep. ¶¶ 79-81. He also compared the results using the middle two quartiles of data, compared to using all the data, to determine whether the results were sensitive to the data selected. Stockton concluded that the results were consistent across all variations of data sets. *See id.* ¶ 28.

Mr. Stockton also provides a reliable method to allocate the overpayment damages between multiple owners of a Class Vehicle. *Id.* ¶¶ 88-93. This method determines the consumers' respective share of ownership participation by relying upon the market's assessment of the percentage of the vehicle's value during the ownership tenure. *Id.* For example, if the first owner acquired the vehicle when the truck's market value was $50,000 and sold the vehicle three years later when its market value was $30,000, then the first owner would share in 40% of the overpayment and the second owner would share in 60% of the overpayment. *Id.*

## D.   GM's Corrected Data

On the eve of filing Plaintiffs' Motion for Class Certification and Stockton's expert report, counsel for GM informed Plaintiffs' counsel that the warranty and

customer pay data it had produced was incomplete and inadvertently contained data that should not have been included. *See* Mot. for Class Cert., ECF No. 112, at 2 n.5. On March 15, 2022, two weeks later, GM produced corrected data records. On April 12, 2022, Plaintiffs submitted a supplemental report from Stockton based on the corrected data. *See* Supplemental Report of Edward M. Stockton, ¶ 1, attached hereto as Ex. 5. Stockton opined that the data changes were considerable, but the method he used to evaluate and prepare the original data "already filtered out the impact of the incorrect or extraneous data." *Id.* ¶ 2. Since he had already taken steps to identify the data relevant to his cost estimate calculation, and eliminated duplicates or extraneous data, his original typical repair cost calculation was adjusted only very slightly using the corrected data GM produced. *Id.*

### III.   ARGUMENT

#### A.   All of GM's Criticisms Go to Weight, Not Admissibility

Although Plaintiffs respond to each objection GM makes to Stockton's opinions, these objections certainly do not offer a basis to exclude Stockton's opinions outright. At most (and read generously), GM's criticisms go to weight, and not admissibility, of Stockton's report. *See Counts*, 2022 WL 2078023, at *21 ("At best, Defendants' arguments about Stockton's methodology go to weight, not admissibility. For that reason alone, they fail.") (citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002)); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001) ("The bulk of Defendants' arguments

challenge the merits of [the expert's] conclusions. ***The courts routinely reject such arguments***, observing that they are improper at this stage of the litigation." (emphasis added)). As *Cardizem* explained, "'[t]he fact that the defendants' expert disagrees with the methodology and conclusions propounded by [plaintiff's expert] is not reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury . . . remains to be seen.'" *Id.* (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 522 (S.D.N.Y. 1996)); *see also Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 646 n.43 (E.D. Mich. 2012) (dueling models related to damages represented a "battle of the experts" that the jury must resolve).[5] GM's criticisms at best are the basis for cross-examination, not exclusion. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 595 (1993).

**B.    Stockton's Calculation of Typical Repair Costs Is Based on Relevant Data**

**1.    Stockton's data preparation is appropriate.**

GM argues that Mr. Stockton manipulates the original data produced to create an "artificial" dataset and that he "shrunk" the data such that it underscores its reliability. *See* Mot. at 13-14. But his decision to remove duplicates and irrelevant

---

[5] *See also Cardizem*, 200 F.R.D. at 311 ("The fact that Defendants' expert disagrees with Plaintiffs' expert . . . is neither surprising nor relevant. Such merit-based arguments are inappropriate at the class certification stage of the litigation. At this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts.").

data is entirely appropriate, especially when it was GM's own carelessness that led to some of the initial data discrepancies. GM's proffered expert Lorin Hitt effectively conceded as much in his deposition. *See* Ex. 6, Hitt Dep. 242:13-16; 258:5-259:12. GM would undoubtedly criticize Stockton if he had *not* cleansed the data in this manner. Data cleansing was necessary to base the cost estimate on records that had the characteristics of the relevant repair. *See* Ex. 3, Stockton Declaration ¶ 22. And Stockton's analysis of the corrected data GM produced on March 15, 2022, confirms that his initial data preparation identified the relevant records and accordingly, there was "little to no alteration in his calculations" using the corrected data. *See* Stockton Suppl. Rep. ¶ 2. GM also provides no counter-analysis from Hitt or anyone else that shows the "real" cost of repair ███████ ███████████████████████████ Ex. 6, Hitt Dep. 274:11-275:3.

Nor is Stockton's data-cleansing a basis to exclude his opinion. "In determining whether an expert based his opinion upon relevant and reliable data, 'deference ought to be accorded to the expert's view that experts in his field reasonably rely on such sources of information.'" *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, 2008 WL 3819752, at *2 (M.D. Fla. Aug. 12, 2008). GM cannot reasonably challenge the reliability of the data Mr. Stockton relied upon because the data came directly from GM, and GM's purported expert also relied on the exact same data. *See* Ex. 6, Hitt Dep. 323:10-13.

- 9 -

Instead, GM challenges the manner in which Mr. Stockton weeds out the irrelevant data GM produced. These issues go to weight, not admissibility. *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility") (citation omitted); *see also Counts*, 2022 WL 2078023, at *22 (challenges to Stockton's selection of data variables go to weight, not admissibility).

GM's critiques are also unfounded and mistaken. Through multiple steps, Mr. Stockton developed a relevant data set to use for his typical repair costs calculation. Stockton Rep. ¶¶ 59-60, Tabs 3 and 4; Ex. 5, Stockton Suppl. Rep. ¶ 2. *First*, he retained records related to the LML engine and the Class Vehicles. *Id.* GM's expert agrees it is ███████████████████████████████. *See* Ex. 6, Hitt Dep. 258:5-9. *Second*, Mr. Stockton retained records that include the part number(s) relevant to the CP4 repair. *Id.* Stockton's preparation of the data retains "the universe of repairs that I got was primarily made up and filtered down to from CP4 failures where there is a kit or pre-kit equivalent, which is the repair." *See* Ex. 2, Stockton Dep. 184:1-5; Stockton Rep. ¶ 59. *Third*, he retained records for repairs performed in the class states. Stockton Rep. ¶¶ 59-60, Tabs 3 and 4. *Fourth*, for records that were duplicated in both the warranty and customer pay file, he only

- 10 -

accounted for the record once. *Id.* ¶¶ 25, 59-60, Tabs 3 and 4; *see also* Ex. 2, Stockton Dep. 201:7-10. ██████████████████████████████████████

██████████ *See* Ex. 6, Hitt Dep. 242:13-16. *Fifth*, records for labor with values greater than $0 were retained. Stockton Rep., Tab 3. This captured customer-pay records which, by definition, would not include zero or negative costs. Again, GM's economic expert agrees that if there are zeros in the data, █████████████████████

█████████████████" *See* Ex. 6, Hitt Dep. 265:9-10. Overall, Mr. Stockton applied eight criteria to create a relevant data set involving the repair of the CP4 fuel pump in the Class Vehicles in the class states to calculate his cost of repair estimation. Stockton Rep. ¶¶ 59-60, Tabs 3 and 4.

GM provides no evidence to support its contention that Stockton's data preparation was unscientific or arbitrary. In fact, GM's expert does not have an opinion on what should or should not be included in the data, or any counter-analysis to suggest that Stockton's methodology was unsound, rendering his critique toothless. As Hitt testified:




[6]

In addition to not having an opinion on what data to include in a cost of repair calculation, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *See* Ex. 6, Hitt Dep. 246:12-18. It is simply his "own opinion" that Mr. Stockton does it incorrectly. This is an unfounded criticism.

The case GM primarily relies upon is inapposite. *See* Mot. at 14 (citing *In re Sonic Corp. Customer Data Sec. Breach Litig.*, 2021 WL 5916743 (N.D. Ohio Dec. 15, 2021). In that case, the expert relied on an extremely small sample of data, reviewing the data of only three to six credit unions from a pool of 5,000 financial institutions, even as these institutions "vary in type, size, and resources. . . . [They also] have a wide range of assets, customer numbers, and average deposits per account." *Id.* at *6. As a result, the proffered expert's analysis "does not capture this variation." *Id.* Here, Stockton's analysis included *all* the relevant data GM produced. Stockton did not rely on sampling at all in this case.

**2.   Stockton's cost of repair calculation is reliable.**

Despite GM's suggestion to the contrary (Mot. at 13-15), Stockton's methodology is highly reliable and based on his "extensive confirmatory work about

---

[6] Ex. 6, Hitt Dep. 254:15-255:11.

the reliability of the average," which give a "high degree of confidence regarding the appropriateness and the lack or the stability of the findings shown in the report." *See* Ex. 2, Stockton Dep. 17:22-18:15. Mr. Stockton's use of a "diverse set of data sources serves to provide cross-checks across estimates of repair costs." Stockton Rep. ¶ 24; *see also* Ex. 2, Stockton Dep. 83:11-84:15. He analyzed a robust set of data, including information on labor rates, labor hours, required parts, part lists prices, dealership composite statements, GM technical service bulletins, and GM's "standard repair times" to identify the typical out-of-pocket customer cost for repairing a fuel system damaged by a CP4 fuel pump failure. *See* Stockton Rep. ¶¶ 42-55. In sum, his data was an aggregate of several sources cross-referenced by Mr. Stockton, ensuring that he is obtaining a complete picture of the costs of the subject repairs, as over-reliance on a single data point may give rise to unreliable results.

Yet GM argues that Mr. Stockton does not "quantify the uncertainty inherent in his calculations or to demonstrate that his results are reliable." Mot. at 14. This argument ignores the sensitivity analysis that Stockton performed. *See supra* § II.C. It also ignores the fact that quantifying any uncertainty is not a required step, and GM fails to explain why this even matters. Even without a quantitative number for error rate or confidence interval, "the experts' opinion is sufficiently based in principles generally-accepted in the field of economics." *In re Universal Serv. Fund*

- 13 -

*Tel. Billing Practices Litig.*, 2008 WL 4382141, at *3 (D. Kan. Sept. 28, 2008). Here, Stockton testified that he "extensively tested [the] stability of the findings," "the sensitivity testing is extensively done," and he describes the many ways he tested the sensitivity of his findings. Ex. 2, Stockton Dep. 54:6-7; 54:22-55:5; 52:23-53:1; 55:10; 56:12-13; 57:8-19. He ran the numbers from multiple sources, with and without data cleansing, "and [the numbers] don't change" from the amount presented in his final calculation. *Id.* at 211:5-7; Stockton Rep. ¶¶ 13, 27-30, 42-55. As a result, all of GM's arguments about "excluding" certain data points are completely irrelevant, because it does not materially change the typical repair costs that Stockton calculated.

GM alternatively argues that Stockton "biased his estimates through manipulation of underlying data." Mot. at 15 (citing *Hurt v. Com. Energy, Inc.*, 2015 WL 410703, at *6 (N.D. Ohio Jan. 29, 2015)). That is an absurd charge, and *Hurt* is inapplicable. In *Hurt*, the proffered expert relied on a problematic survey: plaintiffs' counsel both prepared the survey at issue and fielded questions from respondents. 2015 WL 410703, at *4. The court was rightfully concerned with the unreliability of the survey data, particularly when the expert did "no serious testing to determine whether the respondents were representative of the entire class." *Id.* at *5. Again, the data here was produced by GM, not through a survey created and administered by Plaintiffs' counsel. Stockton did exactly what the court in *Hurt* criticized the

expert for not doing. He tested the data for relevancy and retained those records that relate to the Class Vehicles in the class states with the CP4 repair. *See* Stockton Rep. ¶¶ 17-18. He provided repair cost calculations using multiple data sources and then opined on the one most typical for customer pay repairs to use for classwide damages. *Id.* ¶¶ 14, 27-29. GM's (fabricated) disagreement with Stockton's opinion on the relevant data does not make his opinions unreliable and biased.

GM next asserts that Stockton relied on an "artificially created dataset" which is unreliable. *See* Mot. at 13 (citing *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510-11 (6th Cir. 2014)). But the expert in *Ask Chems* relied on the plaintiff's own damages estimates without even evaluating the bases for the estimates, and simply served as a mouthpiece for plaintiff's position. 593 F. App'x at 509-10. Here, Mr. Stockton did the opposite: he thoroughly examined the data, as described *supra* § II.C, produced by GM to find that there were duplicate entries, non-Class Vehicles and non-CP4 related entries, which he properly excluded. *See* Ex. 6, Hitt Dep. 258:5-9; 259:13-21.

Next, GM cites *Lawrence v. Raymond Corp.* for the rule that "obviously incomplete data" is unreliable. 2011 WL 3418324 (N.D. Ohio Aug. 4, 2011). The proffered expert in *Lawrence* did not provide the results of his efforts to sort and categorize a series of accident reports, and performed no statistical analysis to support his conclusions. *Id.* at *7. Here, Stockton is transparently showing exactly

- 15 -

how he made his calculations, based on GM's own records. *See* Stockton Rep. ¶¶ 61-87, Tabs 7-10; Ex. 5, Stockton Suppl. Rep. ¶¶ 1-2, Tab 1.

In another effort to misconstrue Stockton's data analysis, GM attempts to compare Stockton's work with the proffered expert in *Sheehan v. Daily Racing Form, Inc.*, 104 F. 3d 940, 942 (7th Cir. 1997) (*see* Mot. at 14). In that employment discrimination case involving termination of employees at a shuttered office, the court held that the proffered expert's opinion was properly excluded for a variety of reasons, not—as GM suggests—simply because the expert arbitrarily omitted data. *Id.* at 942. The Seventh Circuit noted that the expert: (1) failed to explain why he omitted two individuals from a pool of 19 in his statistical analysis of potential age discrimination; (2) failed to consider whether there were explanatory variables for termination other than age; (3) failed to consider that age could have been legitimately considered; and (4) failed to account for the variety of job responsibilities among the 19 employees. *Id.* at 941-42. That case bears no resemblance to this case, where Stockton considers thousands of records, he explains his methodology, and he adjusts the data for multiple variables to establish the most relevant dataset. Stockton Rep. ¶¶ 56-60.

GM also cites *Desai v. Geico Casualty Co.*, 2021 WL 5762999, at *15 (N.D. Ohio Dec. 6, 2021), to suggest that "another district court in this circuit recently rejected a similarly biased approach by Mr. Stockton." Mot. at 14 n.32. This, once

again, misstates the holding of the opinion. There was no allegation of "bias" in that case (and no credible claim of bias here); the court simply held that Stockton should have analyzed certain data in his report. *Id.* at \*15. In fact, Stockton *did* review that data in a supplemental report—but because of decisions by plaintiffs' counsel in that case, the Court struck it as untimely. This outcome had nothing to do with the merits of Stockton's analysis. GM once again undermines its credibility by citing unrelated cases and misstating their holding.

GM next resorts to accusing Stockton of using a "garbage in, garbage out" methodology, citing *Teenier v. Charter Communications, LLC*, 2017 WL 3141051, at \*4 (E.D. Mich. July 25, 2017). In *Teenier*, the proffered expert misstated plaintiff's income by about $25,000, even though he had plaintiff's W-2 income; the court characterized this discrepancy as a "mystery." Equally mysterious is why GM thought *Teenier* had anything to do with this case; there is no allegation that Stockton made any data entry errors or relied on the wrong numbers.[7]

---

[7] GM also argues that Stockton "excludes the repairs cost for 7 of 9 named plaintiffs themselves because they are either too low or too high for Mr. Stockton's liking." Mot. at 15. But Stockton has explained that he was calculating a typical cost of repair across the class. Ex. 2, Stockton Dep. 95:24-96:1; *see Counts*, 2022 WL 2078023, at \*18. If Stockton had deliberately included named plaintiffs' cost of repair, regardless of whether they met his criteria, then GM would doubtlessly criticize that decision as arbitrary.

## C.     Stockton's Analysis Fits With Plaintiffs' Theory of Liability

GM next asserts that Stockton's damages model is "not tethered to the alleged defect in this case." Mot. at 15. GM claims that he "did not even try to identify any specific repair records related to plaintiffs' defect theory, as opposed to the myriad other reasons a fuel pump may have been repaired or replaced." Mot. at 16-17. Stockton relied on Dr. Edgar's analysis to quantify the vehicles who had a pump repair that was not covered under warranty. *See* Stockton Rep. ¶¶ 41, 46, 77. Stockton is not offered as an engineering expert, and was not charged with identifying the vehicles that fall within the cost of repair model. It is perfectly proper for one expert to rely on another, provided that this reliance is reasonable based on each expert's respective field. *See Lahar v. Oakland Cty.*, 2006 WL 2269340, at *6 (E.D. Mich. Aug. 8, 2006); *Counts*, 2022 WL 2078023, at *17 (Stockton properly assumed a material defect in the class vehicles).[8]

## D.     Stockton Is Not Required to Allocate Damages

GM contends that Stockton's model calculating typical repair costs "does not offer any opinion about damages for any individual class member" and is "unhelpful to the Court or the Jury." Mot. at 19. But allocation of damages is not a requirement of class certification. In *Counts*, GM criticized Stockton's overpayment model

---

[8] GM claims that "Dr. Edgar testified that the data Mr. Stockton used includes replacements of CP4 pumps that never failed at all." Mot. at 16. This is nonsense— Dr. Edgar said no such thing.

because it did not calculate damages for individuals who "(1) bought their vehicles used; (2) sold their vehicles; or (3) leased their vehicles." *Counts*, 2022 WL 2078023, at *18. The court rejected those criticisms, because "Stockton explained that the damages were not limited to the initial purchaser" because (according to Stockton) owners "consume the item's value . . . over some extended period of time." *Id.* The court further held that "allocation of the per-vehicle overpayment among class members is a post-certification issue of claims administration. Indeed, courts routinely allow the parties to allocate damages among class members after class certification." *Id.* That is precisely what Stockton proposes here. *See also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (finding that the "*fact* of damages" was common to all class members even though the amount of damages sustained by each class member varied) (emphasis added); *see also In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 267 (N.D. Ohio 2014) (method of calculating damages is appropriate where damages are "susceptible of measurement across" the class for purposes of Rule 23(b)(3), though they need not be exact); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *22 (N.D. Cal. June 20, 2013) (damages calculation not required at the class certification stage). "Courts routinely allow the parties to allocate damages among class members after class certification." *Counts*, 2022 WL 2078023, at *18.

Stockton's assignment was to calculate classwide cost of repair damages, not to allocate damages on an individual basis. *See* Stockton Rep. at 2. "[T]he damages methodology does not award damages; it calculates damages on a classwide basis. . . . Questions of allocation need not definitively be resolved now." *In re Polyurethane*, 314 F.R.D. at 269. A damages model that calculates "the total damages that Defendants might be responsible for if the class is certified and awarded damages: *X* amount per vehicle" is appropriate in class action. *Counts*, 2022 WL 2078023, at *18. "How those damages will be distributed among the class members who owned the same vehicle at different times will not affect Defendants' exposure." *Id.* This is exactly what Stockton's model offers here—calculation of classwide damages. Stockton's testimony that "I don't think I would ever propose how much should be paid to an individual in damages" is in line with his role as an expert for classwide damages. Ex. 2, Stockton Dep. 47:14-15; *see Counts*, 2022 WL 2078023, at *18.

GM misconstrues his testimony to suggest that Stockton would not have the Court adopt his allocation method for overpayment damages. Mot. at 20. Stockton clearly testified that "I propose a model which one could allocate overpayment damages." Ex. 2, Stockton Dep. 85:5-6. It is not Stockton's role to opine on

- 20 -

"damages anyone should be awarded." Mot. at 20.[9] The Court determines the makeup of the classes; the jury awards damages.

## E.     Stockton's Opinion on Overpayments to Multiple Owners Is Valid

GM claims that because Stockton did not opine on the eligibility of individual putative class members to receive damages, that the allocation model is unworkable and inadmissible. Mot. at 18. However, Stockton was not asked to provide individual damage awards or determine eligibility, nor is he required to do so, which ultimately is driven by the Court's decision on class certification. *See In re Polyurethane*, 314 F.R.D. at 269.[10] "[A]llocation of the per-vehicle overpayment among class members is a post-certification issue of claims administration." *Counts*, 2022 WL 2078023, at *18.

---

[9] GM is attempting to confuse the issue when it alleges that Stockton is "disavow[ing]" his opinions. Mot. at 19. Stockton is not disavowing anything because he was never asked to calculate damages for any individual class members—only to calculate damages on a classwide basis.

[10] GM insinuates that certain class members would receive more overpayment damages than others, but (even if true) this is not a basis to deny class certification. *See In re Nw. Airlines Corp.*, 208 F.R.D. 174, 224 (E.D. Mich. 2002) (rejecting argument that perceived "windfall" for named plaintiffs defeats class certification because defendants could challenge their recovery later). GM suggests that since Mr. Dawson had a prior CP4 pump failure before he purchased another GM truck, that any overpayment he would receive is essentially a windfall. This ignores Mr. Dawson's testimony that the mechanic and salesman at the dealership assured him nothing was wrong with the pump. *See* Ex. 7, Dawson Dep. 74:21-75:3. A prior failure does not provide Mr. Dawson with knowledge of a defective pump.

GM asserts that the overpayment "allocation" by Stockton is based on his own "say so" and was "unworkable." Mot. at 18. GM is wrong, and indeed, GM relies on its own expert's "say so" to make this argument. Mr. Hitt testified that even though he does not ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. Ex. 6, Hitt Dep. 210:2-4.  This type of opinion has no substance and is worthless.

GM next claims that Stockton's method "cannot reliably apportion 'overpayment' damages over multiple owners with different knowledge and bargaining information." Mot. at 18. These considerations are irrelevant to computing classwide damages, a fact that GM ignores. *See Counts*, 2022 WL 2078023, at *18. Finally, GM cites *Sloan v. General Motors LLC*, 2020 WL 1955643, at *48 (N.D. Cal. Apr. 23, 2020), to suggest that the court rejected a "similar apportionment model" proposed by Stockton. *See* Mot. at 19. This is not accurate: *Sloan* involved calculating the cost of repair as a proxy for overpayment, not to compensate vehicle owners for out-of-pocket repairs. Stockton is *not* proposing a model to share the cost of a single repair across different owners, which is the model the *Sloan* court rejected. Once again, GM is not engaging in the substance of the decision, but instead relying on boilerplate and erroneous summaries of the cases.

**F.      GM Is Not Unfairly Prejudiced by Stockton's Opinions and Testimony**

GM's statement that "Mr. Stockton's opinions and testimony lack sufficient factual support and are not rooted in reliable methodology, they would be overly prejudicial to GM and are not admissible under Federal Rule of Evidence 403," Mot. at 20, is not supported by any facts, case law, or logic. Nor does GM provide any suggestion as to how it will be prejudiced by Mr. Stockton's opinions and testimony.

## IV.   CONCLUSION

The shrill volume of GM's motion is in inverse proportion to its merits. There is no valid basis to strike Stockton's opinion, and GM's motion should be denied.

Dated: June 17, 2022                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

/s/ *Steve W. Berman*
Steve W. Berman
Jerrod C. Patterson
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

Robert C. Hilliard
Lauren Akers
Bonnie J. Rickert
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com
lakers@hmglawfirm.com
brickert@hmglawfirm.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt, Jr. (P81118)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
BERGER MONTAGUE PC
1818 Market Street Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
josterwise@bm.net
apark@bm.net
agertner@bm.net

- 24 -

Sidney D. Torres, III
Roberta L. Burns
Beau F. Camel
Valerie L. Rodrigue
LAW OFFICES OF SIDNEY D. TORRES, III,
A PROFESSIONAL LAW CORPORATION
8301 West Judge Perez Drive, Suite 303
Chalmette, LA 70043
Telephone: (504) 271-8422
Facsimile: (504) 271-1961
storres@torres-law.com
rburns@torres-law.com
bcamel@torres-law.com
vrodrigue@torres-law.com

Eric H. Gibbs
David Stein
Steven Lopez
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA 94612
ehg@classlawgroup.com
sal@classlawgroup.com

*Attorneys for Plaintiffs and the Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2022, the foregoing document was electronically filed using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Steve W. Berman*
Steve W. Berman

010784-21/1935461 V1