# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR
2             THE EASTERN DISTRICT OF MICHIGAN
3
4    MARK D. CHAPMAN, et al.,        )
                                     )
5                    Plaintiffs,     )
                                     ) Case No.:
6         vs.                        ) 2:19-cv-12333-TGB-DRG
                                     )
7    GENERAL MOTORS, L.L.C.,         )
                                     )
8                    Defendants,     )
     _____)
9
10
11
12              VIDEOTAPED DEPOSITION OF
13                 EDWARD M. STOCKTON
14                      Remote
                     April 27, 2022
15                   7:00 a.m. (MST)
16
17
18
19
20    Prepared by:
      Vicki L. O'Ceallaigh Champion, CR
21    Certificate No. 50534
22
23
24    Prepared for:
25    (Certified copy)

Page 14

1  Q.  Okay.  Yeah.  And feel free, you know, to        07:28:33
2  answer any of the questions, if you need to refer to  07:28:35
3  your report, obviously, you can do that.  You are     07:28:37
4  saying you have that on your other monitor, right?    07:28:40
5  A.  Yes.                                              07:28:43
6      MR. PRUITT:  And -- and, Jerry, you are           07:28:45
7  good?  You have everything?                           07:28:46
8      MR. PATTERSON:  I'm good.  Thank you.             07:28:50
9      MR. PRUITT:  Okay.  All right.                    07:28:52
10 BY MR. PRUITT:                                        07:28:53
11 Q.  All right, Mr. Stocktonton.  Is Exhibit 1         07:28:53
12 the expert report that you prepared for this case?    07:28:57
13 A.  Yes.  I sent along supporting materials           07:29:15
14 along with it which I would incorporate into the      07:29:19
15 file, and then there is a conceptually subsumed        07:29:22
16 subpoena meant, but "yes" is generally the answer.    07:29:30
17 Q.  When you say it's supporting materials, you       07:29:34
18 mean the tabs that are at the back of your report?    07:29:38
19 A.  I also sent underlying data, some                 07:29:41
20 intermediate or for perhaps confirmatory work         07:29:47
21 product along with the report.                        07:29:52
22 Q.  Okay.  And are all of those files listed in       07:29:54
23 Tab 24 of Exhibit 1?                                  07:30:00
24 A.  Tab 24 is just reliance material.  We also        07:30:05
25 sent along work product from the reliance material    07:30:09

Page 15

1  which I would not have listed.  Those would have      07:30:14
2  been explicitly contained in that production.         07:30:17
3  Q.  You are talking about your worksheets for         07:30:21
4  your calculation, right?                              07:30:24
5  A.  Yes.                                              07:30:25
6  Q.  Okay.  And so let me direct you to                07:30:27
7  Paragraph 3 in your report:  Let me know when you     07:30:48
8  are there.                                            07:30:54
9  A.  Okay.  I'm there.                                 07:30:55
10 Q.  So this describes what you were asked to          07:31:03
11 opine on; is that right?                              07:31:06
12 A.  It does, and then I was asked another             07:31:11
13 discrete question regarding allocation of             07:31:17
14 overpayment at point of purchase, but along with      07:31:22
15 that, it does.                                         07:31:25
16 Q.  Okay.  Fair enough.  It says here in 3(i)         07:31:26
17 that Counsel for Plaintiffs engaged Fontana, which    07:31:29
18 is your firm, "to evaluate and appropriate to form    07:31:38
19 opinions regarding following:  Whether reasonable     07:31:42
20 and feasible methods exist to determine typical       07:31:46
21 out-of-pocket expenses for consumers who paid for     07:31:51
22 repairs following catastrophic CP4 failures."         07:31:54
23     Did I read that correctly?                        07:32:01
24 A.  Yes.                                              07:32:02
25 Q.  Okay.  And that's a fair summary of that          07:32:03

Page 16

1  aspect of your work?                                  07:32:04
2  A.  Yes.                                              07:32:05
3  Q.  What do you mean by "reasonable and feasible      07:32:06
4  methods?"                                             07:32:09
5  A.  Analytically sound from reliable data that        07:32:15
6  are -- where the data are discernable and available,  07:32:24
7  where there are supportable basis for those methods.  07:32:34
8  Those would be the principles I think -- I would      07:32:39
9  consider to underlie the words "reasonable" and       07:32:42
10 "feasible."                                           07:32:46
11 Q.  Is it sort of like a level of confidence in       07:32:47
12 your conclusions?  Is that fair?                      07:32:50
13 A.  Except the level of confidence sometimes has      07:32:54
14 the reserved meaning in statistics.  If you use that  07:32:56
15 in a plain language sense, level of confidence as an  07:33:00
16 analyst or an economist, I think that's a fair        07:33:05
17 term.                                                 07:33:08
18 Q.  Well, I guess sort of what I'm asking, is it      07:33:09
19 akin to a level of confidence to a statistician       07:33:12
20 where you can assign it like a percentage or any --   07:33:15
21 is that how you are thinking of those terms?          07:33:18
22 A.  No.  It's more holistic than -- than simply       07:33:21
23 the -- what could be assigned as a -- as a            07:33:26
24 confidence interval.                                  07:33:31
25 Q.  So like to a layperson?  Is that what you         07:33:33

Page 17

1  mean?                                                 07:33:36
2  A.  I could form -- by way of contrast, I could       07:33:44
3  form a confidence interval.  If you gave me a data    07:33:47
4  set and I just had numbers, I could form a            07:33:51
5  confidence interval.  Whether or not I understood     07:33:54
6  where the numbers came from what they meant or what   07:33:57
7  their context was.                                    07:34:00
8      Here I consider it more about the process,        07:34:02
9  understanding data are they the right data, and then  07:34:07
10 again, the reliability of the numbers.  So I          07:34:10
11 consider reasonable and feasible to be broader than   07:34:14
12 than simply the -- the notion of a confidence         07:34:20
13 interval.                                             07:34:26
14 Q.  Okay.  But could you assign a confidence          07:34:27
15 interval to your conclusions?                         07:34:29
16 A.  It would be possible to do that.  Yes.            07:34:34
17 Q.  But you haven't done that?                        07:34:37
18 A.  I have not done a -- I have not done a             07:34:39
19 confidence interval.  That's -- I haven't assigned a  07:34:47
20 confidence interval.  That's correct.                 07:34:50
21 Q.  To any aspect of your report, right?              07:34:55
22 A.  No.  No.  I did extensive confirmatory work       07:34:58
23 about the reliability of the averages that I found,   07:35:03
24 but there is not a formal confidence interval         07:35:07
25 assigned that I -- that I can remember.               07:35:11

Page 18

1   Q.  Did you do anything to determine the   07:35:14
2 statistical uncertainty of any of your estimates in   07:35:17
3 your report?   07:35:20
4   A.  Yes.   07:35:23
5   Q.  What did you do?   07:35:25
6   A.  First of all, excluded outliers, the -- the   07:35:27
7 clearest example of that would be the, I guess, what   07:35:35
8 I would call the narrowing ranges exhibits, which --   07:35:42
9 which reports a variety of average repair costs   07:35:46
10 using 50 percent and then expanding out to all of   07:35:52
11 the data within the interquartile range, and there   07:35:57
12 is essentially no movement on that.  So that was --   07:36:00
13 that gave me a high degree of confidence regarding   07:36:07
14 the appropriateness and the lack or the stability of   07:36:10
15 the findings shown in the report.   07:36:16
16   Q.  So, I guess, what I'm asking is a little bit   07:36:17
17 different.  Did you quantify the statistical   07:36:20
18 uncertainty of any of your estimates in the   07:36:26
19 report?   07:36:29
20   A.  I think I answered that with my last   07:36:38
21 question.  I showed that that the averages were   07:36:40
22 stable not sensitive to decisions regarding which   07:36:46
23 observations which records to include, which   07:36:55
24 constituents in the data sets.   07:36:57
25     As far as a formal confidence interval, I   07:37:00

Page 19

1 did not do that, but as I told you in a prior   07:37:03
2 answer, there is extensive work to -- to test the   07:37:07
3 stability of the findings.   07:37:12
4   Q.  Right.  But I'm just trying to get at you,   07:37:15
5 know, when you quantify statistical uncertainty, you   07:37:18
6 can express that as a number, right?   07:37:22
7   A.  You can form a confidence interval.  I think   07:37:30
8 that's what you are asking.   07:37:34
9   Q.  And that's expressed as a number?   07:37:35
10   A.  It's expressed as a range.   07:37:37
11   Q.  And -- yeah.  Like it's a numerical range on   07:37:40
12 top of another number, right?   07:37:42
13   A.  It would be around another number, but   07:37:44
14 that's generally true.   07:37:47
15   Q.  And do you have any of those numerical   07:37:49
16 ranges in your report anywhere for your estimates?   07:37:52
17   A.  I don't think so.   07:37:55
18   Q.  Could you do that work?  Would you be   07:37:59
19 qualified is what -- is what I'm asking?   07:38:02
20   A.  Yes.  That's not difficult -- that's not a   07:38:04
21 difficult thing to do.   07:38:07
22   Q.  Okay.  But you haven't done that to date,   07:38:09
23 right?   07:38:11
24   A.  I have not.   07:38:12
25   Q.  Okay.  Looking back at your report,   07:38:13

Page 20

1 Paragraph 3, 2, little 2, it says you were engaged   07:38:21
2 to form opinions regarding whether it is possible to   07:38:29
3 estimate aggregate out-of-pocket expenditures by   07:38:33
4 consumers who paid for repairs following   07:38:38
5 catastrophic CP4 failures; is that correct?   07:38:41
6   A.  Yes.   07:38:44
7   Q.  So you say "possible" here instead of   07:38:44
8 "reasonable" and "feasible," right?   07:38:46
9   A.  Yes.   07:38:49
10   Q.  Are you making a distinction there?   07:38:50
11   A.  No.   07:38:53
12   Q.  Do you see that as meaning the same thing?   07:38:57
13 "Reasonable" and "feasible" versus "possible"?   07:39:05
14   A.  Yeah.  I can -- I can see the written   07:39:20
15 "possible" sounds more inclusive than "reasonable"   07:39:24
16 and "feasible."  I don't think of those -- I don't   07:39:28
17 think of the answers that I gave as different.   07:39:31
18   Q.  Okay.  So when -- I just want to be clear.   07:39:36
19 When you wrote down whether it is "possible," you   07:39:39
20 didn't mean to give it any different meaning than   07:39:42
21 whether it is "reasonable" and "feasible," right?   07:39:45
22   A.  I did not mean to.   07:39:48
23   Q.  Okay.  And do you have any more or less   07:39:49
24 confidence in your aggregate estimate as opposed to   07:39:57
25 your typical estimate?   07:40:00

Page 21

1   A.  I don't have less -- less confidence.  I   07:40:05
2 note that I -- in developing the aggregate   07:40:11
3 estimates, I note that I rely on another expert's   07:40:15
4 work determining the universe of repairs.  I'm   07:40:19
5 comfortable with that reliance, but there is a   07:40:24
6 little distinction between those two.   07:40:27
7   Q.  What do you mean "a little distinction   07:40:29
8 between those two"?   07:40:31
9   A.  I did the work to -- to identify the typical   07:40:33
10 out-of-pocket repair costs, at least one element of   07:40:41
11 turning those typical repair costs into an aggregate   07:40:46
12 calculation, I relied on another expert.   07:40:50
13   Q.  Got it.  And so what I'm asking is, at the   07:40:54
14 end of the day, you know, you have your typical   07:40:57
15 estimate, you have got your aggregate estimate, do   07:40:59
16 you have any more or less confidence in one as   07:41:01
17 opposed to the other?   07:41:04
18   A.  No.   07:41:05
19   Q.  Okay.  They are perfectly equal in your   07:41:06
20 mind?   07:41:19
21   A.  I don't have an affirmative different   07:41:20
22 feeling about confidence in one versus the other.   07:41:22
23 That does not mean that they are perfectly equal,   07:41:25
24 because one is a -- one is based more on reliance so   07:41:28
25 I came about it a different way, but I -- I have --   07:41:32

6 (Pages 18 - 21)

| Page 46 | |
|---|---|
| 1 vehicle there, but I don't ever move to Rhode | 08:19:51 |
| 2 Island. I live in West Virginia, and I have -- I | 08:19:55 |
| 3 have always lived in West Virginia. Is your model | 08:19:58 |
| 4 proposing that I be paid $9,087 in damages? | 08:20:03 |
| 5   A.   That depends on what happens with the class | 08:20:13 |
| 6 definition. There are the tools available to do | 08:20:17 |
| 7 that, if that's what the Court decides is | 08:20:21 |
| 8 appropriate, but I'm not -- when you say | 08:20:25 |
| 9 "proposing," again, that gets beyond what my role | 08:20:28 |
| 10 is. I think that has to do with eligibility and | 08:20:31 |
| 11 class certification issues. | 08:20:35 |
| 12   Q.   Okay. So I just -- I just want to | 08:20:37 |
| 13 understand "yes" or "no," you are not proposing at | 08:20:40 |
| 14 this stage that the amount of damages a particular | 08:20:43 |
| 15 person would get is the amount in Tab 9 of your | 08:20:47 |
| 16 report, correct? | 08:20:53 |
| 17   A.   That's right. I view this report as giving | 08:20:55 |
| 18 tools, substantiation, explanation of evidence to be | 08:20:58 |
| 19 applied as -- as appropriate within the context of | 08:21:05 |
| 20 legal decisions and class certification decisions. | 08:21:09 |
| 21   Q.   And -- | 08:21:13 |
| 22     MR. PATTERSON: Andrew, when you get to a | 08:21:16 |
| 23 convenient spot, can we take a break. | 08:21:18 |
| 24     MR. PRUITT: Okay. | 08:21:21 |
| 25     MR. PATTERSON: Whenever it's convenient for | 08:21:23 |

| Page 47 | |
|---|---|
| 1 you. | 08:21:25 |
| 2     MR. PRUITT: Yeah. Yeah. Let me just make | 08:21:25 |
| 3 sure I sort of finish my thought here, but then we | 08:21:26 |
| 4 can probably do it within a few minutes or so, if | 08:21:28 |
| 5 that's all right. | 08:21:30 |
| 6     MR. PATTERSON: Sure. No problem. | 08:21:31 |
| 7 BY MR. PRUITT: | 08:21:34 |
| 8   Q.   So, then, is -- are you saying there is not | 08:21:34 |
| 9 enough information available to you right now with | 08:21:40 |
| 10 respect to class certification to be able to propose | 08:21:45 |
| 11 how much any given person should be -- should | 08:21:49 |
| 12 receive in damages? | 08:21:52 |
| 13     MR. PATTERSON: Object to form. | 08:21:55 |
| 14   A.   I don't think I would ever propose how much | 08:22:04 |
| 15 should be paid to an individual in damages, because | 08:22:07 |
| 16 once you use the word "damages," you have adopted | 08:22:11 |
| 17 the formality, which is in the Court's hands. | 08:22:13 |
| 18 Certainly, if the Court gave principles of the | 08:22:19 |
| 19 framework with which they wanted to use this | 08:22:23 |
| 20 information, I could apply that, but I don't know | 08:22:26 |
| 21 when I would step in and say -- say how these data | 08:22:33 |
| 22 would interact with eligibility. I don't have the | 08:22:41 |
| 23 information to do it, but I don't envision doing | 08:22:45 |
| 24 that unless I'm instructed what the Court's decision | 08:22:47 |
| 25 is. | 08:22:51 |

| Page 48 | |
|---|---|
| 1 | 08:22:52 |
| 2 BY MR. PRUITT: | 08:22:52 |
| 3   Q.   Okay. So does that -- just because we need | 08:22:52 |
| 4 to know -- we need to have clarity on what your | 08:22:59 |
| 5 opinion is and what your opinion isn't. You are not | 08:23:02 |
| 6 proposing an amount to be paid to anyone in terms of | 08:23:05 |
| 7 legal damages, right? | 08:23:09 |
| 8     MR. PATTERSON: Object to form. | 08:23:11 |
| 9   A.   That's -- that's right. I think there is a | 08:23:12 |
| 10 layer of the Court's decisions and class | 08:23:16 |
| 11 certification definitions in between what I have | 08:23:22 |
| 12 done and when you would get to that stuff. | 08:23:25 |
| 13 BY MR. PRUITT: | 08:23:28 |
| 14   Q.   And so then you don't intend to get to that | 08:23:28 |
| 15 point in the future in terms of proposing a number | 08:23:30 |
| 16 in terms of damages? | 08:23:33 |
| 17   A.   I'm -- there could be a court instruction | 08:23:37 |
| 18 where I would apply that. I don't think that -- I | 08:23:44 |
| 19 don't envision a way that I would be the one who | 08:23:49 |
| 20 came up with that instruction. | 08:23:52 |
| 21     MR. PRUITT: Okay. All right. Jerrod, we | 08:23:54 |
| 22 can do a break now if you want. | 08:23:57 |
| 23     MR. PATTERSON: Sure. | 08:24:01 |
| 24     MR. PRUITT: Okay. 5 or 10? What do you | 08:24:02 |
| 25 think. | 08:24:03 |

| Page 49 | |
|---|---|
| 1     MR. PATTERSON: Five for me. Ted? | 08:24:04 |
| 2     THE WITNESS: Five is fine. | 08:24:06 |
| 3     MR. PRUITT: Okay. So then let's say -- I | 08:24:08 |
| 4 have 10:24 -- or 24 past the hour. Maybe we will | 08:24:11 |
| 5 say 30 past the hour? | 08:24:16 |
| 6     MR. PATTERSON: Sure. | 08:24:21 |
| 7     THE WITNESS: Uh-huh. | 08:24:22 |
| 8     MR. PRUITT: Thanks. | 08:24:22 |
| 9     THE VIDEOGRAPHER: Going off the record at | 08:24:23 |
| 10 8:24 a.m. | 08:24:25 |
| 11     (Recess taken.) | 08:24:30 |
| 12     THE VIDEOGRAPHER: We are going back on the | 08:30:58 |
| 13 record at 8:30 a.m. | 08:30:59 |
| 14 BY MR. PRUITT: | 08:31:04 |
| 15   Q.   Mr. Stockton, did you speak with anyone | 08:31:04 |
| 16 about your testimony during the break? | 08:31:07 |
| 17   A.   No. | 08:31:09 |
| 18   Q.   Did you speak with anyone at all? | 08:31:11 |
| 19   A.   No. | 08:31:13 |
| 20   Q.   So looking at -- I think we were looking | 08:31:18 |
| 21 at paragraph 14 in your report where you lay out | 08:31:22 |
| 22 your aggregate number that you calculated, of | 08:31:28 |
| 23 $187 million-plus. | 08:31:33 |
| 24     Are you there? | 08:31:41 |
| 25   A.   Yes. | 08:31:54 |

1    Q.  So the -- your estimate of aggregate costs,    08:31:56
2  is it -- should I understand that to be just your    08:32:02
3  typical cost muliplied by the number of people who    08:32:06
4  paid that?  Is that fair?    08:32:10
5    A.  Yes.  And just to be clear, and I'm sure you    08:32:11
6  know this, probably get to it later, but I have got    08:32:14
7  two potential credits that one might apply to that,    08:32:17
8  but just to answer your question, separate from    08:32:21
9  those credits, yes.  You understand the aggregate    08:32:23
10  cost correctly.    08:32:26
11    Q.  Yeah.  At a simple level, that's -- that's    08:32:28
12  what it's referring to, right?    08:32:30
13    A.  Yes.    08:32:32
14    Q.  Is it just that one additional input that    08:32:35
15  you used to calculate the aggregate -- the number    08:32:38
16  of -- the number of people, essentially?    08:32:42
17        MR. PATTERSON:  Object to form.    08:32:47
18    A.  At a high level, yes.  I mean, you've seen    08:32:51
19  also if it's a calculated state level subtotals,    08:32:54
20  which would be more inputs, but they are the same.    08:32:59
21  They are essentially the same input conceptually.    08:33:04
22  BY MR. PRUITT:    08:33:10
23    Q.  Okay.  So then if -- if your typical cost is    08:33:11
24  wrong, then by definition, your aggregate cost is    08:33:15
25  going to be wrong, too, right?    08:33:19

1    A.  Yes.  Well, it's one -- it's the aggregate    08:33:25
2  cost is a function of the typical cost, so if an    08:33:34
3  input needs to change, then the output would need to    08:33:34
4  change.    08:33:41
5    Q.  So, mathematically, that has to be true,    08:33:42
6  right?    08:33:45
7    A.  If it's a dynamic input, yes.    08:33:46
8    Q.  Okay.  And if there is also an error in the    08:33:50
9  number of people input, that would be -- that would    08:33:55
10  compound the error in your aggregate estimate; is    08:34:01
11  that fair?    08:34:07
12    A.  Well, the estimate is the obligation of    08:34:08
13  simple mathematics as -- that we have talked about.    08:34:11
14  In terms of compounding the error, I guess if I    08:34:14
15  assume there is an error in the typical cost, and I    08:34:23
16  assume that there is an error in the number of    08:34:26
17  repairs, the error in the number of repairs could    08:34:32
18  be -- could make the difference between the    08:34:36
19  aggregate number and the true number smaller or    08:34:39
20  larger depending on the directions of the errors.    08:34:42
21    Q.  Did you do any calculation like that as part    08:34:44
22  of your work in this case?    08:34:47
23    A.  Assuming my calculations were wrong?    08:34:49
24    Q.  Assuming any errors in your calculations and    08:34:52
25  then trying to quantify how that affects the numbers    08:34:54

1  you put forward.  Yes.    08:35:00
2    A.  I looked -- as I referred you to before, I    08:35:07
3  looks at the stability of the average as -- which is    08:35:09
4  using all the interquartile data versus the, what I    08:35:15
5  will call the analysis records, being the middle    08:35:19
6  50 percent, I calculated the state level data    08:35:20
7  changing, the order of data selection.    08:35:28
8        Also, there was the replacement data set    08:35:50
9  that GM sent, so that changed the number of records.    08:35:53
10  It looked like the typical number did not -- did not    08:35:57
11  change much after with the new data set, so it    08:36:02
12  suggests the model was robust in terms of filtering    08:36:06
13  out the records, which -- which weren't useful.  I    08:36:10
14  may have done more, but those are the ones that come    08:36:14
15  to mind.    08:36:17
16    Q.  But what I'm asking is, did you do any    08:36:17
17  calculations in your report where you assumed an    08:36:21
18  error exists in your methods or in your data and    08:36:23
19  then determine how that changed the numbers you    08:36:27
20  report at the end of the day?    08:36:32
21    A.  I didn't assume that I made errors.  I    08:36:40
22  wouldn't know what assumption to apply, but it's    08:36:43
23  certainly -- certainly testable.  I have tested    08:36:49
24  different assumptions regarding which records go in,    08:36:53
25  which order the state level data should be -- should    08:36:56

1  be incorporated, so I have tested those.    08:37:02
2        I haven't done a what-if scenario, what if    08:37:05
3  the number is $2,000.  I looked at calculations of    08:37:09
4  repair costs under warranty, which is sort of a    08:37:16
5  conceptually low number.  I could've done it on a    08:37:20
6  TFP, if I was not going to have anything over the    08:37:23
7  warranty -- TFPs, rather.  It wasn't going to add    08:37:26
8  anything over the warranty calculations.    08:37:32
9        I started on the dealer survey and found, as    08:37:34
10  I reported in the report, that there was some    08:37:39
11  conditions that might not have been present, so I    08:37:43
12  considered the possibility of overstating the    08:37:46
13  estimates, drawing from the dealer survey with    08:37:49
14  respect to the independent dealers.    08:37:52
15        I -- I'm not concerned about that.  I don't    08:37:56
16  think there is -- that there is going to be anything    08:37:59
17  material there, but I did put in a matrix that shows    08:38:00
18  if, for example, there are lower labor rates that    08:38:04
19  affect some records, I showed how much effect that    08:38:09
20  would be.    08:38:10
21        So it's several layers -- several layers I    08:38:12
22  did tests akin to that, but in terms of picking a    08:38:16
23  number saying, what if it's actually $8,000 or    08:38:20
24  $2,000 or whatever, I didn't apply that, but that    08:38:25
25  would be rightfully discernable based on the way    08:38:27

14 (Pages 50 - 53)

Page 54

1 calculations are done already.                    08:38:32
2     Q.   So it's feasible and possible to do it, but   08:38:33
3 that's justu not something that's in your report   08:38:35
4 currently, right?                                 08:38:38
5     A.   Well, I have tested -- as I have talked   08:38:40
6 about, I have extensively tested stability of the   08:38:43
7 findings.  If you wanted to know how the damages   08:38:47
8 would be -- would be different or that the payment   08:38:52
9 amounts, the cost amounts would be different with a   08:38:57
10 different number put in, it's almost              08:39:01
11 self-explanatory.  It's A times B, which could be  08:39:04
12 done on the state level, a group of states or at the  08:39:09
13 overall level.                                     08:39:13
14    Q.   Right.  So, you know, you have a cost number  08:39:14
15 estimate, at the end of the day, for typical and   08:39:17
16 aggregate, right?                                  08:39:22
17    A.   I had several, but yes.                   08:39:24
18    Q.   And those, obviously, are based on any    08:39:25
19 number of inputs that you use to do your          08:39:29
20 calculations, right?                              08:39:32
21    A.   Right.                                    08:39:33
22    Q.   And so I guess what I'm getting at is, you  08:39:34
23 know, did you take any one of those inputs and test  08:39:39
24 the sensitivity of the number you come to at the end  08:39:43
25 of the day, how that would change based on changes  08:39:46

Page 55

1 in one or more of those inputs?                    08:39:50
2     A.   And it sounds like the answer is, you did  08:39:54
3 not do that; is that right?                        08:39:56
4     A.   No.  I did that.  I walked you through    08:39:58
5 several ways in which I did that extensively.      08:40:01
6     Q.   And your report, the -- you report this   08:40:04
7 sensitivity in terms of a number, how it would     08:40:11
8 affect the final number?                           08:40:17
9     A.   I don't remember if I excerpted the numbers,  08:40:19
10 but the sensitivity testing is extensively done, and  08:40:23
11 it's -- it's readily discernible if one wanted to  08:40:30
12 apply the numbers to see what the impact would be on  08:40:38
13 aggregate calculations.                            08:40:41
14    Q.   Right.  But I'm just trying to say, you   08:40:44
15 didn't report the impact on the calculations in your  08:40:48
16 report.  You are saying that the data is there to do  08:40:51
17 that calculation, but you didn't do that?          08:40:55
18    A.   I didn't take that last step, so some of the  08:41:00
19 tabs we've looked at -- let me just call them the  08:41:02
20 range analysis.  Will you know what I mean?  We can  08:41:06
21 use that as shorthand.  So the range analyses, I   08:41:09
22 report how the averages would change with different  08:41:14
23 portions that have been used.                      08:41:20
24         So I -- as far as carrying that forward to  08:41:23
25 rerun aggregate calculations with each addition or  08:41:29

Page 56

1 each addition of data of constituents of the       08:41:32
2 analysis record, I didn't at each stage carry it out  08:41:39
3 to a final number, but that's -- that's readily    08:41:43
4 apparent from the numbers that I used.             08:41:45
5         In terms of the number of records, that's  08:41:47
6 just multiplication.  I calculated what the -- if I  08:41:49
7 changed the order of what records were included in  08:41:58
8 the calculation and started with the state level, I  08:42:02
9 report what each of those would be.  That could     08:42:05
10 readily be turned into an aggregate calculation, but  08:42:11
11 I didn't take that last step of rerunning the      08:42:16
12 aggregate exhibits every time, but I have recorded  08:42:21
13 that sensitivity extensively through the report.   08:42:24
14    Q.   Okay.  Did you report -- well, strike that.  08:42:27
15         Did you do any analysis looking at if more  08:42:31
16 than one of your inputs were wrong at the same time,  08:42:36
17 how those collectively would affect the final number  08:42:41
18 you've come to?                                    08:42:44
19    A.   I don't think I understand that question.  08:42:56
20 I'm sorry.  I'm trying to get it.                  08:42:57
21    Q.   Yeah.  So the way I understand, and again,  08:42:59
22 I'm not educated in this, but the way I understand a  08:43:04
23 sensitivity analysis, is you are looking at how I   08:43:08
24 could change one of your inputs, how that might     08:43:12
25 affect your final calculation; is that right?      08:43:15

Page 57

1     A.   Generally.                                08:43:18
2     Q.   So what I'm asking is, did you do that, but  08:43:19
3 changing multiple inputs, you know, looking at if   08:43:21
4 there is uncertainty or errors in more than one     08:43:25
5 input you used, how that would collectively affect  08:43:28
6 the final calculation?  Did you do that analysis for  08:43:31
7 any inputs?                                        08:43:36
8     A.   Inherently, with the inclusion of a record,  08:43:43
9 you are picking up differences in parts, labor, and  08:43:46
10 possibly the weight of where the repairs occurred.  08:43:59
11 So there are three inputs in play in the range     08:44:02
12 analyses, so that would be -- that would be one    08:44:05
13 example.  The order of inclusion of records, I     08:44:12
14 guess, would also implicitly pick up changes,      08:44:15
15 simultaneous changes to parts, labor, and the weight  08:44:20
16 of where the repairs occurred, if that's -- if     08:44:26
17 that's meaningful.  So those would be -- those would  08:44:30
18 be examples of taking into account simultaneous    08:44:35
19 factors.                                           08:44:37
20    Q.   And you did calculations of what effect that  08:44:38
21 would have on the final number you produced?       08:44:42
22    A.   I think I reported it at the -- at the    08:44:47
23 repair cost level, which would be plugged into     08:44:50
24 the -- multiplied by the -- whatever aggregate     08:44:53
25 number is relevant to the calculation to get the   08:44:58

15 (Pages 54 - 57)

Page 82

```
1  don't remember if it was Dr. Edgar or Counsel --      09:27:09
2  if -- that that's -- there was an adjustment for      09:27:11
3  lessees.                                              09:27:17
4     Q.  Okay.  You -- so then your model is not --    09:27:19
5  you don't purport to calculate damages for anyone     09:27:28
6  whose repairs were covered by warranty; is that       09:27:33
7  correct?                                              09:27:37
8     A.  As I understand it from Dr. Edgar's tables,    09:27:38
9  the pumps under -- the pumps repaired under warranty  09:27:43
10 are deducted from the total pump sales, and that's    09:27:47
11 the beginning of the calculation for pumps not        09:27:51
12 covered under warranty, so I understand those are     09:27:55
13 removed upstream of the input figure I received.      09:27:58
14    Q.  That's helpful, but what I'm asking is,        09:28:05
15 slightly different.  I'm just asking what are you      09:28:07
16 trying to do or not do, and so you are not trying to  09:28:08
17 calculate damages for anyone whose repair was         09:28:11
18 covered by a warranty, correct?                       09:28:13
19    A.  That's right.                                  09:28:16
20    Q.  And so -- well, if that's the case, why did    09:28:17
21 you look at warranty data in the first place?         09:28:21
22    A.  Warranty data are very useful and supportive   09:28:26
23 in a sense that they provide a floor for what         09:28:32
24 consumers would have paid out of pocket.  It's just   09:28:39
25 generally the case that customer pay repairs are      09:28:42
```

Page 83

```
1  more expensive than warranty repairs, but            09:28:45
2  warranty -- warranty data, by their nature, are      09:28:50
3  heavily vetted.  There are adversarial inputs and    09:28:54
4  mutual interests in the development of those files.  09:28:58
5     It is -- they were very useful inputs in         09:29:08
6  studying costs associated with what consumers paid   09:29:12
7  out of pocket, but as I say, the customer pay        09:29:16
8  repairs are more reflective of the conditions under  09:29:21
9  which people would have paid for these repairs out   09:29:24
10 of their own pockets.                                 09:29:28
11    Q.  So then the -- just so I'm understanding,      09:29:30
12 the warranty data you looked at, that's so you can    09:29:32
13 have a benchmark to compare customer pay repairs; is  09:29:36
14 that correct?                                         09:29:51
15    A.  In studying the -- I was attempting to         09:29:52
16 evaluate the problem through multiple data sources,   09:29:56
17 and warranty data are a good source to study this     09:29:59
18 problem.  So the context -- there is a benchmark to   09:30:03
19 compare it to.  It's -- warranty data are --          09:30:07
20 although it's going to be systematically lower than   09:30:13
21 customer pay costs, it's going to give reliable       09:30:18
22 outputs.  It's to enhance the reliability of the      09:30:20
23 study, and a --                                       09:30:23
24    Q.  When you -- yes, sir.  I'm sorry.  Are you     09:30:24
25 done?                                                 09:30:26
```

Page 84

```
1     A.  A cross check or benchmark is one of those     09:30:26
2  useful purposes.                                      09:30:29
3     Q.  Okay.  When you come to a typical cost         09:30:31
4  estimate of $9,551 for out-of-pocket costs, you are   09:30:36
5  not relying on warranty data to calculate that; is    09:30:43
6  that correct?                                         09:30:48
7     A.  Warranty data are part of that study for why   09:30:50
8  I considered the $9,500-or-so to be the most          09:30:52
9  representative number, but the warranty data are an   09:30:56
10 input only in the sense that repairs that were        09:31:00
11 coded, recorded on the same day between warranty and  09:31:04
12 customer pay, we excluded those records.  So I did    09:31:08
13 use warranty records to derive that, but the $9,500   09:31:14
14 itself is calculated on the basis of customer pay     09:31:18
15 records alone.                                        09:31:23
16    Q.  Okay.  The -- you are also not -- to be        09:31:26
17 clear, you are not trying to calculate the amount of  09:31:34
18 damages in dollars that anyone may have experienced   09:31:39
19 for what the Plaintiffs say is overpayment for the    09:31:43
20 vehicle; is that correct?                             09:31:47
21    A.  I'm not giving an opinion on overpayment.      09:31:49
22 That's correct.                                       09:31:57
23    Q.  You do offer the opinion that -- you do        09:32:00
24 analyze, I should say, and offer an opinion as to     09:32:08
25 how proportionally overpayment damages should be      09:32:13
```

Page 85

```
1  allocated among multiple owners of the same vehicle,  09:32:18
2  right?                                                09:32:23
3     A.  "Should" is not a word that I would use, but   09:32:26
4  I propose a method to do that and describe how the   09:32:29
5  method would be applied, so I propose a model by     09:32:32
6  which one could allocate overpayment damages.         09:32:38
7     Q.  Okay.  But you are not offering the opinion    09:32:41
8  that the Court should adopt that model to allocate    09:32:44
9  among multiple owners of a vehicle, right?            09:32:48
10    A.  Like similar answers, I think there are        09:32:53
11 things that are in the Court's domain, not mine,      09:32:55
12 with regard to eligibility and class certification,   09:32:58
13 so that's right.  I understand that what I do is a    09:33:04
14 mathematical model, how eligibility is determined.    09:33:09
15 For that to be applied, is beyond the scope of my     09:33:12
16 work.                                                 09:33:15
17    Q.  Were you instructed by the Plaintiffs'         09:33:15
18 lawyers to focus only on out-of-pocket damages,       09:33:19
19 calculating out-of-pocket damages, instead of         09:33:25
20 calculating overpayment damages?                      09:33:28
21    A.  Sorry.  I was sort of waiting for an           09:33:40
22 objection.  Can you give me the question again.  I    09:33:43
23 lost it.  I'm not saying there should have been an    09:33:45
24 objection.                                            09:33:48
25    Q.  No.  Understood.  Understood.                  09:33:49
```

22 (Pages 82 - 85)

Page 94

1  mutually exclusive, but in some cases, that would      09:58:49
2  make sense.      09:58:53
3     Q.  Okay.  Would -- how would you decide whether      09:58:56
4  a class member should fall under the overpayment      09:59:05
5  model or the out-of-pocket repair model?      09:59:11
6        MR. PATTERSON:  Object to form.      09:59:17
7     A.  I would not.  I think that -- I think that's      09:59:17
8  a legal distinction and one that is in the hands of      09:59:24
9  attorneys and the Court.      09:59:31
10 BY MR. PRUITT:      09:59:34
11    Q.  Can you explain to me what you mean by it's      09:59:35
12 a legal decision to determine how to calculate      09:59:43
13 damages using these models?      09:59:49
14    A.  You didn't ask me about calculating damages.      09:59:53
15 You said how should get which one, which is a      09:59:56
16 question of eligibility for recovery.      10:00:00
17    Q.  Uh-huh.  Okay.  So then maybe that's      10:00:04
18 helpful, to be reword it a little bit, and then      10:00:10
19 maybe -- because that's what I'm getting at.      10:00:13
20       So how would -- how would you go about      10:00:17
21 deciding whether to calculate damages for a      10:00:22
22 particular class member using either the overpayment      10:00:26
23 model or the out-of-pocket model?      10:00:30
24       MR. PATTERSON:  Object to form.      10:00:34
25    A.  First of all, I haven't seen the overpayment      10:00:36

Page 95

1  model.  Calculating overpayment is not a part of my      10:00:40
2  assignment, so it's not -- it's not something I'm      10:00:42
3  doing here or that I have attempted to form an      10:00:46
4  opinion on.  The way that I see it, I guess the      10:00:51
5  distinction is -- I give a tool that could be      10:00:54
6  applied, and because of -- because of my job,      10:00:59
7  because of my role here, I have to scrutinize the      10:01:02
8  foundations of that tool, and there is a      10:01:05
9  mathematical and economic application of that.  I      10:01:10
10 create numbers.      10:01:13
11       Then there is a second determination of      10:01:14
12 eligibility, which is -- whether it is appropriate      10:01:16
13 to apply a model to any given person, and I see that      10:01:20
14 as a legal distinction, and that's why I don't have      10:01:24
15 an opinion on it.      10:01:27
16 BY MR. PRUITT:      10:01:28
17    Q.  Okay.  Well, let's -- then let's not think      10:01:29
18 about the overpayment model.  Let me ask it a little      10:01:31
19 bit differently.      10:01:35
20       So you built this out-of-pocket model that's      10:01:35
21 designed, as you put it, to be a tool to calculate      10:01:40
22 out-of-pocket repair costs for multiple class      10:01:43
23 members, right?      10:01:48
24    A.  It's actually for the class as a whole.  It      10:01:50
25 could be applied to class members, but it's -- my      10:01:52

Page 96

1  calculations are classwide, just to make that clear.      10:01:57
2     Q.  So your model is meant to calculate damages      10:01:59
3  for someone who never paid out of pocket for repair      10:02:03
4  costs?      10:02:07
5     A.  No.  I didn't say that.      10:02:08
6     Q.  Okay.  So I'm talking about in terms of the      10:02:13
7  nature of -- the nature of the type of injury that's      10:02:20
8  being alleged, right?  You could be a plaintiff that      10:02:24
9  falls into this overpayment class, right, or you      10:02:30
10 could have this -- or you could be -- I think they      10:02:34
11 call it the failure class, but it's essentially      10:02:36
12 out-of-pocket repair costs, right?  You can't be      10:02:38
13 both?  Do we agree on that?      10:02:42
14       MR. PATTERSON:  Object to form.      10:02:54
15    A.  I think so, but I don't -- I don't know.      10:03:01
16 BY MR. PRUITT:      10:03:05
17    Q.  Okay.  You don't know whether your model      10:03:06
18 could or should be used to calculate overpayment      10:03:08
19 damages?      10:03:12
20       MR. PATTERSON:  Object to form.      10:03:14
21    A.  I didn't intend it to calculate overpayment      10:03:15
22 damages.      10:03:18
23 BY MR. PRUITT:      10:03:20
24    Q.  Okay.  Did you create your model intending      10:03:21
25 for it to -- to calculate only for individuals who      10:03:25

Page 97

1  experienced out-of-pocket repair costs?      10:03:39
2     A.  It's capturing that experiential effect.      10:03:46
3     Q.  And it's meant to capture that effect,      10:03:49
4  right?      10:03:53
5     A.  Yes.      10:03:53
6     Q.  Okay.  So if we are trying to figure out      10:03:56
7  whether someone had that experiential effect, as you      10:04:01
8  put it, how would you go about that for -- for that      10:04:09
9  plaintiff -- or class member?      10:04:15
10       MR. PATTERSON:  Object to form.      10:04:19
11    A.  If I understand the question right, I don't      10:04:36
12 think that's something I have an opinion on.      10:04:38
13 BY MR. PRUITT:      10:04:42
14    Q.  Well, I'm asking you, so imagine -- let me      10:04:42
15 say it a little bit differently.  Imagine the Court      10:04:47
16 adopts these -- both of these models.  I'm trying to      10:04:50
17 get at how do you -- how do you figure out which      10:04:55
18 model applies to a particular person and what the      10:04:57
19 process is for going through that to figure out, do      10:05:00
20 they go in the overpayment bucket, or do they go in      10:05:04
21 the out-of-pocket bucket?  So do you understand      10:05:06
22 that?      10:05:10
23       MR. PATTERSON:  Object to the question.      10:05:13
24    A.  Yes.  And I'm trying to help, but all I can      10:05:16
25 really do is speak for myself, the model and the      10:05:21

25 (Pages 94 - 97)

Page 174

1    Q.  Yeah.  Did you know anything firsthand about    12:54:30
2  what they were talking about in the testimony you    12:54:33
3  reviewed?                                            12:54:36
4    A.  I don't think so.                              12:54:37
5    Q.  Did you review any testimony by any            12:54:45
6  plaintiffs in this case?  Deposition testimony?      12:54:47
7    A.  I don't think so.  If I did, it would have     12:54:49
8  been on my list of documents.                        12:54:51
9    Q.  Did you ask the Plaintiffs' Counsel at any     12:54:58
10  time to provide you with records of actual GM       12:55:03
11  repairs associated with CP4 replacements in the     12:55:13
12  class vehicles?                                     12:55:17
13    A.  Early on we talked about that, and yes.  I    12:55:19
14  think I -- I think we did talk about that early     12:55:33
15  on.                                                 12:55:36
16    Q.  And but, ultimately, what happened?  You      12:55:40
17  didn't get them?                                    12:55:43
18    A.  The -- the agreement between the Parties      12:55:45
19  gave a much better standardized format, which was   12:55:50
20  the customer pay file, and the attempts to get      12:55:54
21  records of repairs.  I understand there were two    12:56:05
22  contemplated, one being dealerships, the other being 12:56:08
23  from GM dealerships, which was superseded by        12:56:11
24  agreeement between the parties, and then they --    12:56:17
25  they gave me what they had from the named           12:56:20

Page 175

1  plaintiffs.                                          12:56:23
2    Q.  So back to your report, paragraph 23, you      12:56:25
3  mentioned the customer pay data set.  That's one of  12:56:57
4  the data sources you relied on for your work; is     12:57:03
5  that right?                                          12:57:07
6    A.  Yes.                                           12:57:07
7    Q.  And you provide an overview in paragraph 23    12:57:07
8  of all the data sets that you relied on; is that     12:57:13
9  fair?                                                12:57:32
10    A.  Yes.                                          12:57:32
11    Q.  Tell me at a high level what the customer      12:57:46
12  pay data set is.                                     12:57:50
13    ==A.  At a high level, it is records responsive to    12:57:52==
14  ==a request for service encounters where customers    12:57:56==
15  ==paid out of pocket for CP4 repairs from GM dealers    12:58:03==
16  ==in approximately 41 states, I think.    12:58:10==
17    Q.  In your view, is the customer pay data set    12:58:14
18  the most reliable data set of the ones you looked at 12:58:21
19  for estimating typical out-of-pocket repair costs,   12:58:26
20  as you put it?                                       12:58:32
21    A.  It's the most aligned with what I'm            12:58:35
22  intending to measure.  I don't consider it a more    12:58:37
23  reliable data set, but it's context versus a         12:58:39
24  warranty data set is -- it's closer and in context   12:58:43
25  to what I'm attempting to measure.                   12:58:48

Page 176

1    Q.  Okay.  It's the best source of data that you   12:58:52
2  had available for what you were trying to do,        12:58:54
3  right?                                               12:58:57
4    A.  When you add in that last clause, yes.         12:58:58
5    Q.  And the $9,551 typical figure that you came    12:59:04
6  to was a calculation that relied on data from the    12:59:09
7  customer pay data set; is that correct?              12:59:16
8    A.  Correct.                                       12:59:18
9    Q.  And by extension, your $187 million estimate   12:59:22
10  also comes from the customer pay data set plus the  12:59:30
11  additional input that you got from Dr. Edgar about  12:59:35
12  the total number; is that right?                    12:59:37
13    A.  Correct.                                       12:59:40
14    Q.  If you look at page Tab D2, page 4 -- and,     12:59:41
15  actually, would now be a good time for a quick       12:59:50
16  break?                                               12:59:55
17    MR. PATTERSON:  Yes.  It would.                    12:59:56
18    MR. PRUITT:  Do you want to do five?               12:59:57
19    MR. PATTERSON:  Five is fine for me.               12:59:59
20    MR. PRUITT:  Okay.  We can go off the              13:00:02
21  record.                                             13:00:02
22    THE VIDEOGRAPHER:  We are going off the           13:00:05
23  record at 1:00 p.m.                                 13:00:06
24      (Recess taken.)                     13:00:09
25    THE VIDEOGRAPHER:  We are going back on the       13:06:02

Page 177

1  record at 1:06 p.m.                                  13:06:03
2  BY MR. PRUITT:                                        13:06:07
3    Q.  Over the break, did you talk to anybody        13:06:07
4  about your testimony?                                13:06:09
5    A.  No.                                            13:06:10
6    Q.  All right.  Right before we broke, I was       13:06:13
7  directing you to Tab B2, page 4.  Let me know when   13:06:17
8  you are there.                                       13:06:22
9    A.  Okay.  I'm there.                              13:06:23
10    Q.  And we were talking about the customer pay    13:06:24
11  data set.  Do you recall that?                      13:06:29
12    A.  Yes.                                          13:06:31
13    Q.  What you have here, as I understand it, is    13:06:34
14  an extract from the customer pay data set; is that  13:06:38
15  right?                                              13:06:42
16    A.  That's right.                                 13:06:42
17    Q.  And, to be clear, customer pay, as you use    13:06:43
18  it, refers to a non-warranty-covered repair; is that 13:06:47
19  correct?                                            13:06:53
20    A.  Yes.                                          13:06:53
21    Q.  And so the customer pay data -- data set      13:06:57
22  does not include information about warranty          13:07:03
23  coverage; is that correct?                          13:07:08
24    A.  Generally -- generally, that's the case.      13:07:25
25  Sometimes there are notes saying we did this part   13:07:32

Page 182

```
 1                                   13:14:07
 2 BY MR. PRUITT:                    13:14:07
 3    Q.  It doesn't have a row, for instance, for   13:14:07
 4 diagnostic codes or anything like that, right?   13:14:11
 5    A.  I don't think it does.  I think I mentioned   13:14:23
 6 that.                             13:14:24
 7    Q.  And, of course, the customer pay data set   13:14:27
 8 isn't going to give you any information about how a   13:14:32
 9 vehicle was used or misused by a plaintiff,   13:14:35
10 correct?                          13:14:41
11    A.  It would not.              13:14:41
12    Q.  And it doesn't tell you anything about   13:14:45
13 whether there was misfueling for a particular   13:14:57
14 vehicle, correct?                 13:15:03
15    A.  The file that I have does not.  That's   13:15:05
16 correct.                          13:15:11
17    Q.  Did you, in calculating your -- in doing   13:15:18
18 your calculations from the customer pay data set,   13:15:25
19 were you instructed to assume that these repairs   13:15:29
20 were because of the Plaintiffs' theory of defective   13:15:38
21 CP4?                              13:15:45
22    A.  Well, first of all, the repair itself that   13:16:18
23 I'm looking for is the kits or the pre-kit   13:16:22
24 equivalent.  I don't know of a reason why that would   13:16:28
25 differ, but I used all the records in the -- at   13:16:33
```

Page 183

```
 1 least -- I think it comes in more in terms of the   13:16:38
 2 the aggregate costs.  It could certainly apply if   13:16:42
 3 there there were different aggregate number -- but   13:16:45
 4 again, I assume I'm being asked to calculate   13:16:49
 5 out-of-pocket costs because Plaintiffs are going to   13:16:55
 6 present a liability theory that seeks to recover   13:16:56
 7 them.  I don't remember if that's a specific   13:17:00
 8 instruction.  No.                 13:17:03
 9    Q.  Okay.  So just to be clear, you don't recall   13:17:04
10 being instructed to assume that each of the repairs   13:17:06
11 involving a CP4 kit or pre-kit equivalent reflected   13:17:12
12 a CP4 failure under the Plaintiffs' theory; is that   13:17:19
13 correct?                          13:17:41
14    A.  I don't think I was told to assume that   13:17:42
15 the -- in terms of the amount of the repair out of   13:17:46
16 the customer pay file, that is going for the per   13:17:53
17 unit amount, and that's what I have calculated.   13:17:56
18 There is a fair amount of filtering that gets down   13:18:01
19 to that.  I don't recall that -- that instruction,   13:18:05
20 but I don't know that it would make a difference.   13:18:09
21    Q.  Okay.  So regardless whether or not you were   13:18:16
22 instructed, did you assume, in looking at each   13:18:19
23 record and the customer pay data set, that it   13:18:22
24 reflected a CP4 failure according to the Plaintiffs'   13:18:26
25 theory?                           13:18:30
```

Page 184

```
 1    A.  No.  It's a bit different.  I assume that   13:18:31
 2 the repairs that -- the universe of repairs that I   13:18:35
 3 got was primarily made up and filtered down to from   13:18:38
 4 CP4 failures where there is a kit or pre-kit   13:18:43
 5 equivalent, which is the repair.   13:18:51
 6    Q.  Okay.  But I'm -- what I'm asking is, did   13:18:56
 7 you assume, whether you were told to or not, just   13:18:59
 8 for purposes of doing your analysis and calculating   13:19:03
 9 damages, that each of those CP4 repair kits or   13:19:07
10 repairs was because of the Plaintiffs' theory of   13:19:13
11 what was -- what's wrong with the CP4 pump?   13:19:17
12    A.  No.  I did not.             13:19:35
13    Q.  Well, is that not part of your analysis,   13:19:39
14 then?                             13:19:41
15    A.  No.  We filtered out all kinds of repairs   13:19:43
16 that look like they have -- were were different,   13:19:49
17 that they were different repairs, didn't have causal   13:19:53
18 parts.  So I don't remember the exact number that we   13:19:59
19 filtered out, but it was tens of thousands of   13:20:03
20 records that we filtered out because the repair was   13:20:07
21 not relevant, so I guess --       13:20:10
22    Q.  Yeah.  I'm sorry.  Let me ask it a little   13:20:13
23 bit differently.  The set of data from the customer,   13:20:16
24 the subset of data from the customer pay data set   13:20:21
25 that you ultimately rely on to do your calculations,   13:20:25
```

Page 185

```
 1 did you assume that each of those repairs was   13:20:31
 2 because of a CP4 pump failure under the Plaintiffs'   13:20:35
 3 theory of defect?                 13:20:41
 4    A.  Not rigidly.  I assumed that the -- the   13:20:52
 5 repairs that I used were reflective of what would   13:20:57
 6 have needed to be done if it were a repair under the   13:21:01
 7 Plaintiffs' theory.  Sorry.  I got to the same place   13:21:07
 8 in maybe a different way.          13:21:15
 9    Q.  Okay.  But, of course, you didn't actually   13:21:17
10 go in and investigate to verify that in the real   13:21:22
11 world each of these repairs was, in fact, a CP4   13:21:28
12 failure, because of the specific theory that   13:21:34
13 Plaintiffs proposed; is that correct?   13:21:38
14    A.  That's correct.            13:21:41
15    Q.  And you -- likewise, you didn't go out and   13:21:42
16 investigate in any way how many repairs in the   13:21:47
17 customer pay data set were because of factors that   13:21:53
18 were unrelated to a bad pump, whether that's   13:21:58
19 misfueling or contamination or something like that?   13:22:02
20 You didn't do that analysis, correct?   13:22:06
21       MR. PATTERSON:  Object to form.   13:22:10
22    A.  I think you meant to incorporate something   13:22:12
23 you said earlier that we were just talking about the   13:22:14
24 records.  We did a lot of work to get rid of what   13:22:16
25 looked like irrelevant repairs.  Among those I used,   13:22:20
```

47 (Pages 182 - 185)

Page 198

1  file on the same day, we excluded those from -- from   13:42:56
2  calculation, so that's one possibility, and those   13:43:01
3  would be out.   13:43:05
4      The other possibility is some of the less   13:43:07
5  common warranty categories or categories where the   13:43:10
6  customer doesn't pay, which would include what's   13:43:14
7  maybe called policy work, and those should be   13:43:17
8  captured in the warranty file.  So we did account   13:43:19
9  for that in those two ways.   13:43:22
10  Q.  Okay.  But setting aside the warranty file,   13:43:25
11  did you, for any of the examples of transactions in   13:43:28
12  the customer pay database that showed zero dollars   13:43:33
13  for cost of repairs, did you investigate whether any   13:43:37
14  of those actually were fixes for free by GM?   13:43:42
15  A.  So the thing is, if those are fixes for free   13:43:50
16  by GM, that's going to mean that GM is compensating   13:44:01
17  the dealer, and if GM is compensating the dealer,   13:44:06
18  those are going to be into the warranty file, so   13:44:10
19  what I'm telling you is that the process that we use   13:44:13
20  should -- should identify those records if they   13:44:19
21  occurred.   13:44:23
22  Q.  So, but again, I'm not asking about the   13:44:25
23  process.  I just want to know, did you actually take   13:44:27
24  any of these repair records and investigate   13:44:30
25  specifically whether it was a fix for free?   13:44:34

Page 199

1  A.  That assumes that our objective process   13:44:41
2  didn't do that.  We did our objective process, which   13:44:44
3  would -- which would capture those instances.  If   13:44:46
4  there were other instances not captured by the   13:44:53
5  process we use, in other words, already being   13:44:56
6  reflected in the GM data and the customer pay data   13:44:59
7  on the same day, which we did exclude, we did not go   13:45:03
8  beyond that to -- and there were not notes that   13:45:08
9  would advise us of that.   13:45:12
10  Q.  If the zero dollar values that you took out   13:45:16
11  actually were fixes for free, it would be wrong for   13:45:20
12  your calculations to exclude those, correct?   13:45:26
13      MR. PATTERSON:  Object to form.   13:45:33
14  A.  It may well have been captured in the   13:45:34
15  warranty file.  I don't know who is paying for these   13:45:36
16  fixes for free, but if GM is paying for them, the   13:45:40
17  warranty file has categories for -- for other   13:45:45
18  encounters where the dealer is reimbursed and the   13:45:51
19  customer is not the payer, so no.  It would not   13:45:57
20  necessarily be wrong.   13:46:00
21  BY MR. PRUITT:   13:46:01
22  Q.  If -- I just want to be clear.  You keep   13:46:01
23  talking about the warranty file.  Forget about the   13:46:05
24  warranty file for purposes of my question.  If, in   13:46:08
25  the customer pay environment, the amount charged out   13:46:11

Page 200

1  of pocket to the customer was zero dollars, it would   13:46:15
2  be an error for you to exclude that from your   13:46:19
3  calculation of typical out-of-pocket damages,   13:46:24
4  correct?   13:46:29
5      MR. PATTERSON:  Object to form.   13:46:31
6  A.  I can't forget about the warranty file,   13:46:33
7  because if something is zero dollars, it's either   13:46:36
8  charity from the dealer, or the dealer is being   13:46:41
9  reimbursed.  If the dealer is being reimbursed, then   13:46:44
10  that record is showing up elsewhere.  It may be   13:46:48
11  recorded, but it's -- it's captured in another file.   13:46:53
12  It's counted as a warranty encounter, so no.  It   13:46:59
13  would not be inappropriate to exclude it.  It would   13:47:03
14  be inappropriate to include it in a calculation of   13:47:08
15  the average.   13:47:12
16  BY MR. PRUITT:   13:47:12
17  Q.  So you would -- in that event, you would   13:47:12
18  stand by removing that data point from the database   13:47:14
19  to do your calculations, if I'm understanding you   13:47:18
20  correctly?   13:47:21
21  A.  Yes.  If there is a repair that is in the   13:47:23
22  customer pay data file, and is -- but it is actually   13:47:26
23  paid by GM, and GM reimburses the dealer, then that   13:47:31
24  is not an out-of-pocket repair.  And if it's in a   13:47:38
25  warranty file, presumably, it is being picked up in   13:47:45

Page 201

1  the account of repairs covered under warranty, so   13:47:46
2  yes.  I would -- in that circumstance, I would stand   13:47:50
3  behind that decision.   13:47:52
4  Q.  The scenario you just described, did you   13:47:53
5  that for a single transaction in your analysis of   13:47:55
6  the customer pay data set?   13:48:01
7  A.  We removed transactions that were in both   13:48:05
8  the warranty file and the customer pay file on the   13:48:08
9  same day.  I don't remember how many there were of   13:48:11
10  those, but I think there were quite a few.   13:48:14
11  Q.  Okay.  You also removed, as I understand it,   13:48:17
12  negative cost repairs; is that right?   13:48:24
13  A.  Yes.   13:48:26
14  Q.  Do you know how many there were?   13:48:28
15  A.  I don't.   13:48:31
16  Q.  Do you know one way or another whether any   13:48:33
17  customers actually received credits for repairs at   13:48:38
18  GM dealerships?   13:48:43
19  A.  As far as an encounter leading to a negative   13:49:06
20  repair cost, that doesn't sound very plausible.   13:49:10
21  Whether there was a credit prior to the calculation   13:49:15
22  of the amount that we used, I'm sure there were.  I   13:49:19
23  don't remember any specifically.   13:49:28
24  Q.  What, if anything, did you do to investigate   13:49:29
25  whether that was possible for any of the repairs in   13:49:32

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 210

1 1 and 8 on Tab 4, page 1?                                14:05:56
2    A.  One, two, three, four -- yeah, one, two,          14:06:23
3 three, four, five, six to the right class vehicles,      14:06:24
4 the relevant parts on a Class 8 not in the warranty      14:07:13
5 file on the same day, class time period.  So one         14:07:19
6 through six are done, and then you get to the blue.      14:07:23
7    Q.  Okay.  So then after Steps 1 through 6, what      14:07:28
8 you have remaining would be the red plus green dots;     14:07:34
9 is that right?                                           14:07:42
10   A.  Yes.                                              14:07:44
11   Q.  And then, at what step do you get -- do you       14:07:46
12 shrink from the red to the green?                       14:07:56
13   A.  That's Number 10.                                 14:07:59
14   Q.  So once you go through all of it, the data        14:08:01
15 cleansing steps, you end up with just the green         14:08:03
16 strip; is that fair?                                    14:08:06
17   A.  Yes.                                              14:08:07
18   Q.  And to come to your damages calculations, at      14:08:09
19 the end of the day, you removed all of the red data     14:08:16
20 points and all of the blue data points; is that         14:08:21
21 correct?                                                14:08:24
22   A.  Yes.  It turns out it doesn't even really         14:08:25
23 give you a different number from removing red, but       14:08:26
24 to get to the unexact number, you would remove red      14:08:29
25 and blue.                                               14:08:35

Page 211

1    Q.  Of all of the red data points and blue data       14:08:45
2 points that you excluded, how many of those were you     14:08:51
3 able to look at the underlying repair records from       14:08:54
4 the GM dealership for that specific transaction?         14:09:01
5    A.  Well, the -- the red -- we exclude it in the      14:09:03
6 final numbers, but we also run the numbers with the      14:09:03
7 red, and they don't change.  So, as far as the blue,     14:09:03
8 we don't have the raw data, but you can see that         14:09:03
9 the -- in -- in some of these, like cause part           14:09:03
10 number, et cetera, we are getting those from the GM     14:09:03
11 records, but we don't have -- I don't think we have     14:09:40
12 any raw records.                                        14:09:43
13   Q.  For the red or the blue, right?                   14:09:43
14   A.  I don't think -- that's right.                    14:09:43
15   Q.  So we talked about variabity that is not a        14:10:20
16 uniform price that's paid for CP4 repairs, right?       14:10:20
17   A.  It's not uniform.  That's correct.                14:10:20
18   Q.  Looking at Tab 6, page 1 of your report, how      14:10:20
19 much variability do you see in the data?                14:10:25
20   A.  For a -- I don't really know how to answer        14:10:32
21 that, but for my purposes, whether there is a           14:10:37
22 typical cost and whether that typical cost is stable    14:10:40
23 with respect to which records I include in the data,    14:12:01
24 there's almost none.                                    14:12:01
25       In terms of whether individual records can        14:12:01

Page 212

1 be different from each other, there is a fair amount     14:12:01
2 of variability, which you would expect, but the          14:12:01
3 relevant variability is the sensitivity or the          14:12:01
4 stability of the average of the measures of central      14:12:01
5 tendency on a classwide basis, and that's extremely      14:12:01
6 stable.                                                  14:12:01
7    Q.  And is there a way to -- in looking at,           14:12:01
8 let's say, the red and the green together, is there      14:12:01
9 a way to quantify the variability and the data           14:12:01
10 points that are reflected on this chart?                14:12:01
11   A.  In terms of the variability that is relevant      14:12:01
12 to what I'm doing, I haven't done that, and that's      14:12:01
13 in my report.                                           14:12:02
14   Q.  Okay.  Not -- I'm not sure what variability       14:12:03
15 is relevant, I'm saying just looking at the data,       14:12:10
16 if -- if you had to quantify how much variability       14:12:13
17 existed whenever you look at all the red and green      14:12:17
18 dots, is there a way to do that?                        14:12:21
19   A.  I don't know why -- I don't know why I            14:12:29
20 would.  It's -- what's interesting is the impact of     14:12:32
21 the variability within the red and green dots, and      14:12:38
22 there essentially isn't any impact of the               14:12:43
23 variability of the red and green dots.  So that's       14:12:46
24 what's -- that's what's relevant to my findings.  So    14:12:49
25 I have done the analysis of variability, and that       14:12:54

Page 213

1 does take into account all of the red and green         14:13:00
2 dots.                                                    14:13:04
3    Q.  When you say you have done the analysis of        14:13:05
4 variability, you quantify the variability that          14:13:08
5 includes green and red?                                 14:13:10
6    A.  Yes.                                              14:13:12
7    Q.  Where is that in your report?                     14:13:13
8    A.  That's the -- that's the range analysis and      14:13:15
9 then, also, the one that changes the order of the --    14:13:21
10 of this data, how I calculate the state averages.      14:13:25
11   Q.  Okay.  Can you point me to both of those.        14:13:29
12   A.  10-1, I think, is the first one you are           14:14:21
13 interested in.                                          14:14:24
14   Q.  Okay.  Is it your opinion that 10-1               14:14:24
15 illustrates the variability in the data that is on      14:14:24
16 Tab 6, page 1, the red and blue -- the reg and green    14:14:24
17 dots?                                                   14:14:24
18   A.  It illustrates the impact of variability,        14:14:24
19 which is what is relevant.  Yes.  Yes.  I think it     14:14:24
20 does reflect the variability, but more importantly     14:14:24
21 the impact.                                             14:14:24
22   Q.  And what's the other one that you pointed me      14:14:24
23 to?                                                     14:14:26
24   A.  This is the Tab 20.                               14:14:43
25   Q.  Uh-huh.  This changes the order of the way       14:14:45

54 (Pages 210 - 213)

Page 230

1  STATE OF ARIZONA             )
                              ) ss
2  COUNTY OF MARICOPA           )

3         BE IT KNOWN that the foregoing deposition

4  was taken by me, VICKI L. O'CEALLAIGH CHAMPION, CR

5  No. 50534, a Certified Reporter for the State of

6  Arizona; that prior to being examined, the witness

7  named was duly sworn to testify to the whole truth;

8  that the questions propounded and the answers of the

9  witness thereto were taken down by me and thereafter

10 reduced to computerized transcription under my

11 direction and supervision; that the foregoing is a

12 true and correct transcript of all proceedings had

13 upon the taking of said deposition, all done to the

14 best of my skill and ability.

15        I further certify that I am in no way

16 related to any party to said action nor in any way

17 interested in the outcome thereof.

18        I CERTIFY that I have complied with the

19 ethical obligations set forth in ACJA 7-206(F)(3)

20 and ACJA 7-206 J(1)(g)(1) and (2).

21        DATED at Phoenix, Arizona, this 29th day of

22 April, 2022.

23

24    _____

         VICKI L. O'CEALLAIGH CHAMPION

25             CR No. 50534

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830